# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### AMARILLO DIVISION

| | |
|---|---|
| THE STATE OF TEXAS,<br><br>                    *Plaintiff*,<br><br>v.<br><br>EQUAL EMPLOYMENT OPPORTUNITY COMMISSION; CHARLOTTE A. BURROWS, in her official capacity as Chairman of the Equal Employment Opportunity Commission; MERRICK B. GARLAND, in his official capacity as Attorney General of the United States; U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; XAVIER BECERRA, in his official capacity as Secretary of the Department of Health and Human Services; LISA J. PINO, in her official capacity as Director of the Department of Health and Human Services Office for Civil Rights,<br><br>                    *Defendants*. | Case No. 2:21-cv-00194-Z |

## FIRST AMENDED COMPLAINT

1.     On June 15, 2021, Charlotte Burrows, the Chairman of the Equal Employment Opportunity Commission, issued guidance purporting to set forth EEOC's interpretation of employers' obligations under Title VII of the Civil Rights Act of 1964. *See* Protections Against Employment Discrimination Based on Sexual Orientation or Gender Identity, NVTA-2021-1 (June 15, 2021) (Exhibit A).

2.     The June 15 Guidance purports to require employers, including the State of Texas, to allow exceptions from their generally applicable workplace policies on usage of bathrooms, locker rooms, and showers (collectively, "bathrooms"), dress codes, and pronoun usage, based on the subjective gender identities of their employees.

3.      That guidance misstates the law, increasing the scope of liability for the State in its capacity as an employer—and Burrows did not even have authority to issue it.

4.      On March 2, 2022, the Office of Civil Rights of the U.S. Department of Health and Human Services issued similar guidance purporting to set forth its interpretation of Section 1557 of the Affordable Care Act, 42 U.S.C. § 18116; Section 504 of the Rehabilitation Act, 29 U.S.C. 794; and Title II of the Americans with Disabilities Act, 42 U.S.C. § 12132. *See* HHS Notice and Guidance on Gender Affirming Care, Civil Rights, and Patient Privacy (March 2, 2022) (Exhibit B).

5.      The March 2 Guidance purports to empower HHS to withhold federal funding from entities, such as the State of Texas, that do not adhere to HHS's misinterpretation of their obligations under those laws. Specifically, it states—incorrectly—that doctors and other staff members at facilities that receive federal funds who comply with obligations to report suspected child abuse to State authorities may have violated federal law.

6.      Texas seeks declaratory and injunctive relief against the enforcement of the June 15 Guidance by EEOC and the March 2 Guidance by HHS.

7.      The State also seeks declaratory and injunctive relief against Attorney General Merrick B. Garland, in his official capacity as the Attorney General of the United States, who has authority to enforce EEOC's views against the States.

8.      Texas brings this suit under Section 10(a) of the Administrative Procedure Act ("APA"), 5 U.S.C. § 702; the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202; and the inherent equitable power of this Court.

9.      Texas and its constituent agencies, including the Texas Department of Agriculture ("TDA"), have the sovereign right to set their own policies on bathroom usage, dress codes, and pronoun usage within their workplaces.

10.     Texas further has the right to define and regulate the practice of medicine and the obligations of professionals toward minors who lack the power to consent to particular medical procedures.

11.     "[T]he State has a significant role to play in regulating the medical profession," *Gonzales v. Carhart*, 550 U.S. 124, 157 (2007), as well as "an interest in protecting the integrity and ethics of the medical profession." *Washington v. Glucksberg*, 521 U.S. 702, 731 (1997). This includes "maintaining high standards of professional conduct" in the practice of medicine. *Barsky v. Bd. of Regents of Univ. of N.Y.*, 347 U.S. 442, 451 (1954).

12.     Texas also has the power to protect children from abuse by their parents. "The whole subject of the domestic relations of husband and wife, parent and child, belongs to the laws of the states, and not to the laws of the United States." *In re Burrus*, 136 U.S. 586, 593–94 (1890).

## I. Parties

### A.  The State of Texas

13.     The Plaintiff is the State of Texas. Through its constituent agencies, the State employs hundreds of thousands of people. TDA alone employs approximately 615 people. The State also maintains numerous programs funded at least in part with monies received from the federal government. Texas's Health and Human Services Commission alone receives billions of dollars in federal funding per year to conduct programs such as Medicare and Medicaid.

### B.  EEOC Defendants

14.     Defendant EEOC is a federal law-enforcement agency empowered to bring civil enforcement actions against employers for violating Title VII of the Civil Rights Act of 1964. *See* 42 U.S.C. § 2000e-6. EEOC also may issue "right-to-sue" letters that allow private individuals to sue their employers for violating EEOC's interpretation of Title VII. *See id.* § 2000e-5(f).

15.     Defendant Charlotte A. Burrows is the Chairman of EEOC. She is sued in her official capacity.

16.     Defendant Merrick B. Garland is the Attorney General of the United States. He is sued in his official capacity. The Attorney General is empowered to bring civil enforcement actions against governmental employers, including the State of Texas, for alleged violations of Title VII. The Attorney General may also issue "right-to-sue" letters that allow private individuals to sue

their governmental employers, including the State of Texas, for violating EEOC's interpretation of Title VII.

## C.  HHS Defendants

17.    Defendant U.S. Department of Health and Human Services ("HHS") is a federal cabinet agency. Its  Office for Civil Rights ("OCR") is the arm of HHS charged with investigating alleged violations of the civil-rights laws pertaining to the statutes HHS administers and enforces. Among these are the Rehabilitation Act and Section 1557 of the Affordable Care Act.

18.    Defendant Xavier Becerra is the Secretary of Health and Human Services and is in charge of HHS. He is sued in his official capacity.

