**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**AMARILLO DIVISION**

| | |
|---|---|
| THE STATE OF TEXAS,<br><br>    Plaintiff,<br><br>    v.<br><br>EQUAL EMPLOYMENT OPPORTUNITY<br>COMMISSION, *et al.*,<br><br>    Defendants. | Case No. 2:21-cv-00194-Z |

**PLAINTIFF'S RESPONSE TO**
**DEFENDANTS' SUPPLEMENTAL MOTION TO DISMISS**
**THE FIRST AMENDED COMPLAINT**

TABLE OF CONTENTS

Table of Contents .................................................................................................................... i

Introduction ......................................................................................................................... 1

Argument .............................................................................................................................. 4

    A.  The HHS Rule is final agency action ......................................................................... 4

        1.  The HHS Rule is a legislative—or "substantive"—rule. ............................... 5

        2.  The HHS Rule binds EEOC. ........................................................................ 8

        3.  The HHS Rule widens the field of potential plaintiffs and sets norms or safe harbors for regulated parties. .................................................................. 9

        4.  The HHS Rule is also reviewable under the Court's inherent equitable power. ......... 10

        5.  Texas has no adequate alternative remedy precluding review under the APA ........... 11

    B.  Texas has standing to challenge the HHS Rule .................................................... 13

        1.  Texas has alleged imminent injury and its claims are ripe. ............................. 15

        2.  Texas's injuries are traceable to the HHS Rule and redressable by this Court ........... 17

Conclusion .......................................................................................................................... 18

### Introduction

In February 2022, Governor Greg Abbott wrote to Jaime Masters, Commissioner of the Texas Department of Family and Protective Services, attaching an opinion from Attorney General Ken Paxton. In that letter, Governor Abbott directed DFPS "to conduct a prompt and thorough investigation of any reported instances" of "so-called 'sex change' procedures" conducted on minors that Texas law recognizes as child abuse. Supp.App.013. He issued that direction because "DFPS and all other state agencies must follow the law as explained in" the attached Attorney General Opinion. *Id.* That opinion had concluded that "it is already against the law to subject Texas children to a wide variety of elective procedures for gender transitioning, including reassignment surgeries that can cause sterilization, mastectomies, removals of otherwise healthy body parts, and administration of puberty-blocking drugs or supraphysiologic doses of testosterone or estrogen." *See* Supp.App.015–027.

On March 2, 2022, HHS's Office of Civil Rights ("OCR") issued the HHS Rule, which it termed "additional information on federal civil rights protections . . . that apply to gender affirming care." Supp.App.001–004. It was neither published in the Federal Register nor promulgated subject to notice-and-comment procedures that apply to the issuance of substantive rules. A press release from HHS Secretary Xavier Becerra accompanied the guidance. In that press release, Becerra stated that OCR had issued the guidance in direct response to "a gubernatorial order in Texas" and that it was "intended to remind Texas and others of the federal protections that exist" under HHS's erroneous interpretation of the Affordable Care Act, the Rehabilitation Act, and the Americans with Disabilities Act. Supp.App.006–008. In bolded, inflated-size type, the HHS Rule invited "[p]arents and caregivers who believe their child has been denied health care, including gender affirming care, on the basis of that child's gender identity" and "[h]ealth care providers who believe that they are or have been unlawfully restricted from providing health care to a patient on the basis of that patient's gender identity" to "file a complaint with OCR." Supp.App.002.

Section 1557 of the Affordable Care Act makes it illegal for an entity receiving funds for a program under that law to discriminate against a person's participation in or receipt of benefits under such a program based on, among other things, the person's sex. *See* 42 U.S.C. § 18116 (incorporating 20 U.S.C. § 1681 (Title IX)). The HHS Rule purported to "remind" the public that that "federally-funded [sic] covered entities restricting an individual's ability to receive medically necessary care, including gender-affirming care, from their [sic] health care provider solely on the basis of their sex assigned at birth or gender identity likely violates Section 1557." Supp.App.003. Section 1557, however, does no such thing, mentioning the concept of gender identity not at all. Instead, HHS Rule adopted a new interpretation of Section 1557, relying on an erroneous interpretation of *Bostock v. Clayton County*—which proceeds directly on the assumption that "'sex' . . . refer[s] only to biological distinctions between male and female"—to do so. 140 S. Ct. 1731, 1739 (2020). The HHS Rule purports to empower HHS to withhold federal funding from entities, such as the State of Texas, that do not adhere to that misinterpretation. Specifically, it states—incorrectly—that doctors and other staff members at facilities that receive federal funds who comply with obligations to report suspected child abuse to State authorities may have violated federal law. Supp.App.003.

