IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | 2:21-CV-194-Z |
| | § | |
| EQUAL EMPLOYMENT OPPORTUNITY | § | |
| COMMISSION, *et al.,* | § | |
| | § | |
| Defendants. | § | |

**ORDER**

Before the Court is Defendants'[1] Motion to Dismiss for Lack of Jurisdiction (ECF No. 12) and Supplemental Motion to Dismiss the First Amended Complaint (collectively "Motions") (ECF No. 37). Having considered the Motions and relevant law, the Court **GRANTS IN PART** and **DENIES IN PART** the Motions. The Court **DISMISSES** Count XI of the Amended Complaint.

**BACKGROUND**

**A. *Bostock* and Federal Guidance**

On June 15, 2020, the Supreme Court held Title VII's "because of . . . sex" terminology should be read to prohibit "sexual orientation" and "gender identity" discrimination. *See generally Bostock v. Clayton County*, 140 S. Ct. 1731 (2020). Exactly one year later, Charlotte Burrows, Chairman of the EEOC issued a "technical assistance document" ("June 15 Guidance") purportedly explaining "what the *Bostock* decision means for LGBTQ+ workers (and all covered

---

[1] Defendants are the Equal Employment Opportunity Commission ("EEOC"), Charlotte A. Burrows, in her official capacity as Chairman of the EEOC, Merrick B. Garland, in his official capacity as Attorney General of the United States, the United States Department of Health and Human Services ("HHS"), Xavier Becerra, in his official capacity as Secretary of HHS, and Lisa J. Pino, in her official capacity as Director of HHS's Office for Civil Rights. The Court will refer to all these parties collectively as "Defendants."

1

workers) and for employers across the country" and "explain[ed] the [EEOC's] established legal positions on LGTBQ+ related matters, as voted by the Commission." ECF No. 31-1 at 4.

On March 2, 2022, HHS's Office of Civil Rights issued a similar "Notice and Guidance" ("March 2 Guidance"). *Id.* at 14. The March 2 Guidance interprets Section 1557 of the Affordable Care Act, Section 504 of the Rehabilitation Act, and Title II of the Americans with Disabilities Act to prohibit federally funded entities from "restricting an individual's ability to receive medically necessary care, including gender-affirming care, from their health care provider solely on the basis of their sex assigned at birth or gender identity" and from "prevent[ing] otherwise qualified individuals from receiving medically necessary care on the basis of their gender dysphoria, gender dysphoria diagnosis, or perception of gender dysphoria." *Id.* at 15. HHS issued the March 2 Guidance in direct response to a Texas gubernatorial order. *See id.* at 18 ("[O]n the heels of a discriminatory gubernatorial order in Texas, Health and Human Services (HHS) Secretary Xavier Becerra released the following statement . . . [and] announced several immediate actions HHS is taking [sic] to support LGBTQI+ youth and further remind Texas and others of the federal protections that exist.").

### B. Procedural History

On September 20, 2021, Plaintiff State of Texas sued EEOC, Charlotte Burrows, in her official capacity as Chairman of the EEOC, and Merrick Garland, in his official capacity as Attorney General of the United States. On March 9, 2022, Plaintiff filed an Amended Complaint (ECF No. 31), adding HHS, Xavier Becerra, in his official capacity as Secretary of the HHS, and Lisa Pino, in her official capacity as Director of HHS's Office for Civil Rights. Plaintiff asks the Court to declare the June 15 Guidance and the March 2 Guidance (collectively "Guidances") unlawful, vacate the Guidances, issue preliminary and permanent injunctive relief enjoining

Defendants from enforcing or implementing the June 15 Guidance, issue a temporary restraining order, preliminary injunction, and permanent injunction prohibiting HHS Defendants from enforcing or implementing the March 2 Guidance, and award attorney's fees. In response, Defendants filed the instant Motions pursuant to Federal Rule of Civil Procedure 12(b)(1) arguing this Court lacks jurisdiction.

### LEGAL STANDARD

A Rule 12(b)(1) motion "allows a party to challenge the subject-matter jurisdiction of the district court to hear a case." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001). The plaintiff bears the burden to establish a court's jurisdiction. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). A federal court must "presume [it] lack[s] jurisdiction unless the contrary appears affirmatively from the record." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 n.3 (2006) (internal marks omitted). "Ultimately, a motion to dismiss for lack of subject matter jurisdiction should be granted only if it appears certain that the plaintiff cannot prove any set of facts in support of [its] claim that would entitle plaintiff to relief." *Ramming*, 281 F.3d at 161.

### ANALYSIS

Defendants argue five grounds preclude the Court's subject-matter jurisdiction: (1) the Guidances do not constitute final agency actions and are thus not subject to judicial review under the Administrative Procedure Act ("APA"); (2) Plaintiff has an adequate, alternative remedy; (3) Plaintiff lacks Article III standing to sue Defendants; (4) Plaintiff's claims are not ripe; and (5) the narrow *ultra vires* exception to the APA's final agency action requirement does not apply. The Court will evaluate each of these in turn.

### A.  The Guidances Constitute Final Agency Actions

The Court addresses the question of final agency action first because the analysis "contextualizes the standing inquiry." *Texas v. E.E.O.C.* 933 F.3d 433, 441 (5th Cir. 2019). The APA only permits judicial review of *final* agency action. 5 U.S.C. § 704. Final agency action is action that: (1) "mark[s] the consummation of the agency's decision-making process" and (2) "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (internal marks omitted). "The Supreme Court has long taken a pragmatic approach to finality, viewing the APA's finality requirement as flexible." *E.E.O.C.*, 933 F.3d at 441 (internal marks omitted).

### 1.  The Guidances mark the consummation of EEOC's and HHS's decision-making processes.

The consummation prong requires the Court to determine "whether an action is properly attributable to the agency itself and represents the culmination of that agency's consideration of the issue," or "only the ruling of a subordinate official, or tentative." *Soundboard Ass'n v. Fed. Trade Comm'n*, 888 F.3d 1261, 1267 (D.C. Cir. 2018) (internal marks omitted). Guidance letters can mark the "consummation" of an agency's decision-making process. *See Her Majesty the Queen in Right of Ontario v. E.P.A.*, 912 F.2d 1525, 1532 (D.C. Cir. 1990) (holding EPA's guidance letters constituted final agency actions because they "serve[d] to confirm a definitive position that has a direct and immediate impact on the parties").