19.    Defendant Lisa J. Pino is the Director of OCR. She is sued in her official capacity.

## II. JURISDICTION AND VENUE

20.    The Court has federal question jurisdiction under 28 U.S.C. § 1331 because this suit concerns the scope of EEOC's and HHS's authority under federal law, and it also arises under the APA, 5 U.S.C. §§ 702–703. Further, the Court has jurisdiction to compel an officer or employee of EEOC to perform a duty under 28 U.S.C. § 1361. Finally, the Court is authorized to award the requested declaratory and injunctive relief under 5 U.S.C. § 706, 28 U.S.C. § 1361, and 28 U.S.C. §§ 2201–2202.

21.    Venue is proper in this District under 28 U.S.C. § 1391(e) because the State of Texas is a resident of this judicial district, the State and its constituent agencies have employees in this District, and a substantial part of the events or omissions giving rise to the State's claims against the unlawful agency actions of EEOC and HHS occurred in this District.

22.    This Court is authorized to award the requested declaratory and injunctive relief under the APA, the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202; 28 U.S.C. § 1361; and its general equitable powers.

## III. FACTUAL BACKGROUND

### A.  EEOC's June 15 Guidance and its Flawed Legal Foundations

#### 1.  Chairman Burrows Issues the June 15 Guidance

23.    On June 15, 2021, Burrows issued what she termed a "technical assistance document" that purportedly both "explain[ed] what the *Bostock* decision means for LGBTQ+ workers (and all covered workers) and for employers across the country" and "explain[ed] the [EEOC's] established legal positions on LGBTQ+ related matters, as voted by the Commission." Ex. A at 2–3 (citing *Bostock v. Clayton Cnty.*, ⸺ U.S. ⸺, 140 S. Ct. 1731 (2020)).

24.    The June 15 Guidance was not approved by a vote of the full Commission and was never published in the Federal Register. On information and belief, Burrows did not consult with the other Commissioners on this subject before issuing the June 15 Guidance.

25.    In question-and-answer format, the June 15 Guidance purported to describe three key substantive requirements *Bostock* had imposed on employers:

> **9. May a covered employer require a transgender employee to dress in accordance with the employee's sex assigned at birth?**
>
> No. Prohibiting a transgender person from dressing or presenting consistent with that person's gender identity would constitute sex discrimination.
>
> **10. Does an employer have the right to have separate, sex-segregated bathrooms, locker rooms, or showers for men and women?**
>
> Yes. Courts have long recognized that employers may have separate bathrooms, locker rooms, and showers for men and women, or may choose to have unisex or single-use bathrooms, locker rooms, and showers. The Commission has taken the position that employers may not deny an employee equal access to a bathroom, locker room, or shower that corresponds to the employee's gender identity. In other words, if an employer has separate bathrooms, locker rooms, or showers for men and women, all men (including transgender men) should be allowed to use the men's facilities and all women (including transgender women) should be allowed to use the women's facilities.

5

**11. Could use of pronouns or names that are inconsistent with an individual's gender identity be considered harassment?**

Yes, in certain circumstances. Unlawful harassment includes unwelcome conduct that is based on gender identity. To be unlawful, the conduct must be severe or pervasive when considered together with all other unwelcome conduct based on the individual's sex including gender identity, thereby creating a work environment that a reasonable person would consider intimidating, hostile, or offensive. In its decision in *Lusardi v. Dep't of the Army*, the Commission explained that although accidental misuse of a transgender employee's preferred name and pronouns does not violate Title VII, intentionally and repeatedly using the wrong name and pronouns to refer to a transgender employee could contribute to an unlawful hostile work environment.

Ex. A at 6–7 (citations omitted).

26.    The June 15 Guidance makes several substantive changes including requirements that employers treat biological men as women—and biological women as men—when applying sex-specific policies or using sex-specific pronouns, despite these policies disregarding the concept of gender identity.

**2.   The June 15 Guidance Relies on Two Inapplicable Sources of Authority**

27.    The June 15 Guidance justifies its rules based on two sources of authority: *Bostock* and previous EEOC decisions. Neither supports the June 15 Guidance.

28.    *Bostock* is far narrower than the June 15 Guidance. *Bostock* explicitly disclaimed that it was deciding whether "sex-segregated bathrooms, locker rooms, and dress codes" would violate Title VII. *Id*. at 1753. Nor did the Court ever address the issue of pronouns.

29.    *Bostock* did not add new categories to those protected by Title VII; it applied existing rules covering discrimination on the basis of "sex": "While *Bostock* held that Title VII protection based on sex classification includes an individual's sexual orientation [or gender identity], it did not establish a new or otherwise separate protected class, but instead clarified the scope of sex classification." *Stollings v. Texas Tech Univ.*, No. 5:20-cv-250-H, 2021 WL 3748964, at *10 (N.D. Tex. Aug. 25, 2021) (Hendrix. J.) (citing *Bostock*, 140 S. Ct. at 1739).

30.     *Bostock* did not adopt a different and broader definition of "sex." Rather, the Court "proceed[ed] on the assumption that 'sex'. . . refer[s] only to biological distinctions between male and female," and did not include "norms concerning gender identity." *Bostock*, 140 S. Ct. at 1739.

31.     The June 15 Guidance also cites "established legal positions . . . as voted by the Commission," but those authorities were not interpretations of the portions of Title VII that apply to private and State employers. Instead, they involved the distinct language that applies to federal employees.

32.     In the language that applies to private-sector and State employers, Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, *because of* such individual's race, color, religion, sex or national origin." 42 U.S.C. § 2000-e2(a)(1) (emphasis added). The language covering federal employers is broader. There, the statute states that "[a]ll personnel actions affecting employees or applicants for employment . . . shall be made *free from any discrimination based on* race, color, religion, sex, or national origin." *Id*. at § 2000e-16(a) (emphasis added).