The HHS Rule further states that "Section 504 [of the Rehabilitation Act] protects qualified individuals with disabilities from discrimination in programs and activities receiving federal financial assistance" and that "[g]ender dysphoria may, in some cases, qualify as a disability under" that law. Supp.App.003. It concludes on that basis that "[r]estrictions that prevent otherwise qualified individuals from receiving medically necessary care on the basis of their gender dysphoria . . . may, therefore, also violate Section 504[.]" *Id.* Congress, however, has explicitly exempted gender dysphoria

from the definition of "disability" under Section 504 and the Americans with Disabilities Act except when that condition itself results from a physical impairment. See 42 U.S.C. § 12211(b).[1]

Texas sued the Defendants to have the HHS Rule and its erroneous interpretation of the law set aside. ECF No. 31. It identified billions of dollars of funding it received from the federal government each year, particularly its Department of State Health Services and its Health and Human Services Commission. *Id.* ¶ 59. It noted that HHS's threat to withhold federal funding from it based on its enforcement of its child-abuse laws, which conflict with HHS's erroneous interpretation of the law, threatened those billions of dollars in funding and that this threat—to change its laws or risk losing funds critical to the operation of its healthcare system—threatened its sovereign right to develop and enforce a legal code and threatened it with the burden of defending itself against frivolous investigations. *Id.* ¶¶ 60–62. It charged the Defendants with violating the Administrative Procedure Act by failing to use notice-and-comment procedures before promulgating the HHS Rule, *id.* ¶¶ 90–92; by adopting an unreasoned rule that did not consider all relevant factors, *id.* ¶¶ 111–118; and by adopting a rule not in accordance with the law, *id.* ¶¶ 119–123. It also challenged the HHS Rule as *ultra vires*, *id.* ¶¶ 124–127, and invalid as having not been published in the Federal Register, *id.* at 102–105.

The Defendants have moved to dismiss those claims. ECF No. 37. Texas now responds in opposition, demonstrating why dismissal is improper. Because the Defendants' claims in their Supplemental Motion to Dismiss largely parallel the arguments they raised in their Motion to Dismiss similar claims against Defendants EEOC and Charlotte Burrows, Texas incorporates by reference the legal bases for opposing dismissal that it raised in its Opposition to that motion, ECF No. 18, and uses this opposition to address only the facts and particular arguments relevant to the claims against the HHS Defendants.

---

[1] Consistent with this narrow exception, Texas's child abuse laws recognize "rare circumstances" of medical necessity for "children [who] have a medically verifiable genetic disorder of sex development or do not have the normal sex chromosome structure for male or female." Supp.App.016.

ARGUMENT

**A. The HHS Rule is final agency action.**

Texas has previously explained in detail why the EEOC Rule constituted final agency action. ECF No. 18 at 19–29. This section will explain why that analysis also applies to the HHS Rule.

Defendants do not contest that the HHS Rule satisfies the first prong of finality, that "it marks the consummation of the agency's decisionmaking process and is not of a merely tentative or interlocutory nature." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (cleaned up). Their argument is limited to the second prong of the finality analysis, contending that the HHS Rule "does not determine Plaintiff's rights or obligations." Supp. MTD at 19. This misunderstands the nature of the finality analysis—Texas does not need to demonstrate that that the HHS Rule determines "*Plaintiff's* rights or obligations," only that it affects the rights or obligations of *someone*, including regulated parties or HHS staff. *See Texas v. EEOC*, 933 F.3d 433, 444 (5th Cir. 2019) ("Finality, however, cannot vary depending on who sued the agency; it depends on the rule itself.").

Defendants argue that the HHS Rule isn't determinative because some court "in enforcement proceedings" might find the HHS Rule's interpretation of the law to be mistaken. Supp. MTD at 20. But "reliance on formalistic criteria, such as whether the agency decision itself imposes penalties or is binding on a court" is inconsistent with the Supreme Court's emphasis on a "'pragmatic approach' to assessing whether APA review is appropriate." *Texas v. EEOC*, 827 F.3d 372, 384 (5th Cir. 2016), *opn. withdrawn on reh'g*, 838 F.3d 511 (5th Cir. 2016). "The possibility that the agency might not bring an action for penalties or, if it did, might not succeed in establishing the underlying violation [does] not rob the administrative order . . . of its legal consequences. . . ." *Rhea Lana, Inc. v. Dept. of Labor*, 824 F.3d 1023, 1032 (D.C. Cir. 2016).

Defendants also believe that if the HHS Rule is categorized as "[a]n interpretive rule and general statement of policy," it could not constitute final agency action. Supp. MTD at 19. But as

4

Texas already explained, even policy statements or interpretive rules may be final agency actions due to their effects. ECF No. 18 at 23. Several effects serve to make the HHS Rule final agency action.

First, the OCR document, Supp.App.001–004, is not the entirety of the HHS Rule. A challenged agency action with a "skeletal" explanation may be supplemented by reasons given in "accompanying explanatory correspondence" from the agency. *Alaska Dept. of Envtl. Conservation v. EPA*, 540 U.S. 461, 497 (2004). "Final agency action may result from a series of agency pronouncements rather than a single edict." *Barrick Goldstrike Mines Inc. v. Browner*, 215 F.3d 45, 48–49 (D.C. Cir. 2000) (cleaned up). "Hence, a preamble plus a guidance plus an enforcement letter from [an agency] could crystallize an agency position into final agency action." *Id.*; *see also Ciba–Geigy Corp. v. EPA*, 801 F.2d 430, 436 n.8 (D.C. Cir. 1986) (final agency action consisted of a "series of steps taken by EPA" culminating in a letter from an EPA official clarifying the agency's position). This is consistent with the "flexible and pragmatic way" in which courts apply the finality requirement. *Her Majesty the Queen in Right of Ontario v. EPA*, 912 F.2d 1525, 1531 (D.C. Cir. 1990).