Defendants argue the June 15 Guidance is not the consummation of EEOC's decision-making process because it "merely summarizes prior EEOC decision-making and the *Bostock* decision — it does not reflect any new decision by the agency." ECF No. 12 at 25. This argument ignores the limited reach of *Bostock*, the limited weight of EEOC's prior decisions, and the June 15 Guidance itself.

*Bostock* "did not establish a new or otherwise separate protected class, but instead clarified the scope of sex classification." *Stolling v. Tex. Tech Univ.*, No. 5:20-CV-250-H, 2021 WL 3748964, at *10 (N.D. Tex. Aug. 25, 2021); *see also Bostock*, 140 S. Ct. at 1739 (interpreting definition of "sex" rather than creating new, independent protected class); *Bear Creek Bible Church v. E.E.O.C.*, No. 4:18-CV-00824-O, 2021 WL 5449038, at *35 (N.D. Tex. Nov. 22, 2021) ("Transgender individuals are not a protected class, and the 'discrimination' must still link to biological sex."). Nor did *Bostock* broaden the definition of "sex", and the Supreme Court explicitly refused to decide whether "sex-segregated bathrooms, locker rooms, and dress codes" violate Title VII. *Bostock*, 140 S. Ct. at 1739, 1753. Yet, the June 15 Guidance does not cabin itself to *Bostock*'s holding — addressing only discrimination against employees based on their gender identity — but seeks to mandate accommodations for transgender employees from lawful, sex-based workplace rules.

*Bostock* forbids "gender identity" discrimination under the Title VII protected class "sex." But this prohibition does not necessarily include *conduct* associated with "transgenderism."[2] Specifically, *Bostock* expressly did not hold that Title VII discrimination "because of . . . sex" necessarily includes all *conduct* correlated to the protected class "sex" — or by *Bostock*'s reading, "gender identity." *See Bostock*, 140 S. Ct. 1731, 1753 ("But none of these other laws are before us; we have not had the benefit of adversarial testing about the meaning of their terms, and we do not prejudge any such question today. Under Title VII, too, we do not purport to address bathrooms, locker rooms, or anything else of the kind."); *see also Garcia v. Gloor*, 618 F.2d 264,

---

[2] The Guidances and briefs intermittently use the terms "homosexual," "bisexual," and "transgender" to refer to the categories "sexual orientation" and "gender identity" referenced in *Bostock*. Though the terminology is potentially underinclusive, overinclusive, and inaccurate, this Court will refer to "sexual orientation" and "gender identity" as collective of *all* aforementioned categories — unless particularity is necessary for the Court's analysis.

268 (5th Cir. 1980) (rejecting attempts to find discrimination based on "language" because it correlated with "national origin"); *Garcia v. Spun Steak Co.*, 998 F.2d 1480, 1489–90 (9th Cir. 1993) (holding rule mandating only English be spoken in workplace was not "national origin" discrimination); *E.E.O.C. v. Catastrophe Mgmt. Sols.*, 852 F.3d 1018, 1032 (11th Cir. 2016) ("[E]very court to have considered the issue has rejected the argument that Title VII protects hairstyles culturally associated with race"). By forcing employers to more favorably accommodate *conduct* associated with "gender identity," the June 15 Guidance exceeds the scope of Title VII and *Bostock*.

Defendants argue the June 15 Guidance merely recites "established legal positions," citing prior EEOC decisions as examples. ECF No. 12 at 11–13 (citing ECF No. 1-1 at 3–4). But these decisions are irrelevant because they interpret Title VII provisions applicable to *federal* employers — not private-sector and state employers. *Compare* 42 U.S.C. § 2000e-(2)(a)(1) (declaring it unlawful for private-sector and state employers to "fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual . . . *because of* such individual's . . . sex" (emphasis added)), *with* 42 U.S.C. § 2000e-(16)(a) ("All personnel actions affecting employees or applicants for employment . . . shall be made *free from any discrimination based on* . . . sex . . ." (emphasis added)). These differences "hold the Federal Government to a stricter standard than private employers or state or local government." *Babb v. Wilkie*, 140 S. Ct. 1168, 1173–74 (2020) (analyzing ADEA standard with identical wording to Title VII). Given the difference in language, the Court cannot assume these provisions should be interpreted synonymously. *See Neese v. Becerra*, No. 2:21-CV-163-Z, 2022 WL 1265925, at *13 (N.D. Tex. Apr. 26, 2022).

Defendants also rely on a 2016 document titled "Preventing Employment Discrimination Against Lesbian, Gay, Bisexual, or Transgender Works," highlighting consent decrees negotiated with private employers. For Defendants, this 2016 document evinces that the June 15 Guidance is nothing new. ECF No. 12 at 27. However, "adoption of a consent decree is not an agency act under the APA." *Home Builders Ass'ns of N. Cal. v. Norton*, 293 F. Supp. 2d 1, 5 (D.D.C. 2002). Contrast the 2016 document, which relies only on federal-sector decisions and cites no judicial authority, to the June 15 Guidance which asserts "established legal positions" and imposes "existing requirements under the law," particularly *Bostock*. ECF No. 1-1 at 3–4.

Finally, Defendants' argument that the June 15 Guidance is "merely a summary" ignores the operation and text of the Guidance itself. Like the assistant administrator's letter at issue in *Her Majesty the Queen in Right of Ontario* — issued under the authority of the EPA and explaining a legal position — the June 15 Guidance was issued under EEOC's authority and explicitly claims its requirements are "established legal positions" and "existing requirements under the law." ECF No. 1-1 at 3–4. Evaluating all this under the Supreme Court's instruction to approach finality flexibly and pragmatically, the June 15 Guidance "marks the consummation" of EEOC's decision-making process.

Likewise, the March 2 Guidance "marks the consummation" of HHS's decision-making process. Defendants argue the March 2 Guidance is an interpretive rule or a general policy statement, "merely provid[ing] potential applications of the law in the abstract." ECF No. 37 at 28. Thus, the March 2 Guidance does not constitute HHS's final determination of any issues. *Id.* But this argument suffers the same fate as Defendants' argument defending the June 15 Guidance as mere summarization of prior EEOC decisions and the requirements of *Bostock*. Like the June 15

Guidance — which exceeds the requirements of *Bostock*, Title VII, and prior EEOC decisions — the March 2 Guidance extends beyond the provisions of Title IX and the limits of *Bostock*.