33.     These textual differences "hold the Federal Government to a stricter standard than private employers or state or local governments." *Babb v. Wilkie*, 140 S. Ct. 1168, 1173–74 (2020) (relating to ADEA standard with identical wording to Title VII); *id*. at 1181 ("Because § 633a(a)'s language also appears in the federal-sector provision of Title VII, 42 U.S.C. § 2000e–16(a), the Court's rule presumably applies to claims alleging discrimination based on sex, race, religion, color, and national origin as well.") (Thomas, J., dissenting); *see also Smith v. City of Jackson*, 544 U.S. 228 (2005) (ADEA language should be read *in pari materia* with parallel language in Title VII); *Durr v. Dept. of Veterans Affs.*, 843 F. App'x 246, 247 (11th Cir. 2021) (per curiam) (recognizing applicability of *Babb* to Title VII and lower causation threshold in federal employment context).

### 3.   The June 15 Guidance Misapplies Title VII

34.     The bathroom, dress code, and pronoun policies targeted by the June 15 Guidance do not discriminate based on gender identity and therefore do not violate *Bostock*. While that case held that "discrimination based on homosexuality or transgender status necessarily entails discrimination based on sex," 140 S. Ct. at 1747, the June 15 Guidance instead addresses "the converse question: whether discrimination on the basis of sex necessarily entails discrimination based on transgender status." *Adams v. Sch. Bd. of St. Johns Cnty.*, 3 F.4th 1299, 1332 (Pryor, C.J., dissenting), *vacated, reh'g en banc granted,* 9 F.4th 1369 (11th Cir. 2021).

35.     As explained by Chief Judge Pryor: "Separating bathrooms by sex treats people differently on the basis of sex. . . [but] the mere act of determining an individual's sex, using the same rubric for both sexes, does not treat anyone differently on the basis of sex." *Id.* at 1325–26 (Pryor, C.J., dissenting).

36.     The June 15 Guidance explicitly allows sex-specific bathrooms and implicitly allows sex-specific dress codes and pronoun usage policies as a general matter. But it then "tr[ies] to work around [those concessions] with a linguistic device" by conflating "sex" with "gender identity." *Doe 2 v. Shanahan*, 917 F.3d 694, 723 (D.C. Cir. 2019) (Williams, J., concurring in the result) (noting transgender plaintiffs' simultaneous concession that military may have sex-specific standards and assertion that "sex" should be determined by subjective gender identity).

37.     *Bostock* never defined the terms "sexual orientation," "transgender status," or "gender identity." Indeed, the issues in *Bostock* were exclusively related to discrimination based on status; no discrimination based on conduct was at issue: "Each of the three cases before us started the same way: An employer fired a long-time employee shortly after the employee revealed that he or she is homosexual or transgender—and allegedly for no reason other than the employee's homosexuality or transgender status." 140 S. Ct. at 1737; *see also id.* at 1753 ("The only question before us is whether an employer who fires someone *simply for being* homosexual or transgender" violates Title VII) (emphasis added).

38.     Discrimination based on gender dysphoria or its treatment—which would include conduct such as opposite-sex dress, bathroom usage, or pronoun usage—is not the same as discrimination based on transgender *status*. *Shanahan*, 917 F.3d at 699–700.

39.     For all categories in Title VII (other than religion), courts have repeatedly rejected attempts to conflate volitional behavior or attributes that are associated with protected classes. *See Espinoza v. Farah Mfg. Co*., 414 U.S. 86, 88, 95 (1973) (rejecting conflation of citizenship or alienage status with Title VII category of national origin); *EEOC v. Catastrophe Mgmt. Sols.*, 852 F.3d 1018, 1032 (11th Cir. 2016) (noting "every court to have considered the issue has rejected the argument that Title VII protects hairstyles culturally associated with race") (collecting cases); *In re Union Pac. R.R. Emp. Pracs. Litig*., 479 F.3d 936, 942–45 (8th Cir. 2007) (rejecting conflation of contraception use with Title VII category of sex); *cf. Hazen Paper Co., v. Biggins*, 507 U.S. 614, 608–14 (1993) (rejecting conflation of age discrimination under ADEA with seniority or pension status).

40.     Simply put, gender identity is not more protected than race or national origin, and EEOC was wrong to do so in the June 15 Guidance. Practices or conduct associated with transgender status—as opposed to the status of feeling one is "really" the opposite sex—are not protected at all.

## B.  HHS's March 2 Guidance and Its Flawed Legal Foundations

41.     On March 2, 2022, OCR issued what it termed "additional information on federal civil rights protections . . . that apply to gender affirming care." Ex. B at 1. It was neither published in the Federal Register nor promulgated subject to notice-and-comment procedures that apply to the issuance of substantive rules.

42.     A press release accompanying the guidance stated that it was issued in direct response to "a gubernatorial order in Texas" and was "intended to remind Texas and others of the federal protections that exist" under HHS's erroneous interpretation of the law. *See* Statement by

HHS Secretary Xavier Becerra Reaffirming HHS Support and Protection for LGBTQI+ Children and Youth (Ex. C) at 1 (March 2, 2022).

43.     The "gubernatorial order" to which the press release refers is a February 22, 2022, letter from Governor Greg Abbott to Jaime Masters, Commissioner of the Texas Department of Family and Protective Services (attached as Ex. D). In that letter, Governor Abbott directs DFPS "to conduct a prompt and thorough investigation of any reported instances" of "so-called 'sex change' procedures" conducted on minors that Texas law recognizes as child abuse. Ex. D at 1. The letter incorporates an attached opinion from Texas Attorney General Ken Paxton—instructing that "DFPS and all other state agencies must follow the law as explained in OAG Opinion No. KP-0401"— concluding that "it is already against the law to subject Texas children to a wide variety of elective procedures for gender transitioning, including reassignment surgeries that can cause sterilization, mastectomies, removals of otherwise healthy body parts, and administration of puberty-blocking drugs or supraphysiologic doses of testosterone or estrogen." *Id.* (citing OAG Opn. No. KP-0401 (attached as Ex. E) and Tex. Fam. Code § 261.001(1)(A)–(D)).