An agency may not avoid judicial review "merely by choosing the form of a letter to express its definitive position on a general question of statutory interpretation." *Ciba–Geigy*, 801 F.2d at 438 n. 9. Secretary Becerra's statement "clearly and unequivocally" declared Texas's child abuse laws to be unlawful. *Her Majesty*, 912 F.2d at 1531. The challenged agency action—the HHS Rule—is the decision to mandate accommodations based on gender identity in Section 1557 and Section 504 of the Rehabilitation Act, and it is "simply *explained*" by the OCR document and Secretary Becerra's statement that accompanied it. *Texas v. Biden ("Texas MPP")*, 20 F.4th 928, 950–51 (5th Cir. 2021) (emphasis in original).

## 1. The HHS Rule is a legislative—or "substantive"—rule.

Texas previously explained in detail why the EEOC Rule contradicts Title VII—as interpreted in *Bostock*—because it did not merely forbid discrimination based on transgender status, but attempted

to protect conduct associated with transgenderism and to mandate accommodations for transgender persons from concededly lawful rules. ECF No. 18 at 2–17.

The same reasoning applies to the HHS Rule, which targets state child-abuse laws not on the basis that they discriminate against anyone based on their "internalized, felt sense of who they are as male or female," *Doe 2 v. Shanahan*, 917 F.3d 694, 708 (D.C. Cir. 2019) (Williams, J., concurring in the result), but because the targeted laws refuse to make exceptions from their generally applicable language—that is, make accommodations—based on gender identity. The child-abuse laws the HHS Rule purports to target do not discriminate based on the concept of gender identity; they disregard that concept altogether, as *Bostock* requires. *See Bostock*, 140 S. Ct. at 1741 ("[homosexuality or transgender status is not relevant to" decisions governed by a prohibition on sex discrimination). For example, Texas's child abuse laws forbid sterilization, genital mutilation, and unnecessary medical interventions for minors regardless of the minor's subjective gender identity. Supp.App.013–027.

For the same reasons that the EEOC Rule constituted a legislative rule, ECF No. 18 at 22–24, the HHS Rule is a legislative rule: neither Title IX, its implementing regulations, nor *Bostock* "compels or logically justifies" it. *Natl. Council for Adoption v. Blinken*, 4 F.4th 106, 113 (D.C. Cir. 2021). As the Fifth Circuit phrased it in rejecting a different attempt by the federal government to excuse a rule from review, "the [HHS Rule] does not simply repeat the relevant provisions of Title [IX or the other provisions it cites]. Instead, the [HHS Rule] purports to interpret authoritatively [those statutory requirements]. This court has always considered such a distinction important when deciding whether agency action is 'final' under the APA." *EEOC*, 827 F.3d at 385–86. In addition to the reasons Texas previously explained, ECF No. 18 at 2–17, the HHS Rule exceeds the outer reaches of *Bostock* because that decision did not purport to eliminate the permissibility of a distinction between legal adults and minors for irreversible medical procedures.

Defendants also maintain that the HHS Rule is "not a new interpretation of law" because it previously issued a rule explaining that "[c]ategorically refusing to provide treatment" based on gender identity is prohibited discrimination under Section 1557. Supp. MTD at 19; *see also* Supp.App.003. But nothing in that prior rule mentions the accommodation interpretation that HHS advances by requiring exemptions for transgender persons from concededly lawful policies. Supp.App.010–011. The HHS Rule therefore *is* a new interpretation of law, not only because no previous rule articulated an accommodation requirement, but also because none construed Section 1557 to require state child-abuse laws to fall silent if someone claims a transgender identity.

Furthermore, Defendants cite no prior HHS interpretation that Section 504 of the Rehabilitation Act protects as a disability "some cases" of gender dysphoria, as the OCR document asserts. Supp.App.003. The Rehabilitation Act expressly excludes "transvestism, transsexualism . . . [and] gender identity disorders not resulting from physical impairments" from its definition of disability. 29 U.S.C. § 705(20)(F)(i). And "[g]ender dysphoria, as a gender identity disorder, is specifically exempted as a disability by the Rehabilitation Act." *Michaels v. Akal Sec., Inc.*, 2010 WL 2573988, at *6 (D. Colo. June 24, 2010). *See also Parker v. Strawser Constr., Inc.*, 307 F. Supp. 3d 744, 753-54 (S.D. Ohio 2018);; *Gulley-Fernandez v. Wis. Dept. of Corr.*, 2015 WL 7777997, at *2 (E.D. Wis. Dec. 1, 2015) ("gender identity disorder is not a 'disability' under the Americans with Disabilities Act or the Rehabilitation Act."); *Mitchell v. Wall*, 2015 WL 10936775, at *1 (W.D. Wis. Aug. 6, 2015) (gender identity disorders expressly excluded from coverage under the ADA); *Kastl v. Maricopa Cnty. Cmty. Coll. Dist.*, 2004 WL 2008954, at *4 & n. 2 (D. Ariz. June 3, 2004) (equating "gender identity disorder" and "gender dysphoria" and holding them to be expressly excluded from definition of "disability"). The HHS Rule is therefore also a legislative rule on this basis.