The March 2 Guidance "does not simply repeat the relevant provisions" of the statutes and regulations it relies on. *Texas v. E.E.O.C.*, 827 F.3d 372, 385 (5th Cir. 2016). Instead, the March 2 Guidance "purports to interpret authoritatively" those statutory and regulatory requirements *Id.* The March 2 Guidance states: "Section 1557 protects the right of individuals to access the health programs and activities of recipients of federal financial assistance without facing discrimination on the basis of sex, which *includes* discrimination on the basis of *gender identity*." ECF No. 31-1 at 15 (emphasis added). Therefore — according to HHS — "[c]ategorically refusing to provide treatment to an individual based on their gender identity *is* prohibited discrimination," and "federally-funded covered entities restricting an individual's ability to receive medically necessary care, including gender-affirming care, from their health care provider solely on the basis of their sex assigned at birth or gender identity *likely violates* Section 1557." *Id.* (emphasis added).

But Section 1557 does not include the terms "sex" or "gender identity." 42 U.S.C. § 18116(a). Instead, Section 1557 expressly incorporates Title IX, which prohibits discrimination "on the basis of sex." *See id.*; 20 U.S.C. § 1681(a). Based on the ordinary public meaning conveyed when Congress enacted Title IX and "judicially accepted principles of linguistics in reading the whole — including compositionality . . . . Title IX appears to operate in binary terms — male and female — when it references 'sex.'" *Neese*, 2022 WL 1265925, at *12.

And not even the outer limits of *Bostock* justify the March 2 Guidance's interpretation of Section 1557. Though Courts *generally* apply the legal standards used in Title VII cases to adjudicate similar Title IX cases — *see, e.g.*, *Canutillo Indep. Sch. Dist. v. Leija*, 101 F.3d 393, 404 (5th Cir. 1996) (collecting cases) — Title IX and Section 1557 do not completely mirror Title VII.

In *Bostock*, the plaintiff sued for a violation of Title VII. 140 S. Ct. at 1738; 42 U.S.C. § 2000e-2(a)(1). Title VII prohibits certain employer decisions "*because of*" certain factors, including "sex." *Id.* (emphasis added). By contrast, Title IX forbids "discrimination *on the basis of* sex." 20 U.S.C. § 1681(a) (emphasis added). The Court cannot read these phrases synonymously.

The Court must give full effect to Congress's decision to use different phrases. HENRY J. FRIENDLY, MR. JUSTICE FRANKFURTER AND THE READING OF STATUTES, *in* BENCHMARKS 224 (1967) ("[W]hen Congress employs the same word, it normally means the same thing, when it employs different words, it usually means different things"). "After all, only the words on the page constitute the law adopted by Congress and approved by the President." *Bostock*, 140 S. Ct. at 1738. The Court "would risk amending [the] statutes outside the legislative process reserved for the people's representatives" should it ignore the different phrasing in Title VII and Title IX. *Id.* Based on Title VII's "because of" sex language, the Supreme Court used a "but-for" causation analysis to decide *Bostock* and hold Title VII prohibits employment discrimination because of one's gender identity. *See id.* at 1739. Because Title IX prohibits discrimination "on the basis of sex," no certainty exists that Title IX and Section 1557 similarly prohibit discrimination on the basis of gender identity. As "neither Title VII, [Title IX], . . . nor *Bostock* 'compels or logically justifies' the [March 2 Guidance], it is a legislative rule." ECF No. 42 at 9–10. Legislative rules are "by definition, final agency action." *E.E.O.C.*, 933 at 441.

### 2. *Legal consequences flow from the Guidances.*

*Bennett*'s second prong is satisfied when an agency's guidance document binds it and its staff to a legal position "produc[ing] legal consequences or determin[ing] rights and obligations." *Id.* Action binding an agency to a legal view "gives rise to direct and appreciable legal consequences." *U.S. Army Corps of Eng'rs v. Hawkes*, 578 U.S. 590, 598 (2016) (internal marks

omitted). Courts look for mandatory language to determine "whether an agency's action binds it and accordingly gives rise to legal consequences." *E.E.O.C.*, 933 F.3d at 441.

As illustrated above, the June 15 Guidance imposes new duties and "chang[ed] the text" of the statute it "profess[ed] to interpret." *POET Biorefining, LLC v. E.P.A.*, 970 F.3d 392, 407 (D.C. Cir. 2020). Although the dress-code, bathroom, and pronoun accommodations it imposes are not required by *Bostock* or EEOC's cited federal-sector employment decisions, the Guidance argues those impositions are "existing requirements under the law." ECF No. 1-1 at 3. As Plaintiff argues, these requirements are "legislative rules that impose new duties on employers." ECF No. 18 at 32. All legislative rules are, "by definition, final agency action." *E.E.O.C.*, 933 F.3d at 441.

Defendants argue the June 15 Guidance "exhibits none of the attributes that the Fifth Circuit found dispositive of final agency action in *Texas v. EEOC*," claiming the June 15 Guidance "does not indicate in *any* manner how EEOC staff must assess potential sex discrimination on the basis of sexual orientation or gender identity." ECF No. 12 at 26. But Defendants "can't have their cake and eat it too": if the June 15 Guidance states existing requirements of law and "established legal positions," how could EEOC investigators and staff not consider them *binding*?

The June 15 Guidance also uses mandatory language. *See* ECF 19-1 at 7–8 ("May a covered employer require a transgender employee to dress in accordance with the employer's sex assigned at birth? No . . . ."); *id.* ("[E]mployers may not deny an employee equal access to a bathroom . . . that corresponds to the employee's gender identity."); *id.* ("Could use of pronouns or names that are inconsistent with an individual's gender identity be considered harassment? Yes, in certain circumstances."). Such language commands, requires, orders, and dictates. *See Appalachian Power Co. v. E.P.A.*, 208 F.3d 1015, 1022–23 (D.C. Cir. 2000) (holding an EPA document constituted final agency action when "the entire Guidance, from beginning to

end . . . read like a[n] ukase."). Defendant cannot fall back on the Guidance's boilerplate provisions "stating [t]he contents of this document do not have force and effect of law and are not meant to bind the public in any way." ECF No. 19-1 at 3. Such a disclaimer does not render a guidance non-final where legal consequences still flow from it, as they do here. *See Appalachian Power*, 208 F.3d at 1023. Further, where the language of an EEOC guidance "broadly condemn[s]" an employment practice, "it leaves no room for EEOC staff *not* to issue referrals to the Attorney General when an employer" implements the condemned practice. *E.E.O.C.*, 933 F.3d at 443. Here, the challenged Guidance broadly condemns the employment practices that Plaintiff and its agencies implement, leaving no wriggle room for EEOC to issue referrals to the Attorney General. Therefore, legal consequences stem from the Guidance.