44.     The March 2 Guidance does not state that it is adopting a policy. Rather, it states that it "is providing additional information on federal civil rights protections . . . that apply to gender affirming care." Ex. B at 1. In bolded, inflated-size type, it invites "[p]arents and caregivers who believe their child has been denied health care, including gender affirming care, on the basis of that child's gender identity" and "[h]ealth care providers who believe that they are or have been unlawfully restricted from providing health care to a patient on the basis of that patient's gender identity" to "file a complaint with OCR." *Id.*

45.     Section 1557 of the Affordable Care Act makes it illegal for an entity receiving funds for a program under that law to discriminate against a person's participation in or receipt of benefits under such a program based on, among other things, the person's sex. *See* 42 U.S.C. § 18116 (incorporating 20 U.S.C. § 1681 (Title IX)). According to the March 2 Guidance, "federally-funded [sic] covered entities restricting an individual's ability to receive medically

necessary care, including gender-affirming care, from their [sic] health care provider solely on the basis of their sex assigned at birth or gender identity likely violates Section 1557." Ex. B at 2.

46.     Because Section 1557 does not mention the concept of gender identity, the March 2 Guidance necessarily relies on *Bostock* for this interpretation of sex discrimination. But, as discussed above, *Bostock* proceeds directly on the assumption that "'sex' . . . refer[s] only to biological distinctions between male and female." 140 S. Ct. at 1739.

47.     Nothing in *Bostock* altered the distinction between individuals who are legal adults and individuals who are minors, nor did anything in *Bostock* indicate that conduct associated with gender identity is protected. Only discrimination that is "inextricably" related to sex is forbidden by Title VII; distinctions "related to sex in some vague sense" or having only "some disparate impact on one sex or the other" are not reached by the statute. *Id*. at 1741–42.

48.     *Bostock* did not make a protected class those suffering from gender dysphoria, "a mental health condition from which only a subset of transgender people suffer. It is a serious mental health condition that is recognized by the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders." *Shanahan*, 917 F.3d at 708 (Williams, J., concurring in the result) (cleaned up).

49.     A recommended treatment for this mental disorder "includes, as appropriate, gender transition, which includes social transition, hormone therapy, and surgical interventions to bring the body into alignment with one's gender identity." *Id*. (cleaned up). Social transition, which is "the sole choice of many, consists simply of living one's life fully in accordance with one's gender identity, which typically includes publicly identifying oneself as that gender through all of the ways that people signal their gender to others such as through their name, pronoun usage, dress, manner and appearance, and social interactions." *Id*. at 708–09 (cleaned up).

50.     By contrast, few transgender people take the extreme step of surgical body modification. Only 2% of biologically male transgender persons undergo "sex reassignment surgery"; this number is only 10% for biologically female transgender persons. *Id.* at 708.

51.     In sum, being "transgender" is defined "in terms of how one *identifies*, not how one *lives*." *Id*. at 722 (emphasis in original; cleaned up). This distinction has a meaningful practical application: "[O]nly 55% of transgender individuals report living in their preferred gender," and "of the remainder only half—27% of the total—even wished to transition at some point in the future." *Id*.

52.     "Transgender individuals have a gender identity—an internalized, felt sense of who they are as male or female—that does not align with their sex assigned at birth." *Id.* at 708 (cleaned up). But the March 2 Guidance does not address discrimination against persons based on their "internalized, felt sense of who they are as male or female"—it instead seeks to require exceptions from Texas's law regarding child abuse for medical procedures that would concededly constitute child abuse when performed on non-transgender children. But such special treatment violates *Bostock*'s admonition that "[a]n individual's homosexuality or transgender status is not relevant to" decisions governed by a prohibition on sex discrimination. *Bostock*, 140 S. Ct. at 1741.

53.     *Bostock* does not allow any expansion of this concept to conduct that may be "associated with" transgender status—or any expansion as to sexual orientation beyond the internal orientation of one's sexual attraction. Any such conduct would only be "related [to transgender status] in 'some vague sense,'" or merely have "some disparate impact" on transgender persons. *Bostock*, 140 S. Ct. at 1742. Given that many transgender persons make no attempt to socially transition through dressing as or using bathrooms of the opposite sex, or demand to be referred to by pronouns of the opposite sex—much less undergo hormone treatment or genital mutilation—such behavior is not "inextricably" related to transgender status, and thus not sufficiently related to sex to be reached by Section 1557. *Id*.

54.     The March 2 Guidance also states that "Section 504 [of the Rehabilitation Act] protects qualified individuals with disabilities from discrimination in programs and activities receiving federal financial assistance" and that "[g]ender dysphoria may, in some cases, qualify as a disability under" that law. Ex. B at 2. It concludes on that basis that "[r]estrictions that prevent otherwise qualified individuals from receiving medically necessary care on the basis or their

gender dysphoria . . . may, therefore, also violate Section 504[.]" *Id.* But Congress has explicitly exempted gender dysphoria from the definition of "disability" under Section 504 and the Americans with Disabilities Act except when that condition itself results from a physical impairment. *See* 42 U.S.C. § 12211(b).[1] Consistent with this narrow exception, Texas's child abuse laws recognize "rare circumstances" of medical necessity for "children [who] have a medically verifiable genetic disorder of sex development or do not have the normal sex chromosome structure for male or female." Ex. E at 2.

## C.  The Effect of the Guidance Documents on the State of Texas

55.    The State of Texas employs hundreds of thousands of people. TDA alone employs approximately 615 people.

56.    TDA requires its employees to dress tastefully and professionally and be well-groomed. If any employee dressed as a member of the opposite sex, TDA would consider such conduct to be a violation of its standards.