All legislative rules are, "by definition, final agency action," *EEOC*, 933 F.3d at 441. Because neither Title VII, the Rehabilitation Act, nor *Bostock* "compels or logically justifies" the HHS Rule, it

is a legislative rule issued in violation of the APA's notice-and-comment requirements. *See NRDC v. Wheeler*, 955 F.3d 68, 84 (D.C. Cir. 2020) (because EPA "treated [a judicial decision] as having a legal effect—full vacatur—that the decision disclaimed[,] [it was] a legislative rule").

### 2. The HHS Rule binds EEOC.

Defendants do not address the binding nature of the HHS Rule on the agency—a fatal omission, as binding agency staff, as Texas previously explained, affects rights or obligations and indicates a legislative rule. ECF No. 18 at 22–26.

The Fifth Circuit has held EEOC guidance "broadly condemning" an employment practice "leaves no room for EEOC staff *not* to issue referrals to the Attorney General when an employer" implements that practice. *EEOC*, 933 F.3d at 443. The same reasoning applies here. OCR's document explaining the HHS Rule appeared to hedge the certainty of its guidance. *See, e.g.,* Supp.App.003 ("For example, if a parent and their child visit a doctor for a consultation regarding or to receive gender affirming care, and the doctor or other staff at the facility reports the parent to state authorities for seeking such care, that reporting may constitute violation of Section 1557 if the doctor or facility receives federal financial assistance. Restricting a health care provider's ability to provide or prescribe such care may also violate Section 1557."). But the HHS Rule was accompanied by the imprimatur of Secretary Becerra himself who hedged not at all. Becerra, indeed, indicated that he had already concluded that Texas's interpretation of its own child-abuse laws was "discriminatory and unconscionable," referring to "a discriminatory gubernatorial order in Texas," explaining that he had "directed [his] team to evaluate the tools at [its] disposal" to interfere with that interpretation, and inviting "[a]ny individual or family in Texas who is being targeted by a child welfare investigation because of this discriminatory gubernatorial order . . . to contact our Office for Civil Rights" to pursue that interference. Supp.App.006.

The Secretary of Health and Human Services himself has announced the Department's conclusion that Texas has violated federal law. What agency staffer has discretion to countermand him? *Cf. Profs. & Patients for Customized Care v. Shalala*, 56 F.3d 592, 599 (5th Cir. 1995) ("We would expect agency employees to consider all sources of pertinent information in performing [their] task[s], whether the information be contained in a substantive rule, an interpretive rule, or a statement of policy. Indeed, what purpose would an agency's statement of policy serve if agency employees could not refer to it for guidance?"). "Such an approach would flout the Supreme Court's repeated instruction to approach finality flexibly and pragmatically." *EEOC*, 933 F.3d at 445. The HHS Rule constitutes final agency action.

### 3. The HHS Rule widens the field of potential plaintiffs and sets norms or safe harbors for regulated parties.

Just like the EEOC Rule, the HHS Rule is "binding as a practical matter because private parties can rely on it as a norm or safe harbor by which to shape their actions." *See* ECF No. 18 at 26–29 (citing *EEOC*, 933 F.3d at 444 (cleaned up)). As in *EEOC*, the HHS Rule also "encourages" "[a]ny individual or family in Texas who is being targeted by a child welfare investigation because of this discriminatory gubernatorial order . . . to contact" the agency, Supp.App.006, "thus opening the field of potential plaintiffs." *EEOC*, 933 F.3d at 444 (citation omitted); *see also* Supp.App.002 (inviting "[p]arents or caregivers who believe their child has been denied" "gender affirming care" to "file a complaint with OCR").

The HHS Rule contains a norm or safe harbor on which HHS expects funding recipients to rely in shaping their behavior: "gender[-]affirming care for minors" must not be considered "abuse." Supp.App.002. *See also* Supp.App.003 (stating it "likely violates Section 1557" if "gender-affirming care" is reported as child abuse). Indeed, the HHS Rule, as Becerra announced, has a norm or safe harbor *specific to Texas*: to avoid loss of federal health care funding, change your child abuse laws. Supp.App.006. That this "safe harbor" is phrased in the negative ("don't do this, or you will lose

funding") rather than in the affirmative ("do this and you will avoid the loss of funding") is of no consequence. *See EEOC*, 933 F.3d at 442 (discussing "affirmative" versus "negative" jurisdictional determinations as safe harbors in *Hawkes*, 578 U.S. at 598–99).