Finally, the June 15 Guidance creates safe harbors by which public employers can avoid EEOC referrals to the Department of Justice. When "the language of the agency document is such that private parties can rely on it as a norm or safe harbor by which to shape their actions, it can be binding as a practical matter." *Id*. at 442 (internal marks omitted). Here, the Guidance creates at least three safe harbors in its requirement of dress code, bathroom, and pronoun usage accommodations. And it "open[s] the field of potential plaintiffs," *id*. at 444 (internal marks omitted), inviting employees to "fil[e] a charge of discrimination against . . . a state . . . employer." ECF No. 19-1 at 8. Such an invitation imposes legal consequences.

Legal consequences also flow from the March 2 Guidance. Defendants argue the March 2 Guidance "does not purport to determine the outcome of any particular enforcement action or any rights or obligations," but "only 'remind[s] parties of existing statutory duties, [and] merely track[s] the statutory requirements and thus simply explain[s] something the statute already require[s]." ECF No. 37 at 27 (citing *Pros. & Patients for Customized Care v. Shalala*, 56 F.3d

592, 602 (5th Cir. 1995)) (internal marks omitted). First, this argument ignores the fact the March 2 Guidance does more than merely "track" and "explain" existing statutory requirements as explained above. *Supra* at 7–9.

Second, the March 2 Guidance — like the June 15 Guidance — binds agency staff. Secretary Becerra issued a statement alongside the March 2 Guidance. *See generally* ECF No.31-1 at 17–20. In that statement, Secretary Becerra decried Texas's interpretation of its own child-abuse laws as "discriminatory and unconscionable." *Id.* at 18. Secretary Becerra also stated he "directed [his] team to evaluate the tools at [its] disposal" in response to the "discriminatory gubernatorial order in Texas" and encouraging "[a]ny individual or family in Texas who is being targeted by a child welfare investigation . . . to contract our Office for Civil Rights." *Id.* Secretary Becerra's statement broadly condemns Plaintiff's interpretation of its own laws and announces HHS's determination that Plaintiff's actions violate federal law. How could HHS staff act contrary to this statement? *See Shalala*, 56 F.3d at 599 ("We would expect agency employees to consider all sources of pertinent information in performing [their] task[s], whether the information be contained in a substantive rule, an interpretive rule, or a statement of policy. Indeed, what purpose would an agency's statement of policy serve if agency employees could not refer to it for guidance?"). Thus, the March 2 Guidance — as described by Secretary Becerra — binds HHS staff.

Finally, the March 2 Guidance widens the field of potential plaintiffs. Secretary Becerra's statement encourages "[a]ny individual or family in Teas who is being targeted by a child welfare investigation because of this discriminatory gubernatorial order." ECF No. 31-1at 18. Such an invitation imposes legal consequences. And like the June 15 Guidance, the March 2 Guidance is "binding as a practical matter because private parties can rely on it as a norm or safe harbor by

which to shape their actions." *E.E.O.C.*, 933 F.3d at 444 (internal marks omitted). The March 2 Guidance declares: "'gender affirming care for minors' must not be considered 'abuse,'" threatening Plaintiff to change its child abuse laws or risk the loss of federal healthcare funding. ECF No. 42 at 11 (citing ECF No. 31-1 at 14–15). Considering the above, the Guidances mark consummations of agency action and legal consequences flow from them. As Plaintiff surpasses both prongs of the *Bennett* test, the Court finds the Guidances constitute final agency actions.

### B.  No Adequate, Alternative Remedy Precludes Judicial Review

A court may only review final agency action "for which there is no other adequate remedy in a court." 5 U.S.C. § 704. The "alternative remedy need only be adequate," and "does not need to be as effective as an APA lawsuit, merely that it provides the same genre of relief." *De La Garza Gutierrez v. Pompeo*, 741 F. App'x 994, 998 (5th Cir. 2018) (internal marks omitted). When an adequate alternative remedy exists, the district court lacks subject matter jurisdiction to adjudicate an APA claim. *Id.* at 997. Defendants argue the APA's alternative remedy provision precludes Plaintiff's claims because the State "would have an opportunity to defend itself in any future Title VII enforcement action," designating that occurrence as the proper context for the assertion of Plaintiff's defenses. ECF No. 12 at 24 (citing *NAACP v. Meese*, 615 F. Supp. 200, 203 (D.D.C. 1985)).

Defendants' arguments are belied by the very language cited in their briefs to this Court. Defendants correctly assert the alternative remedy must merely "provide the *same* genre of relief." ECF No. 12 at 23 (emphasis added). Here, Plaintiff seeks *pre-enforcement* equitable relief. Requiring Plaintiff to wait until EEOC moves to enforce the June 15 Guidance is an inadequate alternative — it precludes Texas from obtaining the pre-enforcement equitable relief it seeks and is not the "same genre of relief." Furthermore, "a plaintiff need not . . . run the risk of enforcement

proceedings or pursue an arduous, expensive, and long . . . process to seek review of an already-final agency action," like the June 15 Guidance. *De La Garza Gutierrez*, 741 F. App'x at 998 (internal marks omitted).

Nor does *Meese* support Defendants' argument. *Meese* did not concern reviewable agency action; it involved an attempt to prevent the Attorney General from reopening any consent decree pending in another court. 615 F. Supp. at 201–03. Additionally, courts in this district have rejected agency attempts to rely on *Meese* when a final rule is challenged. *See, e.g.*, *Texas v. United States*, 201 F. Supp. 3d 810, 826 n.14 (N.D. Tex. 2016).

Courts also allow pre-enforcement challenges to agency action even if the parties could raise the same arguments as defenses in a future enforcement action. *See Sackett v. E.P.A.*, 566 U.S. 120 (2012). In *Sackett*, the Supreme Court permitted a pre-enforcement challenge to an EPA compliance order even though "judicial review ordinarily comes by way of a civil action" brought by the agency. *Id*. at 127. The Court reasoned that no adequate remedy — apart from APA review — existed where plaintiffs could not "initiate that process [of judicial review]" and were forced to "wait for the Agency to drop the hammer" while accruing daily penalties. *Id*. Defendants believe *Sackett* is inapposite, arguing Plaintiff "cannot point to any injury it is currently suffering or will imminently suffer as a result of EEOC document." ECF No. 29 at 25. But like the agency action challenged in *Sackett*, EEOC forces Plaintiff to choose: (1) comply with the June 15 Guidance's accommodation mandates — against its own interests, or (2) violate the June 15 Guidance at risk of financial penalties — while waiting for EEOC and the Department of Justice to "drop the hammer." ECF No. 18 at 39–40. Similarly situated to the plaintiffs in *Sackett*, Plaintiff's only adequate remedy is judicial review under the APA.