57.    TDA has both unisex single-occupancy bathrooms and bathrooms that are designated by sex. It interprets "sex" as referring to biological sex rather than gender identity. If any employee wanted to use the bathrooms designated for the opposite sex, TDA would reject such a request.

58.    TDA does not have a policy of directing its employees to use pronouns based on gender identity to refer to other employees. It also does not discipline employees based on any use of pronouns based on biological sex rather than the gender identity of other employees. If any employee wanted TDA to require other employees to use pronouns based on gender identity, TDA would reject such a request.

---

[1]    Section 1557 prohibits discrimination against those who may not be discriminated against under the Rehabilitation Act by citing to 29 U.S.C. § 794. That section defines "disability" by reference to 29 U.S.C. § 705(20). That definition states that "individual with a disability" means "any person who has a disability as defined in Section 12102 of title 42." 29 U.S.C. § 705(20)(B). Section 12102 is part of Chapter 126 of Title 42, and "[u]nder [that] chapter, the term 'disability' shall not include . . . gender identity disorders not resulting from physical impairments. . . ." 42 U.S.C. § 12211.

59.     The State of Texas receives billions of dollars of funding from the federal government each year. The most significant of those funds are those dedicated to Texas's healthcare services. In Fiscal Year 2020, Texas's Department of State Health Services received approximately $1.36 billion in federal funds; the State's Health and Human Services Commission received more than $26 billion. Those funds made up, respectively, 67% and 62% of those agencies' budgets.

60.     Covered entities that are found to violate the March 2 Guidance may lose their federal funding, be barred from doing business with the government, or risk false claims liability. 45 C.F.R. § 92.5(a).

61.     Section 1557 empowers OCR "to handle complaints, initiate and conduct compliance reviews, conduct investigations, supervise and coordinate compliance within the Department, make enforcement referrals to the Department of Justice" for violations of Section 1557. 42 U.S.C. § 92.5(b).

62.     The March 2 Guidance is a threat to the State—a threat that HHS will withhold funds to which Texas is legally entitled under the terms of the laws and regulations governing those federal programs unless it reforms its laws to comport with HHS's erroneous interpretation of federal law. Further, the March 2 Guidance itself binds HHS's employees and agents, requiring investigators and agency adjudicators to determine that the State has violated the law if its actions do not comport with the erroneous interpretation HHS has promulgated. And the threat of investigation itself imposes costs on the State; it must prepare for, and will have to defend against, investigations of the sort that HHS has explicitly invited based upon its erroneous interpretation of the law and its publicizing that erroneous interpretation to persons who would not otherwise have filed complaints that will now result in investigations.

63.     The June 15 Guidance has a direct and immediate impact on the day-to-day business of the State, its agencies, and its political subdivisions, including TDA.

64.     Plaintiff faces imminent injury for noncompliance with the June 15 Guidance in the form of EEOC investigations, Justice Department enforcement actions, and suits by "private

attorneys general," *Trafficante v. Metropolitan Life Ins. Co.*, 409 U.S. 205, 211 (1972), authorized by the Justice Department. State employers, including TDA, no less than private ones, are susceptible to "charges" of discrimination based on EEOC's unlawful interpretation of Title VII. *See* 42 U.S.C. § 2000e-5(b).

65.     The only difference between EEOC's authority regarding State employers and private ones is that the Commission generally does not have the authority to directly initiate a civil enforcement action against the former. *See* 42 U.S.C. § 2000e-5(f)(1). When it is a State employer that allegedly committed an unlawful employment practice, EEOC must refer the charge of discrimination to the Attorney General. *Id*. The Attorney General, in turn, can either sue the State or authorize the employee to do so. *Id*.

66.     But EEOC does have the authority to investigate and adjudicate Title VII claims against a State employer where the claim is on behalf of certain high-level state employees. *See* 42 U.S.C. § 2000e-16c; 29 C.F.R. §§ 1603.109, 1603.304.

67.     The State and its agencies often face lawsuits under Title VII, including on the basis of sex discrimination.

68.     Burrows—in the name of EEOC—has issued a substantive interpretation of Title VII that purports to preempt the State's sovereign power to enact and abide by its workplace policies. The State must analyze, agency by agency, the risk of EEOC investigations arising from the June 15 Guidance's standards, facing the forced choice of either changing their policies at taxpayer expense or ignoring the June 15 Guidance and accepting impending enforcement actions and increased costs of litigation and liability under Title VII.

### IV. CLAIMS FOR RELIEF

### COUNT I

### EEOC Defendants: Action Not in Accordance With Law

69.     The June 15 Guidance is a final agency action reviewable under the APA. *See* 5 U.S.C. § 701(a). There is no "evidence of legislative intention to preclude review" of the June 15

Guidance, much less the "clear and convincing evidence" that is required. *Japan Whaling Assn. v. Am. Cetacean Socy.*, 478 U.S. 221, 230 n.4 (1986).

70.     The June 15 Guidance is not in accordance with law because it contradicts Title VII. Title VII, as interpreted by *Bostock*, forbids discrimination based on sexual orientation and gender identity because discriminating on those grounds treats employees differently based on the biological distinction between male and female. The June 15 Guidance, on the other hand, requires employers to treat employees of the same sex differently based on the employee's gender identity—it does this by mandating accommodations for transgender employees with regard to workplace policies that are not based on gender identity.

71.     It therefore violates the APA. It is both "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(A), (C).

72.     Because the March 2 Guidance are not in accordance with the law, it is invalid and must be set aside. 5 U.S.C. § 706.

## COUNT II

### EEOC Defendants: Substantive Violation of the First Amendment

73.     The June 15 Guidance is "not in accordance with law" and "contrary to constitutional right, power, privilege, or immunity," 5 U.S.C. § 706(2)(A)–(B), because it violates the First Amendment to the U.S. Constitution.