### 4.  The HHS Rule is also reviewable under the Court's inherent equitable power.

"The ability to sue to enjoin [illegal] actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015) (citing Jaffe & Henderson, *Judicial Review and the Rule of Law: Historical Origins*, 72 L.Q. REV. 345 (1956)). An *ultra vires* claim to enjoin operation of an illegally promulgated policy and actions premised on an illegal policy is just such a claim, neither preempted by the APA nor requiring Texas to wait until the federal government makes good on its promise to act against it.

As an initial matter, even if the Defendants were correct that *ultra vires* review represents only an exception to the APA's requirement of final agency action, that would not require dismissal of Texas's claim. A plaintiff is allowed to plead in the alternative, Fed. R. Civ. P. 8(d)(2)–(3), and pleading both that the HHS Rule is a violation of the APA and that it is *ultra vires* action does not require that one of those claims be dismissed.

And more, even if the Defendants were correct that Texas needed to satisfy a two-part test to defeat their motion to dismiss, Texas does so. For one, were this suit dismissed, Texas would not have a meaningful opportunity for review before it is injured. *See Bd. of Govrs. of Fed. Reserve Sys. v. MCorp Fin., Inc.*, 502 U.S. 32, 43–44 (1991) (citing *Leedom v. Kyne*, 358 U.S. 184, 190 (1958)). It suffers from the increased regulatory burden that the HHS Rule places on it, and it suffers the pressure to change state law that violates its sovereign interest in its power to create and enforce a legal code. *Texas v. EEOC*, 933 F.3d 433, 446–47 (5th Cir. 2019) (citing *Texas v. United States*, 787 F.3d 733, 749 (5th Cir. 2015)). Without the Court's intervention, those injuries cannot be remedied. For two, there is no clear

and direct preclusion of judicial review at issue here. *Cf. MCorp*, 502 U.S. at 44 (citing *Kyne*, 358 U.S. at 190, and *Abbott Labs. v. Gardner*, 387 U.S. 136, 141 (1967)). Indeed, the Defendants' only argument is that the APA requires that judicial review come later instead of now—a rehash of their incorrect argument that the HHS Rule is not final agency action. ECF 37 at 22–23.

### 5.  Texas has no adequate alternative remedy precluding review under the APA.

For the same reasons it did not have an adequate alternative remedy against the EEOC Rule, *see* ECF No. 18 at 30–31, Texas has no adequate remedy against the HHS Rule.

As they did in their motion to dismiss, Defendants maintain that Texas's adequate remedy is to defend itself against an enforcement action. Supp. MTD at 15. But Texas cannot "initiate that process" and instead has to "wait for the Agency to drop the hammer." *Sackett v. EPA*, 566 U.S. 120, 127, 131 (2012). A pre-enforcement challenge under the APA is therefore the only "adequate remedy," even though "judicial review ordinarily comes by way of a civil action brought by the [enforcement agency]." *Id.* at 127. The cases cited by Defendants involve plaintiffs who file lawsuits to attempt to evade already-underway administrative proceedings. *See, e.g., Hinojosa v. Horn*, 896 F.3d 305 (5th Cir. 2018); *Garcia v. Vilsack*, 563 F.3d 519 (D.C. Cir. 2009); *El Rio Santa Cruz Neighborhood Health Ctr. v. U.S. Dept. of Health and Hum. Servs.*, 396 F.3d 1265 (D.C. Cir. 2005); *Temple Univ. v. Brown*, No. 00-cv-1063, 2001 WL 185535 (E.D. Pa. Feb. 23, 2001); *N.J. Hosp. Assn. v. United States*, 23 F. Supp. 2d 497 (D.N.J. 1998); *Assn. Am. Med. Colls. v. United States*, 34 F. Supp. 2d 1187 (C.D. Cal. 1998); *U.S. Steel Corp. v. Fri*, 364 F. Supp. 1013 (N.D. Ind. 1973); *Bd. of Educ of the Highland Loc. Sch. Dist. v. U.S. Dept. of Educ.*, 208 F. Supp. 3d 850 (S.D. Ohio 2016); *Elgin v. Dept. of Treas.*, 567 U.S. 1 (2012).

Here, Plaintiff is not challenging a specific agency action against it—in APA parlance, an "order"—but a generally applicable "rule." *See Texas MPP*, 20 F.4th at 982–83 (explaining the distinction). Defendants' cited cases are not on point; there is no ongoing administrative action regarding the issuance of the HHS Rule—it is complete and there is nothing that a court could

interfere with. *See Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 213 (1994) (distinguishing between statutory preclusions of individual determinations by the agency as opposed to "broad 'pattern and practice' challenges to the program" that may be challenged through the APA).