Defendants raise the same argument regarding the March 2 Guidance: Plaintiff "may defend against any future enforcement of Section 1557 under the express administrative and judicial review provisions provided by Congress." ECF No. 37 at 23 (citing 42 U.S.C. § 18116(a)). Just as with the June 15 Guidance, Defendants expect Plaintiff to choose between compliance with the March 2 Guidance or violate the Guidance and wait for HHS to "drop the hammer" — a situation that is only abated by a pre-enforcement challenge under the APA. Though Defendants cite several cases to support their argument that review under the enforcement mechanisms of Section 1557 provides the same genre of relief — *see* ECF No. 37 at 23–25 — as Plaintiff explains, those cases "involve plaintiffs who file[d] lawsuits to attempt to evade already-underway administrative proceedings." ECF No. 42 at 13. Those cases are inapt; there is no ongoing administrative proceedings regarding the issuance of the March 2 Guidance.

Finally, Defendants aver that Section 1557's "procedure for adjudicative proceedings, followed by judicial review, plainly reflects Congress's desire to preclude pre-enforcement judicial review of [Texas's] claims." ECF No. 37 at 25. Defendants argue the Supreme Court "held that a statute providing for administrative proceedings followed by judicial review foreclose[s] a parallel challenge to an agency's statutory interpretation." *Id.* at 25–26 (citing *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 207–08 (1994). Defendants assert this case is analogous to *Thunder Basin*, and Congress's intent to preclude pre-enforcement judicial review is "fairly discernible in the statutory scheme" provided by Section 1557 through Title IX. *Id.* Specifically — like *Thunder Basin* — Defendants aver no action has been taken against Plaintiff, Plaintiff's claims turn on statutory interpretation, the statute does not evince Congress's intent to allow pre-enforcement review, and the statute provides "opportunity for judicial review if the agency files an action in federal court or seeks to withhold federal funds." *Id.*

But Title IX does not preclude Plaintiff's pre-enforcement action here. Regarding judicial review, Title IX states:

> Any department or agency action taken pursuant to section 1682 shall be subject to such judicial review as may otherwise be provided by law for similar action taken by such department or agency on other grounds. In the case of action, not otherwise subject to judicial review, terminating or refusing to grant or to continue financial assistance upon a finding of failure to comply with any requirement imposed pursuant to section 1682 of this title, any person aggrieved (including any State or political subdivision thereof and any agency of either) may obtain judicial review of such action in accordance with chapter 7 of Title 5, and such action shall not be deemed committed to unreviewable agency discretion within the meaning of section 701 of that title.

20 U.S.C. § 1683.

Section 1682 describes two types of agency action: (1) "issuing rules, regulations, or orders of general applicability" and (2) "termination of or refusal to grant or to continue assistance . . . as to whom there has been an express finding on the record . . . of a failure to comply with such requirement." *Id.* § 1682. Here, Plaintiff challenges the issuance of "rules, regulations, or orders of general applicability," which is "subject to judicial review as . . . provided by law for similar action." *Id.* §§ 1682, 1683. The law providing access to judicial review is the APA, and Title IX does not preclude review. 5 U.S.C. § 702. Other courts in this District have found the same. *See Texas v. United States*, 201 F. Supp. 3d 810, 826–27 (N.D. Tex. 2016) ("Title IX [does not] present[] [a] statutory scheme[] that would preclude Plaintiffs from bringing these claims in federal district court. Indeed, the Supreme Court has held that Title IX's enforcement provisions, codified at Title 20 U.S.C. §§ 1681–1683, do[] not provide the exclusive statutory remedy for violations."). Unlike the statute at issue in *Thunder Basin*, whose "comprehensive enforcement structure demonstrate[d] that Congress intended to preclude challenges," "[n]o similar elaborate statutory framework exists covering Plaintiff's claims." *Thunder Basin*, 510 U.S. at 200; *Texas*, 201 F. Supp. 3d at 826. Therefore, no adequate, alternative remedy exists to deprive the Court of jurisdiction.

16

**C.  Plaintiff has Article III Standing to Challenge the Guidances**

Article III standing requires: (1) an injury in fact which is concrete and particularized, actual or imminent, not conjectural or hypothetical; (2) the injury must be fairly traceable to the challenged action; and (3) the injury must be redressable by a favorable ruling. *Lujan v. Defs. of Wildlife*, 504 U.S. at 560–61. Before examining whether Plaintiff established standing under the three above elements, the Court must analyze whether Plaintiff is owed special solicitude as a State. *See Texas v. Biden*, 20 F.4th 928, 969 (5th Cir. 2021).

"Special solicitude has two requirements: (1) the State must have a procedural right to challenge the action in question, and (2) the challenged action must affect one of the State's quasi-sovereign interests." *Id*. When a State is entitled to special solicitude, "that means imminence and redressability are easier to establish here than usual." *Id*. at 970. Special solicitude also applies to the traceability element of standing. "The Fifth Circuit has explicitly interpreted special solicitude to lower the level of certainty required in the traditional causation . . . analysis." *Texas v. United States*, 549 F. Supp. 3d 572, 585 (S.D. Tex. July 16, 2021) (citing *Texas v. United States*, 809 F.3d 134, 159 (5th Cir. 2015)).

Plaintiff satisfies both prongs. Assertion of a procedural right under the APA to challenge an agency action satisfies the first prong. *Texas*, 20 F.4th at. at 970; *see also Texas*, 809 F.3d at 152 ("In enacting the APA, Congress intended for those suffering legal wrong because of agency action to have judicial recourse, and states fall well within that definition." (internal marks omitted)). Defendants aver Plaintiff holds no procedural right here, as the APA "extends a procedural right to challenge final agency action for which there is no other adequate remedy in court." ECF No. 29 at 8 (internal marks omitted). Defendants also argue because "the EEOC Document is merely explanatory . . . Plaintiff has no procedural right that it can properly assert

here." *Id.* Even so, these arguments ignore the fact that the Guidances constitute final agency action, as described above.