74.     By purporting to require that employers and their employees use of an individual's preferred pronouns based on subjective gender identity rather than biological sex, the June 15 Guidance unconstitutionally compels and restrains speech. *Meriwether v. Hartop*, 992 F.3d 492 (6th Cir. 2021).

75.     Adopting the policies required by the June 15 Guidance would cause Texas to violate its employees' free speech rights.

16

## COUNT III

**EEOC Defendants: Procedural Violation of Title VII—Failure to Follow Statutory Requirements to Issue Technical Assistance**

76.    The June 15 Guidance is a final agency action.

77.    The June 15 Guidance is categorized as a "technical assistance document," Ex. A at 1, but was not adopted by the means prescribed by Title VII for such documents.

78.    EEOC has the power "to furnish to persons subject to this subchapter such technical assistance as they may request to further their compliance with this subchapter or an order issued thereunder." 42 U.S.C. § 2000e-4(g)(3).

79.    Exercising that power, just like "exercis[ing] all the powers of the Commission," requires action of a majority of "a quorum" of "three members." *Id*. § 2000e-4(c). Although the Chairman, acting alone, is responsible "for the administrative operations of the Commission," *id*. § 2000e-4(a), she cannot provide "technical assistance," *id*. § 2000e-4(g)(3).

80.    The June 15 Guidance was also not issued in accordance with Title VII's process for providing technical assistance.

81.    Title VII establishes "a revolving fund . . . to pay the cost (including administrative and personnel expenses) of providing . . . technical assistance." *Id*. § 2000e-4(k)(1). To replenish the fund, EEOC must "charge fees . . . to offset the costs of . . . technical assistance." *Id*. § 2000e-4(k)(2)(A). "Such fees" must "be imposed on a uniform basis on persons and entities receiving such . . . assistance." *Id*. § 2000e-4(k)(2)(A)(i).

82.    EEOC has not, however, followed this process or charged any fees at all related to the June 15 Guidance; it is available for free online on the Commission's website. *See* https://www.eeoc.gov/laws/guidance/protections-against-employment-discrimination-based-sexual-orientation-or-gender.

83.    Because it did not follow the proper procedures, EEOC therefore cannot defend its issuance of the June 15 Guidance as an effort to provide "technical assistance."

84.     The June 15 Guidance therefore violates the APA. It is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations," and "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (C), (D).

## COUNT IV

**EEOC Defendants: Procedural Violation of Title VII—Issuance of an Invalid Substantive Rule**

85.     The June 15 Guidance is a final agency action.

86.     EEOC "may issue only 'procedural regulations' implementing Title VII and may not promulgate substantive rules." *Texas v. EEOC*, 933 F.3d 433, 439 (5th Cir. 2019) (citing 42 U.S.C. § 2000e-12(a)).

87.     There are "two criteria [that] distinguish [procedural rules] from substantive rules: whether the rule (1) impose[s] any rights and obligations and (2) genuinely leaves the agency and its decisionmakers free to exercise discretion." *Texas v. United States*, 809 F.3d 134, 151–155 (5th Cir. 2015) (quotation omitted). Under those criteria, the June 15 Guidance is a substantive rule.

88.     "Because the Guidance is a substantive rule, and the text of Title VII and precedent confirm that EEOC lacks authority to promulgate substantive rules implementing Title VII," *Texas*, 933 F.3d at 451, it is unlawful.

89.     The June 15 Guidance therefore violates the APA. It is both "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(A), (C).

## COUNT V

**EEOC Defendants and HHS Defendants: Failure to Follow the Requirements of Notice-and-Comment Rulemaking**

90.     The June 15 Guidance and the March 2 Guidance are final agency actions reviewable under the APA. *See* 5 U.S.C. § 701(a).

91.     Because they mandate requirements not required by Title VII or Section 1557 on employers and funding recipients, respectively, both Guidance documents are substantive or legislative rules that required notice-and-comment rulemaking. *See* 5 U.S.C. § 553. They are not exempt from the APA's notice-and-comment requirements as interpretive rules, general statements of policy, or rules of agency organization, procedure, or practice. *See id.* § 553(b)(A).

92.     Because EEOC and HHS did not use notice-and-comment procedures, the June 15 Guidance and March 2 Guidance are invalid. *See* 5 U.S.C. § 706.

## COUNT VI

### EEOC Defendants: Failure to Follow Proper Procedures—Violation of Agency's Own Regulations

93.     The June 15 Guidance is a final agency action.

94.     Burrows lacked the authority to issue the June 15 Guidance on her own. When a "guidance document sets forth the Commission's position on a legal principle for the first time or change[] the Commission's legal position on any issue, the Commission must approve the guidance document by majority vote." 29 C.F.R. § 1695.2(d).

95.     The June 15 Guidance announced a new legal position: that non-federal employers are obligated to treat biological men as women and treat biological women as men. *See* Ex A at Questions 9–11.

96.     The June 15 Guidance attempts to downplay the significance of this change by pointing to previous precedent about federal employers. *Id.* But as Title VII establishes different standards for federal and non-federal employers, an assertion that precedent governing federal employers extends to non-federal employers is a new legal position.

97.     Because the Commission did not "approve the guidance document by a majority vote," 29 C.F.R. § 1695.2(d), it is invalid.

98.     Alternatively, even if the June 15 Guidance did not set forth a new or changed position under 29 C.F.R. § 1695.2(d), Burrows would have had to circulate the document "to the Commission for informational purposes for a period of not less than five days, unless emergency

circumstances do not allow." *Id.* On information and belief, she did not do so. Nor did she invoke the "emergency circumstances" exception that would have allowed her to do so. *See* Ex. A. Indeed, she could not have done so as there was no basis to do so. The June 15 Guidance is thus procedurally invalid.