The Defendants argue to the contrary, that is, that Texas cannot seek review because the governing statute postpones judicial review until an individual determination has been made. *See Thunder Basin*, 510 U.S. at 207 (pre-enforcement challenges are prohibited if such an "intend is 'fairly discernible in the statutory scheme.'") (quoting *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 351 (1984)). That statute here does no such thing. The only language in Title IX that addresses judicial review states:

> Any department or agency action taken pursuant to section 1682 of this title *shall be subject to such judicial review as may otherwise be provided by law for similar action* taken by such department or agency on other grounds. In the case of action, not otherwise subject to judicial review, terminating or refusing to grant or to continue financial assistance upon a finding of failure to comply with any requirement imposed pursuant to section 1682 of this title, any person aggrieved (including any State or political subdivision thereof and any agency of either) *may obtain judicial review of such action in accordance with chapter 7 of Title 5* . . . .

20 U.S.C. § 1683 (emphasis added). Section 1682 in turn describes two types of agency action, "issuing rules, regulation or orders of general applicability" and "termination of or refusal to grant or to continue assistance . . . for failure to comply" with a requirement so adopted. *Id.* The agency action that Texas is challenging is not a withholding of funds—that is, an individual determination. It is the issuance of "rules, regulations, or orders of general applicability," which is "subject to judicial review as . . . provided by law for similar action[.]" 20 U.S.C. § 1682. That law is the APA, which allows for pre-enforcement review. The Fifth Circuit permitted a pre-enforcement challenge to just such "guidance" in *Texas v. EEOC*:

> Texas is not, however, simply challenging the prospect of an investigation by the EEOC. Instead, it is challenging the Enforcement Guidance itself, which

> represents the legal standards that the EEOC applies when deciding when
> and how to conduct such an investigation, and what practices may require
> charges. The Guidance is an agency determination in its final form and is
> applicable to all employers nation-wide; it is not an intermediate step in a
> specific enforcement action that may or may not lead to concrete injury.

*EEOC*, 827 F.3d at 387 (finding final agency action).

This is the same conclusion Judge O'Connor reached in *Texas v. United States* when evaluating the enforcement mechanisms at issue here. 201 F. Supp. 3d 810, 826–27 (N.D. Tex. 2016). As he held there, "Title IX [does not] present[] [a] statutory scheme[] that would preclude Plaintiffs from bringing these claims in federal district court. Indeed, the Supreme Court has held that Title IX's enforcement provisions, codified at Title 20 U.S.C. §§ 1681–1683, do[] not provide the exclusive statutory remedy for violations." *Id.* at 826 (citing *Cannon v. Univ. of Chicago*, 441 U.S. 677 (1979)). He similarly rejected in another case the argument that a "comprehensive scheme of administrative and judicial review" precluded "pre-enforcement review of [a rule issued under HHS's authority]." *Franciscan All., Inc. v. Burwell*, 227 F. Supp. 3d 660, 683 (N.D. Tex. 2016).

Texas is not asking the Court intercede in a pending administrative action, so the remedial scheme applicable to such actions is irrelevant and does not bar judicial review. The forums available under that scheme "are not adequate because Texas can only reach them by deliberately violating the law to test its validity." *Natl. Fedn. of Indep. Bus. v. Dougherty*, No. 3:16-CV-2568-D, 2017 WL 1194666, at *10 (N.D. Tex. Feb. 3, 2017) (Fitzwater, J.). *See also id.* (rejecting similar preclusion challenge because each case agency cited "was a challenge to an ongoing or impending enforcement proceeding"). The Court has jurisdiction to consider Texas's claim, and it should reject the Defendants' arguments to the contrary.

**B.   Texas has standing to challenge the HHS Rule.**

As with the EEOC Rule, *see* ECF No. 18 at 31–38, Texas has standing to challenge the HHS Rule because it directly regulates the State. When the plaintiff is "an object of the [agency's] action,"

"there is ordinarily little question that the action . . . has caused him injury, and that a judgment preventing . . . the action will redress it." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561–62 (1992). Here, there is no doubt that the State of Texas, which HHS specifically identified in issuing the HHS Rule, is "an object of [HHS's] action." Because Texas is an "object" of the Rule, all three of the constitutional standing requirements are satisfied. *Id.*

"Whether someone is an object of a regulation is a flexible inquiry rooted in common sense." *EEOC*, 933 F.3d at 446 (citation omitted). "That common sense inquiry is easy here [because the Rule] explicitly states that it applies to" entities that receive federal financial assistance from HHS; "[t]hus, by its own terms, the [HHS Rule] covers Texas." *Id.*; *see also Religious Sisters of Mercy v. Azar*, 513 F. Supp. 3d 1113, 1136 (D.N.D. 2021) ("Plaintiffs, as entities that operate health programs receiving federal financial assistance from HHS, qualify as objects of Section 1557 and its implementing regulations" and therefore have standing to challenge an interpretation of Section 1557).