Plaintiff also satisfies the second prong. A State's quasi-sovereign interests include those implicated by: "(1) federal assertions of authority to regulate matters they believe they control, (2) federal preemption of state law, and (3) federal interference with the enforcement of state law, at least where the state statute at issue regulates behavior or provides for the administration of a state program and does not simply purport to immunize state citizens from federal law." *Texas*, 809 F.3d at 153 (internal marks omitted). Plaintiff's interest in determining "how its agencies perform their duties under State law, and how its employees conduct themselves" qualifies as the type of quasi-sovereign interest supporting special solicitude. ECF No. 18 at 41. The June 15 Guidance would preempt Texas law empowering the Commissioner of the Texas Department of Agriculture ("TDA") to "employ personnel as the duties of the department require" and to determine "[employee] qualifications for employment and their responsibilities under the applicable laws relating to standards of conduct for state employees." TEX. AGRIC. CODE §§ 11.001, 12.013(a) (empowering the commissioner of agriculture with responsibility for "exercising the powers and performing the duties assigned to the department by [the Texas Agriculture Code]"). Defendants argue Plaintiff "does not point to any actual employment policies or practices of the [TDA] regarding transgender persons." ECF No. 29 at 9. But the TDA does have such policies, even if Defendants consider them "unwritten and contingent." *See generally* ECF No. 1 at 8, ¶¶ 30–32 And the March 2 Guidance would interfere with the State's enforcement of its own child abuse laws. *See generally* ECF No. 26-1 at 14, ¶ 62. Meeting both prongs, Plaintiff is entitled to special solicitude in the standing inquiry.

### 1. *Plaintiff suffers from an alleged, imminent injury.*

"An increased regulatory burden typically satisfies the injury in fact requirement." *E.E.O.C.*, 933 F.3d at 446 (internal marks omitted). And "being pressured to change state law constitutes an injury," because "states have a sovereign interest in the power to create and enforce a legal code." *Id.* at 446–47 (citing *Texas v. United States*, 787 F.3d 733, 749 (5th Cir. 2015)). The Fifth Circuit has stated the injury-in-fact requirement is satisfied when an EEOC "[g]uidance does, at the very least, force Plaintiff to undergo an analysis, agency by agency, regarding whether the certainty of EEOC investigations stemming from the [Guidance's] standards overrides the State's interest." *E.E.O.C.*, 827 F.3d at 379. Past enforcement and "threatened enforcement of a law create[s] an Article III injury." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157–59 (2014). Therefore, a plaintiff can articulate pre-enforcement standing when it can show "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *Id.* (internal marks omitted) Under these principles, Plaintiff has articulated an injury in fact.

Plaintiff meets the requirement of showing "an intention to engage in a course of conduct arguably affected with a constitutional interest." *Id.* As discussed above, Plaintiff holds a quasi-sovereign interest in determining "how its agencies perform their duties under State law, and how its employees conduct themselves." ECF No. 18 at 41. And its agencies, such as the TDA, enforce policies that govern how the agency will perform its duty and how its employees will conduct themselves in the workplace. The State also has "a significant role to play in regulating the medical profession" — *Gonzales v. Carhart*, 550 U.S. 124, 157 (2007) — and has fulfilled that role in utilizing state agencies to investigate the subjection of children to elective gender-transition procedures and administration of puberty-blocking drugs.

Plaintiff also meets the second requirement, showing that its present and intended future conduct is proscribed by the June 15 Guidance's accommodations mandates as well as the March 2 Guidance. The June 15 Guidance states that Title VII, which Defendants enforce and interpret through that Guidance, "applies . . . to state and local government employers with 15 or more employees." ECF No.19-1 at 5. There is no indication from Defendants or in the record that the Guidance does not apply to Plaintiff. As for the March 2 Guidance — the plain language of the Guidance applies to Plaintiff, as the OCR document and Secretary Becerra's statement call out the application of Plaintiff's child abuse laws. ECF 31-1, Exs. B & C.

Finally, a credible threat of prosecution exists under the Guidances. Again, the Guidances' plain language suggests they apply to Plaintiff, and Defendants have not suggested they will not apply to Plaintiff. Nothing "suggest[s] that [Defendants] will refrain from enforcing the [Guidances] against [Texas]." *Roark & Hardee LP v. City of Austin*, 522 F.3d 533, 543 (5th Cir. 2008). In *Roark & Hardee*, injury in fact was found even when the defendant-city had not provided notice or charged any plaintiffs for violating the challenged city ordinance. *Id.* Here, however, Defendants admit in their Motion that EEOC has performed investigations, prosecuted lawsuits, and entered consent decrees based on the interpretation of Title VII outlined in the June 15 Guidance. ECF No. 12 at 9 n.3. It thus stands to reason that Defendants would enforce the June 15 Guidance against Plaintiff. The March 2 Guidance goes even further — Secretary Becerra directly referenced the "discriminatory gubernatorial order in Texas" and described the State's action as "discriminatory and unconscionable." ECF No. 31-1 at 18. "When an individual is subject to such a threat, an actual . . . enforcement action is not a prerequisite to challenging the law." *Susan B. Anthony List*, 573 U.S. at 158.

Defendants deploy myriad arguments against Article III injury. All fail to persuade. First, Defendants argue Plaintiff lacks standing because the State is not "currently engaged in any litigation alleging that it has violated Title VII's antidiscrimination provisions" as they relate to gender identity or sexual orientation "or that it is currently being investigated in connection with a complaint of such discrimination . . . [n]or has it alleged that it is aware of any imminent or threatened investigation." ECF No. 12 at 16.

Relying on *Trump v. New York*, Defendants argue the lack of litigation or specter of investigation confirms that Plaintiff's injuries are too "speculative" to constitute an injury in fact as there are too many "contingencies and speculations that impede judicial review." 141 S. Ct. 530, 535 (2020). Defendants contend this is especially so because the June 15 Guidance is "merely explanatory," and a "long chain of procedural contingencies" must occur before Plaintiff "might suffer any liability." ECF No. 12 at 17.

But *Trump* is distinguishable. *Trump* involved a challenge to a presidential memorandum instructing the Secretary of Commerce to take certain actions with regards to the 2020 Census results. 141 S. Ct. at 534. As the Supreme Court explained, the case against the President was "riddled with contingencies" because he had qualified his directive to the Secretary that he should act "to the extent practicable," making the alleged injury speculative. *Id.* at 535. Furthermore, the Court recognized the tentative nature of the President's action as "the Secretary [could] make (and the President [could] direct) changes to the census up until the President transmits his statement to the House." *Id.* Unlike the memorandum and directive in *Trump*, "there is nothing tentative or interlocutory" about the June 15 Guidance. ECF No. 18 at 40 n.11. Furthermore, the June 15 Guidance is not "merely explanatory." As described above, the June 15 Guidance exceeds what is required by Title VII as interpreted in *Bostock. Supra*, 4–7.