99.     More, Burrows violated the procedural requirements governing cost estimates. EEOC's procedural obligations turn in large part on whether a guidance document is "significant." *Compare* 29 C.F.R. § 1695.5(a) (imposing requirements for "[e]ach proposed significant guidance document"), and *id.* § 1695.4(b) (the procedures described in § 1695.5" are not required "[i]f the guidance document is determined not to be significant"). To avoid gamesmanship, the regulations explain how to determine significance.

100.     Second, before issuing guidance, EEOC must provide the Office of Information and Regulatory Affairs "an opportunity to review a guidance document to determine if it meets the definition of "'significant guidance document.'" 29 C.F.R. § 1695.4(a). On information and belief, Burrows did not.

101.     Because EEOC did not comply with its own rules, the June 15 Guidance violates the APA because it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," and "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D).

## COUNT VII

### EEOC Defendants and HHS Defendants: Failure to Follow Proper Procedures—Failure to Publish Substantive Rule of General Applicability

102.     The June 15 Guidance and the March 2 Guidance are final agency actions reviewable under the APA. *See* 5 U.S.C. § 701(a).

103.     The Freedom of Information Act requires agencies to publish in the Federal Register all "substantive rules of general applicability adopted as authorized by law, and statements of general policy or interpretations of general applicability formulated and adopted by the agency." 5 U.S.C. § 552(a)(1)(D).

104.     The June 15 Guidance and March 2 Guidance are substantive rules of general applicability because they bind their respective staff to a legal interpretation that is not commanded by any statute. However, neither was published in the Federal Register.

105.     The June 15 Guidance and March 2 Guidance therefore violate the APA. They are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations," and "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (C), (D).

## COUNT VIII

**EEOC Defendants: Substantive Violation of the Eleventh Amendment**

106.     The June 15 Guidance is a final agency action.

107.     The June 15 Guidance is "not in accordance with law" and "contrary to constitutional right, power, privilege, or immunity," 5 U.S.C. § 706(2)(A)–(B), because its interpretation of Title VII violates the Eleventh Amendment to the U.S. Constitution.

108.     Congress may use its authority to enforce the Fourteenth Amendment to abrogate the States' sovereign immunity only to remedy violations of the Constitution by the States; it may not substantively redefine a State's constitutional obligations. *See City of Boerne v. Flores*, 521 U.S. 507, 520 (1997) (requiring "congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end").

109.     Congress never identified any pattern of discrimination by the States against employees based on homosexual status or transgender status, let alone one that amounted to a constitutional violation.

110.     Because the June 15 Guidance is an unlawful attempt to abrogate Plaintiff's sovereign immunity, it is unconstitutional.

## COUNT IX

**EEOC Defendants and HHS Defendants: Arbitrary and Capricious Agency Action**

111.    The June 15 Guidance and the March 2 Guidance are final agency actions reviewable under the APA. *See* 5 U.S.C. § 701(a).

112.    The APA's prohibition against arbitrary and capricious agency action requires federal agencies to engage in "reasoned decision-making." *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 374 (1998) (quotation marks omitted). "Not only must an agency's decreed result be within the scope of its lawful authority, but the process by which it reaches that result must be logical and rational." *Id*. Put differently, "agency action is lawful only if it rests 'on a consideration of the relevant factors.'" *Michigan v. EPA*, 576 U.S. 743, 750 (2015) (quoting *State Farm*, 463 U.S. at 43).

113.    The June 15 Guidance did not articulate reasons that justify extending precedent governing federal employers to non-federal employers, whose liability is judged under a different standard.

114.    The March 2 Guidance did not articulate reasons that justify extending *Bostock*'s interpretation of "sex" as relating to the biological differences between men and women to gender dysphoria. Nor did it articulate reasons to disregard Congress's exclusion of gender dysphoria from the definition of "disability" subject only to a narrow exception.

115.    The absence of reasoning dooms any administrative action. "[A] court may uphold agency action only on the grounds that the agency invoked when it took the action." *Michigan*, 576 U.S. at 758 (citing *SEC v. Chenery Corp*., 318 U.S. 80, 87 (1943)). Because there is no "basis articulated in the order by the agency itself," the June 15 Guidance and the March 2 Guidance cannot "be upheld." *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168–69 (1962).

116.    This result is the same even if the June 15 Guidance or March 2 Guidance were determined to be interpretive rules. An agency has an "obligation to explain its reasoning on the record" for interpretive rules just as it does for legislative rules. *Yale-New Haven Hosp. v. Leavitt*, 470 F.3d 71, 82 (2d Cir. 2006); *see Perez v. Mortgage Bankers Assn.*, 575 U.S. 92, 105–06 (2015) When an agency, as EEOC did with the June 15 Guidance and HHS did with the March 2 Guidance, offers "no contemporaneous explanation at all in promulgating the" interpretive rule at

issue, the rule is invalid. *Id*. at 83; *see also Hicks v. Comm'r of Soc. Sec*., 909 F.3d 786, 808 (6th Cir. 2018) (interpretation arbitrary and capricious because the agency's rule "did not include any of the reasons it now offers for" its interpretation).

117.     Even if EEOC or HHS had provided some explanation, the June 15 Guidance and March 2 Guidance would be arbitrary and capricious. "Agency action is lawful only if it rests on a consideration of the relevant factors." *Michigan*, 576 U.S. at 750 (internal quotation marks omitted). By implicitly equating federal employers and other employers, Burrows ignored EEOC's previous decisions. Similarly, the March 2 Guidance gives no evidence that HHS considered any factors other than its erroneous interpretation of the law. Indeed, it evinces a disregard for the law, directly contradicting Congress's definition of "disability" to exclude gender dysphoria with a narrow exception by implying that the exception applies to orders of magnitudes more persons than it in fact does.