Secretary Becerra's accompanying statement makes clear that one particular recipient is the primary target of the HHS Rule—the State of Texas. Supp.App.006. Because it is the object of the mandates in the HHS Rule, Texas suffers an increased regulatory burden because the HHS Rule "deems unlawful" its current child abuse policies and "warns the [S]tate that . . . it will be able to show that its current policies . . . are lawful under [Section 1557 and other provisions] only if it abandons those policies." *EEOC*, 933 F.3d at 447. "Texas [thus] faces the possibility of investigation by [HHS] and [withdrawal of federal funding] if it fails to align its laws with the [HHS Rule.]" *Id.* Texas has shown imminent injury because it "has opted to express certain values [in its child abuse laws] and the [HHS Rule] imposes a regulatory burden on Texas to comply with the [HHS Rule] to avoid enforcement actions and, consequently, pressures it to abandon its laws and policies." *Id.*; *see also EEOC*, 827 F.3d 372 at 379 (injury-in-fact requirement satisfied where "the Guidance does, at the very least, force Texas to undergo an analysis, agency by agency, regarding whether the certainty of EEOC

investigations stemming from the Enforcement Guidance's standards overrides the State's interest in not hiring felons for certain jobs").

### 1. Texas has alleged imminent injury and its claims are ripe.

Just as with the EEOC Rule, ECF No. 18 at 33–36, Texas is threatened with imminent injury and its challenge is ripe for pre-enforcement review.

"[S]tates may have standing based on . . . federal assertions of authority to regulate matters [states] believe they control." *Texas v. United States*, 809 F.3d 134, 153 (5th Cir. 2015) (citation omitted). "States possess special proficiency in the field of domestic relations, including child custody," *Reno v. Flores*, 507 U.S. 292, 310 (1993) (cleaned up), and "a significant role to play in regulating the medical profession," *Gonzales v. Carhart*, 550 U.S. 124, 157 (2007), especially where there is "medical and scientific uncertainty," *id.* at 163. This is just such a case. *See Gibson v. Collier*, 920 F.3d 212, 216, 224 (5th Cir. 2019) ("[S]ex reassignment surgery remains one of the most hotly debated topics within the medical community today."); *see also In re Burrus*, 136 U.S. 586, 593–94 (1890) ("The whole subject of the domestic relations of husband and wife, parent and child, belongs to the laws of the states, and not to the laws of the United States.").

"[T]he threat of future enforcement . . . is substantial" because the plain text of the HHS Rule applies to Texas. *Driehaus*, 573 U.S. at 157-59; *cf. Alexis Bailly Vineyard, Inc. v. Harrington*, 931 F.3d 774, 778 (8th Cir. 2019) (if "a plaintiff's intended course of action falls within a codified law's 'plain text,' a 'credible threat' of enforcement necessarily exists without more."). The HHS Rule—in both the Becerra statement and the OCR document—condemn the application of Texas's child abuse laws to "gender-affirming care." Supp.App.002, 006.

And the Defendants have not "disavowed enforcement" of the HHS Rule. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 165 (2014). Defendants' assertion that Texas lacks a basis to claim that "HHS has made a final determination as to the lawfulness of a particular act by the state with regard

to transgender minors," Supp. MTD at 13, is risible. Indeed, Secretary Becerra could hardly have threatened Texas more explicitly. Supp.App.006. When a plaintiff is subject to a threat of enforcement, "an actual . . . enforcement action is not a prerequisite to challenging the law." *Driehaus,* 573 U.S. at 158 (citing *Steffel v. Thompson*, 415 U.S. 452, 459 (1974)); *see also Bear Creek Bible Church v. EEOC*, No. 4:18-CV-00824-O, 2021 WL 5449038, at *9–12 (N.D. Tex. Nov. 22, 2021) (O'Connor, J.) (finding credible fear of enforcement satisfied ripeness and standing requirements).

"[W]here a regulation requires an immediate and significant change in the plaintiffs' conduct of their affairs with serious penalties attached to noncompliance, hardship has been demonstrated." *Suitum v. Tahoe Regional Planning Agency*, 520 U.S. 725, 743–44 (1997) (internal quotation marks omitted). And the "fear of future sanctions" to "force immediate compliance" with the HHS Rule is a sufficient hardship. *Ohio Forestry Assn. v. Sierra Club*, 523 U.S. 726, 734 (1998) (being "force[d] . . . to modify [one's] behavior in order to avoid future adverse consequences" constitutes a practical harm); *see also Barrick Goldstrike Mines*, 215 F.3d at 49 (sufficient hardship where plaintiff's "only alternative to obtaining judicial review now is to violate EPA's directives, refuse to report releases involving waste rock, and then defend an enforcement proceeding on the grounds it raises here.").

Texas is therefore injured due to the HHS Rule's "pressure[] to change state law . . . because states have a sovereign interest in the power to create and enforce a legal code." *EEOC*, 933 F.3d at 446–47 (citation omitted); *see also Tex. Office of Pub. Util. Counsel v FCC*, 183 F.3d 393, 449 (5th Cir. 1999) (federal agency's declaring authority over object of state law was a sufficient injury, even though agency had not yet exercised that authority); *Alaska v. U.S. Dept. of Transp.*, 868 F.2d 441, 443 (D.C. Cir. 1989) (standing to seek declaratory and injunctive relief "because DOT claims that its rules preempt state consumer protection statutes, [and therefore] the States have suffered injury to their sovereign power to enforce state law"). Texas's claims are ripe because they are purely legal and denying judicial review would be a hardship for Texas. *See Franciscan All.*, 227 F. Supp. 3d at 680–82

(rejecting need for factual development because "the parties do not dispute that Plaintiffs are covered entities under the Rule" and parties' disagreement "as to the Rule's exact application and effect on Plaintiffs" did not make claim unripe). The claims need no factual development because they do not involve a particular enforcement action—as discussed earlier, an "order" under the APA—but challenge the legality of a generally applicable "rule." *See Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1023 n.18 (D.C. Cir. 2000); *Ciba–Geigy*, 801 F.2d at 435.