Second, Defendants aver that "[w]ithout any certainly impending harm, costs incurred in anticipating and proactively responding to legal uncertainties are not Article III injuries." ECF No. 12 at 17. Relying on *Clapper v. Amnesty International USA*, Defendants assert "any decision by Texas to change its behavior due to a fear of future enforcement that is not certainly impending does not confer standing." *Id.* at 18. This argument ignores the recent jurisprudence, cited above, recognizing the validation of a plaintiff's Article III standing in a pre-enforcement action. And Defendants argue the June 15 Guidance does not "regulate, constrain, or compel any action" on Plaintiff's part, and Plaintiff "has not shown any credible threat of an enforcement action by the federal government against it, much less any threat that is certainly impending." *Id.* (internal marks omitted). But this argument once again ignores the fact that the Guidance applies an interpretation of Title VII beyond that required in *Bostock* and ignores Supreme Court precedent such as *Susan B. Anthony List*.

Defendants' arguments notwithstanding, Plaintiff also seeks relief under the Declaratory Judgment Act ("DJA") — 28 U.S.C. §§ 2201–02 — which creates a mechanism for pre-enforcement review of government action. "[W]here threatened action by government is concerned, we do not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128–29 (2007). A plaintiff suing under the DJA has Article III standing whenever governmental coercion "put[s] the challenger to the choice between abandoning his rights or risking prosecution." *Id.* at 129. Plaintiff faces the dilemma of coercion here and "cannot simply abandon its rights and forswear the authority granted by State law to its agencies as employers," to avoid the risk of prosecution. ECF No. 18 at 45. Thus, for this reason and the reasons discussed above, Plaintiff has articulated an imminent injury.

### 2. *Plaintiff's injuries are traceable to the Guidances.*

Defendants make two primary arguments against traceability of Plaintiff's injuries to the June 15 Guidance: (1) "[a]ny legal consequences flow from Title VII itself, not the [Guidance]"; and (2) the "[Guidance] merely summarizes existing law and longstanding EEOC policy." ECF No. 12 at 19. As the Court has explained in detail, the Guidance diverges from *Bostock* and EEOC's relied-upon federal-sector decisions do not support the Guidance.

Plaintiff's injuries are traceable because the June 15 Guidance, "not Title VII, condemns [Plaintiff's] policies," and the Guidance, "not Title VII, pressures [Plaintiff] to change its laws and policies or risk referral to the Attorney General by EEOC." *E.E.O.C.*, 933 F.3d at 448. As further explained by the Fifth Circuit in that case, Plaintiff meets the traceability requirement because "[t]he pressure on Texas to change its laws exists, in part, because the Attorney General has prosecutorial power to bring enforcement actions against Texas based on EEOC referrals or a pattern-or-practice claim . . . . That the Attorney General has not attempted to enforce the Guidance against Texas does not deprive it of standing." *Id.* at 449. Because Plaintiff's injury and any legal consequences it might face flow from the June 15 Guidance, the injury is traceable.

Defendants argue the same vis-à-vis the March 2 Guidance. ECF No. 37 at 15. As with the June 15 Guidance, it is the March 2 Guidance — not Title IX — that *directly* condemns Plaintiff's policies and pressures the State to change it laws and policies to avoid adverse action taken by HHS and its Office of Civil Rights. Plaintiff again meets the traceability requirement as the State is pressured to change its laws and policies because HHS has the power and ability to withhold billions of dollars in federal healthcare funding. "That the [HHS] has not attempted to enforce the Guidance against Texas does not deprive it of standing." *E.E.O.C.*, 933 F.3d at 449. Here, Plaintiff's injury and potential consequences flow from and are traceable to the March 2 Guidance.

### 3.   *Plaintiff's injuries are redressable by a favorable decision from this Court.*

A judicial remedy redresses an injury where the "risk [of the alleged harm] would be reduced to some extent if [the plaintiffs] received the relief they seek." *Massachusetts v. E.P.A.*, 549 U.S. 497, 526 (2007). The "court's remedy need not forestall *every* injury a plaintiff will suffer." *Planned Parenthood of Greater Tex. Surgical Health Servs. v. City of Lubbock*, No. 5:21-CV-114-H, 2021 WL 4775135, at *7 (N.D. Tex. Oct. 13, 2021) (citing *Massachusetts*, 549 U.S. at 526 (emphasis in original)).

Defendants argue the redressability requirement is not met because private litigants could still pursue Title VII claims and "HHS could investigate and adjudicate a complaint of sex discrimination (including sexual orientation or gender identity discrimination) under [S]ection 1557" despite an order vacating the Guidances and enjoining Defendants. ECF No. 12 at 20; ECF No. 37 at 16. Plaintiff agrees that such an order would not prevent suits from private litigants based on the understanding of Title VII set forth in the June 15 Guidance. Yet such an order would reduce the alleged harm to some extent. As for the March 2 Guidance, Plaintiff argues — and the Court agrees — the judicial relief it seeks "against an agency action *operates against the action* — here, the adoption of the interpretation — and *not just the explanatory documents*." ECF No. 42 at 19 (emphasis added). Were the Court to grant Plaintiff the relief it seeks against the March 2 Guidance — that is vacating the adoption of an interpretation of Title IX — the relief would reduce the risk of the alleged harm in some way. Therefore, a favorable decision of the Court would redress Plaintiff's alleged injuries should the Court grant the relief sought.

Because Plaintiff has shown injury in fact, fairly traceable to the challenged agency action and redressable by a favorable decision, Plaintiff has Article III standing to challenge the Guidances.

24

### D.  Plaintiff's Claims Are Ripe for Review

The Court now turns to the ripeness of Plaintiff's claims. Agency rules, unlike statutes, are "typically reviewable without waiting for enforcement." *U.S. Telecom Ass'n v. F.C.C.*, 825 F.3d 674, 739 (D.C. Cir. 2016). When deciding whether a plaintiff's claims are ripe for judicial review, a court "must consider whether: (1) delayed review would cause hardship to the plaintiff[]; (2) judicial intervention would inappropriately interfere with further administrative action; and (3) the courts would benefit from further factual development of the issues presented." *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 733 (1998). Considering this test, Plaintiff's claims are ripe for review.