118.     EEOC and HHS "entirely failed to consider [those] important aspect[s] of the problem" each was purporting to address. *Dept. of Homeland Sec. v. Regents of the Univ. of Cal*., 140 S. Ct. 1891, 1913 (2020) (quoting *Motor Vehicle Mfrs. Assn. of U.S., Inc. v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 51 (1983)). The June 15 Guidance and the March 2 Guidance are therefore arbitrary and capricious, and each must be set aside.

## COUNT X

### HHS Defendants: Action Not in Accordance With Law

119.     The March 2 Guidance is a final agency action.

120.     The APA prohibits agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

121.     The March 2 Guidance is not in accordance with law. The March 2 Guidance purports to empower HHS to withhold federal funds from a state based on an erroneous interpretation of sex discrimination in Section 1557. The actions the Guidance purports to target— the basis on which HHS purports that it has the right to withhold federal funding—does not

discriminate based on the concept of gender identity, but disregards that concept altogether, as *Bostock* requires. Texas's child abuse laws forbid sterilization, genital mutilation, or unnecessary medical interventions for minors regardless of the gender identity of any persons. The March 2 Guidance does not challenge these generally applicable rules of Texas law, but interprets Section 1557 as requiring exemptions form those laws for persons who identify as transgender. But *Bostock* does not require such accommodations—indeed, it forbids them.

122.    The March 2 Guidance therefore violates the APA. It is both "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(A), (C).

123.    Because the March 2 Guidance are not in accordance with the law, it is invalid and must be set aside. 5 U.S.C. § 706.

## COUNT XI

### EEOC Defendants and HHS Defendants: Ultra Vires Action

124.    A plaintiff has a cause of action "at equity," *Green Valley Spec. Util. Dist. v. City of Schertz*, 969 F.3d 460, 475 (5th Cir. 2020) (en banc), arising from "a long history of judicial review of illegal executive action, tracking back to England." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326–27 (2015). "Equity thus provides the basis for relief—the cause of action, so to speak"—when a plaintiff seeks prospective relief "with respect to violations of federal law by federal officials." *Simmat v. U.S. Bur. of Prisons*, 413 F.3d 1225, 1232 (10th Cir. 2005) (McConnell, J.); *Armstrong*, 575 U.S. at 327 (citing *Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 108 (1902)). *See also Stark v. Wickard*, 321 U.S. 288, 310 (1994) ("[U]nder Article III, Congress established courts to adjudicate cases and controversies as to . . . the exertion of unauthorized administrative power.")

125.    "When an executive acts ultra vires, courts are normally available to reestablish the limits on his authority." *Dart v. United States*, 848 F. 2d 217, 224 (D.C. Cir. 1988). "Nothing in

the subsequent enactment of the APA altered the *McAnnulty* doctrine of review. It does not repeal the review of ultra vires actions that was recognized long before, in *McAnnulty*." *Id.*

126.    The State can bring a "non-statutory review action," and courts have authority to review federal executive action that exceeds statutory authorization. *Chamber of Commerce of U.S. v. Reich*, 74 F.3d 1322, 1327–32 (D.C. Cir. 1996). Such an action need not satisfy the requirements of proceeding under the APA. *See Simmat*, 413 F.3d at 1233 n.9 (allowing constitutional claim to proceed even though plaintiff "appear[ed] to concede that his claim does not satisfy the APA's requirement of 'final agency action'").

127.    EEOC's June 15 Guidance and HHS's March 2 Guidance, and the enforcement proceedings they threaten, are just such actions. The agencies' interpretations of the law are incorrect, leading them to assume investigatory and enforcement power Congress has not awarded them. Texas is entitled to an injunction to prevent their exercise of that authority.

## V. DEMAND FOR JUDGMENT

Plaintiff the State of Texas respectfully requests the Court:

a.    Declare that the June 15 Guidance and March 2 Guidance are unlawful;

b.    Vacate and set aside the June 15 Guidance and March 2 Guidance;

c.    Issue a preliminary injunction prohibiting the EEOC Defendants from enforcing or implementing the June 15 Guidance or the interpretation of Title VII described in that guidance or, in the alternative, postponing the effective date of the June 15 Guidance;

d.    Issue a temporary restraining order and preliminary injunction prohibiting the HHS Defendants from enforcing or implementing the March 2 Guidance or the interpretation of the law described in that guidance or, in the alternative, postponing the effective date of the March 2 Guidance;

e.    Issue a permanent injunction prohibiting the EEOC Defendants from enforcing or implementing the June 15 Guidance or the statutory interpretation contained in that guidance;

f.  Issue a permanent injunction prohibiting the HHS Defendants from enforcing or implementing the March 2 Guidance or the statutory interpretation contained in that guidance;

g.  Award Texas the costs of this action and reasonable attorney's fees; and

h.  Award such other and further relief as the Court deems equitable and just.

Dated: March 9, 2022

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

WILLIAM T. THOMPSON
Deputy Chief, Special Litigation Unit
Texas Bar No. 24088531

BRENT WEBSTER
First Assistant Attorney General

*/s/ Ryan D. Walters*
RYAN D. WALTERS
*Attorney-in-Charge*
Special Counsel
Texas Bar No. 24105085

PATRICK K. SWEETEN
Deputy Attorney General for
Special Litigation

LEIF A. OLSON
Special Counsel
Texas Bar No. 24032801

OFFICE OF THE ATTORNEY GENERAL
SPECIAL LITIGATION UNIT
P.O. Box 12548 (MC-009)
Austin, Texas 78711-2548
Tel.: (512) 463-2100
Fax: (512) 457-4410
will.thompson@oag.texas.gov
ryan.walters@oag.texas.gov
leif.olson@oag.texas.gov

*Counsel for Plaintiff State of Texas*

### CERTIFICATE OF SERVICE

I certify that on March 9, 2022, this First Amended Complaint was filed through the Court's

CM/ECF system, which automatically serves it upon all counsel of record.

*/s/ Ryan D. Walters*
RYAN D. WALTERS