 "[T]hese injuries are sufficient to confer constitutional standing, especially when considering Texas's unique position as a sovereign state defending its existing practices and threatened authority." *EEOC*, 827 F.3d at 379.

### 2.   Texas's injuries are traceable to the HHS Rule and redressable by this Court.

The same analysis that showed why Texas's injuries were traceable to and redressable by a judgment against EEOC, ECF No. 18 at 36–38, shows why Texas's injuries here are traceable to and redressable by a judgment against the Defendants.

There is nothing "novel" or "expansive" about Texas's request that the Court enjoin HHS from adopting the interpretation advanced in the HHS Rule rather than enjoining enforcement of the OCR memorandum. *Cf.* Supp. MTD at 8–10. The Fifth Circuit recognizes a distinction between the challenged agency action and the documents that explain it. *Texas MPP*, 20 F.4th at 950–51. Just as an appellate court's reversal of a trial court's order operates against the judgment rather than the opinion explaining that judgment, judicial relief against an agency action operates against the action—here, the adoption of the interpretation—and not just the explanatory documents. *Id.* at 951.

This would not be the first bench of this Court to grant relief of the sort Texas seeks. Indeed, it would not be the first bench to do so in the specific context of a challenge to an interpretation of Section 1557. Judge O'Connor in *Franciscan Alliance v. Becerra*:

> **PERMANENTLY ENJOIN[ED]** HHS [and] Secretary Becerra . . . from interpreting or enforcing Section 1557 of the Affordable Care Act, 42 U.S.C. § 18116(a), or any implementing regulations thereto[,] against Plaintiffs . . . in a manner that would require them to perform or provide insurance coverage for gender-transition procedures or abortions, including by denying Federal financial assistance because of their failure to perform or provide insurance coverage for such procedures or by otherwise pursuing, charging, or assessing any penalties, fines, assessments, investigations, or other enforcement actions.

553 F. Supp. 3d 361, 378 (N.D. Tex. 2021) (emphases added).

Such relief has also survived Supreme Court scrutiny in high-profile cases. In *New York v. Department of Commerce*, for example, the district court held that the Secretary of Commerce violated the APA by deciding to ask about citizenship on the census. 351 F. Supp. 3d 502, 516 (S.D.N.Y. 2019), *aff'd in part, rev'd in part on other grounds*, 139 S. Ct. 2551 (2019). In addition to vacating the memorandum reflecting that decision, that court enjoined the Secretary from asking the question "based on any reasoning that is substantially similar to the reasoning contained in that memorandum." 351 F. Supp. 3d at 676–77. Absent an injunction, the court reasoned, the Secretary "could theoretically reinstate his decision by simply re-issuing his memorandum under a new date or by changing the memorandum in some immaterial way." *Id.* (Perhaps not coincidentally, this is precisely what the Defendants claim they could do here were the HHS Rule vacated.) Despite the federal government's direct argument that such an injunction was error, the Supreme Court affirmed. *Compare* Br. for Pets., *Dept. of Commerce v. New York*, No. 18-966, 2019 WL 1093053, at *17 (U.S. Mar. 6, 2019) ("The District Court Erred in Enjoining the Secretary from Reinstating the Citizenship Question to the 2020 Decennial Census") *with* 139 S. Ct. at 2575–76 (affirming).

The relief sought by plaintiff here is apparently not so novel.

## CONCLUSION

Defendants' supplemental motion to dismiss the First Amended Complaint should be denied.

DATED: April 29, 2022

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

PATRICK K. SWEETEN
Deputy Attorney General
for Special Litigation

Respectfully submitted,

WILLIAM T. THOMPSON
Deputy Chief, Special Litigation Unit
Texas Bar No. 24088531

*/s/ Ryan D. Walters*
RYAN D. WALTERS
*Attorney-in-Charge*
Special Counsel
Texas Bar No. 24105085

LEIF A. OLSON
Special Counsel
Texas Bar No. 24032801

OFFICE OF THE ATTORNEY GENERAL
SPECIAL LITIGATION UNIT
P.O. Box 12548 (MC-009)
Austin, Texas 78711-2548
Tel.: (512) 463-2100
Fax: (512) 457-4410
will.thompson@oag.texas.gov
ryan.walters@oag.texas.gov
leif.olson@oag.texas.gov

*Counsel for Plaintiff State of Texas*

**CERTIFICATE OF SERVICE**

I certify that a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) on April 29, 2022, which automatically serves all counsel of record who are registered to receive notices in this case.

                                   /s/ *Ryan D. Walters*
                                   RYAN D. WALTERS