Here, delayed review would cause hardship to Plaintiff. In *Ohio Forestry Ass'n*, the Court determined delay in judicial review would not cause hardship to the plaintiffs. This was because the Land Resource Management Plan causing the alleged harm did "not command anyone to do anything or refrain from doing anything; [did] not grant, withhold, or modify any formal legal license, power, or authority; [did] not subject anyone to any civil or criminal liability; [and did] not create . . . legal rights or obligations. *Id*. Unlike the Land Resource Management Plan at issue in *Ohio Forestry Association*, the June 15 Guidance modifies formal legal authority and power, and it creates legal obligations by forcing Plaintiff to change its employment policies to reflect Defendants' interpretation of Title VII that extends beyond what is required by *Bostock*. And it subjects Plaintiff to civil liability should it violate the Guidance. The March 2 Guidance operates similarly, creating legal obligations by forcing Plaintiff to modify its child abuse laws in accordance with Defendant's interpretation of Section 1557 and Title IX.

As discussed above, the Guidances harm Plaintiff now — coercing it to change its employment policies and practices and enforcement of its child abuse laws or suffer legal consequences. "Where a regulation requires an immediate and significant change in plaintiffs' conduct of their affairs with serious penalties attached to noncompliance, hardship has been demonstrated." *Roark & Hardee*, 522 F.3d at 545. The *Roark & Hardee* court held that a challenge to an Austin city ordinance was ripe for review because the ordinance forced the plaintiffs to choose between compliance with the allegedly valid ordinance or risk a fine. *Id.* Plaintiff is similarly situated: the Guidances coerce Plaintiff to abandon its workplace policies and enforcement of its child abuse laws with threats of enforcement actions, civil penalties, and withholding of federal funds.

Judicial intervention would not interfere with further administrative action. In *Ohio Forestry Association*, the Court determined immediate judicial review would interfere with further administrative action, as the possibility existed that further consideration would occur before the Land Resource Management Plan's implementation. 523 U.S. at 735. But nothing here suggests the Guidances will undergo further consideration. Defendants argue the June 15 Guidance is based on already established principles of law. EEOC has already launched investigations, prosecuted misconduct, and entered consent decrees based on those legal principles. ECF No. 12 at 9, n.3. And the March 2 Guidance — according to Defendants — "reflects the [HHS's] prior determination . . . that HHS will interpret Section 1557 to prohibit discrimination based on gender identity." ECF No. 37 at 13. No action by this court would interfere with any further administrative action.

Finally, neither this Court nor any court on appellate review would benefit from further factual development. Plaintiff's claims are "purely legal, facial challenges" to the Guidance. ECF No. 18 at 47; ECF No. 42 at 18. Facial challenges to a regulation are generally ripe the moment the challenged regulation is passed. *Suitum v. Tahoe Reg'l Plan. Agency*, 520 U.S. 725, 736 n.10 (1997). A facial attack on a regulation raises a purely legal question and is therefore ripe. *Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 287–88 (5th Cir. 2012). And in another case involving Texas, EEOC, and EEOC's felon-hiring guidance, the Fifth Circuit stated:

> Having determined that the Guidance is final agency action under the APA, it follows naturally that Texas' APA claim is ripe for review. Texas's challenge to the EEOC Guidance is purely a legal one, and as such it is unnecessary to wait for further factual development before rendering a decision. Furthermore, Texas faces significant hardships should the court decline to consider its claims. Taking Texas's allegations as true, it must change its hiring practices to ensure compliance with the Guidance, or face the numerous adverse effects already set forth.

*E.E.O.C.*, 827 F.3d at 388 n.9 (internal marks omitted). The same is true of Plaintiff's claims here, the workplace policies it implements, and the enforcement of its own laws.

Defendants argue — regarding the June 15 Guidance — that this Court "is not in a position to evaluate what, if any, actions by the Federal Government should be enjoined and what specific conduct by Texas should be allowed" without "a concrete set of facts." ECF No. 12 at 22. As Plaintiff correctly responds, "only two facts matter." ECF No.18 at 48. First, that Plaintiff argues it is authorized by law to create (and has created) workplace policies that enforce sex-specific dress codes, sex-segregated bathrooms, and pronoun usage based on biological sex. *Id*. Second, the June 15 Guidance, based on Defendants' own interpretation of *Bostock* and Title VII, makes Plaintiff's policies unlawful. *Id.* Plaintiff and Defendants set forth competing understandings of Title VII. No further factual development is necessary to adjudicate this dispute. Regarding the March 2 Guidance, Defendants argue "critical facts remain to be developed which would define the scope

of the controversy and aid the court in reaching a decision." ECF No. 37 at 20. Plaintiff's challenge to the March 2 Guidance — however — is a facial attack raising a purely legal question on HHS's interpretation and enforcement of Section 1557. Plaintiff's claims against HHS "need no factual development because they do not involve a particular enforcement action . . . but challenge the legality of a generally applicable rule." ECF No. 42 at 19 (internal marks omitted).

Plaintiff satisfies all three prongs of the *Ohio Forestry Association* standard, and there is a credible threat of enforcement against the State. Accordingly, Plaintiff's claims are ripe for review.

### E.   The Court Lacks Jurisdiction Over Plaintiff's *Ultra Vires* Claim

Plaintiff asserts the Guidances constitute *ultra vires* agency actions over which the Court may exercise its jurisdiction. ECF No. 31 at 24–25. The Court may exercise its jurisdiction over "agency action exceed[ing] the scope of its delegated authority or violat[ing] a clear statutory mandate." *Kirby Corp. v. Pena*, 109 F.3d 258, 268 (5th Cir. 1997); *see also Leedom v. Kyne*, 358 U.S. 184 (1958). Courts have "rarely exercised their jurisdiction under *Kyne*, and have limited *Kyne*'s application to situations in which an agency has exceeded it delegated powers or on its face violated a statute. *Kirby Corp.*, 109 F.3d at 268–69 (internal marks omitted). And an "agency action allegedly in excess of authority must not simply involve a dispute over statutory interpretation or challenged findings of fact." *Am. Airlines, Inc. v. Herman*, 176 F.3d 283, 293 (5th Cir. 1999) (internal marks omitted).

Here, Plaintiff's challenge to the Guidances raises — at its core — a dispute as to EEOC's and HHS's interpretation and application of the word "sex" in Title VII and Title IX. Therefore, the Court will not exercise jurisdiction over Plaintiff's *ultra vires* claim in Count XI of the Amended Complaint. The Court **DISMISSES** Count XI of the Amended Complaint.

**CONCLUSION**

For the reasons set forth above, Plaintiff meets its burden to establish this Court's jurisdiction over all its claims except for the *ultra vires* claim raised in Count XI of the Amended Complaint. The Court **GRANTS IN PART** and **DENIES IN PART** Defendants' Motions. The Court **DISMISSES** Count XI of the Amended Complaint.

**SO ORDERED**.

May 26, 2022.

MATTHEW J. KACSMARYK
UNITED STATES DISTRICT JUDGE