# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## AMARILLO DIVISION

|  |  |
|---|---|
| THE STATE OF TEXAS, | Case No. 2:21-cv-00194-Z |
| Plaintiff, |  |
| v. |  |
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, *et al.*, |  |
| Defendants. |  |

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF ITS OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND ITS CROSS-MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

Table of Contents ...................................................................................................................i

Table of Authorities............................................................................................................ii

Background..........................................................................................................................1

    I.    EEOC's June 15 Guidance. .....................................................................................1

    II.   HHS's March 2 Guidance. ......................................................................................3

Standard of Review.............................................................................................................5

Argument .............................................................................................................................5

    I.    Plaintiffs have standing and the challenged actions constitute final agency action. ...............5

    II.   The June 15 Guidance is not in accordance with law because it is inconsistent with Title VII and *Bostock*. ..........................................................................................................7

        A.   The June 15 Guidance conflates gender identity with gender dysphoria......................10

        B.   The June 15 Guidance applies *Bostock's* prohibition of gender-identity discrimination to workplace policies disregarding that concept..............................15

        C.   The June 15 Guidance wrongly protects practices correlated with protected traits......18

        D.   The June 15 Guidance wrongly attempts to impose accommodation requirements....22

    III.  The March 2 Guidance is not in accordance with law because it is not consistent with Section 1557 and *Bostock*..........................................................................................26

    IV.  The Guidances are the products of arbitrary and capricious decisionmaking......................28

        A.   The June 15 Guidance is arbitrary and capricious.............................................29

        B.   The March 2 Guidance is arbitrary and capricious............................................31

    V.   The June 15 Guidance and the March 2 Guidance are invalid substantive rules.................32

    VI.  The Pronoun Accommodation in the June 15 Guidance violates the First Amendment. ....36

    VII. EEOC violated the APA by failing to follow Title VII and its own procedures..................37

        A.   EEOC violated Title VII's requirements..........................................................37

        B.   EEOC violated its own agency rules.................................................................38

    VIII.    EEOC and HHS violated the APA by failing to publish substantive rules of general applicability as required by FOIA. ...................................................................40

Conclusion .........................................................................................................................41

TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Adams v. Sch. Bd. of St. Johns Cty.*,
   3 F.4th 1299 (11th Cir. 2021) (Pryor, C.J., dissenting), *vacated, reh'g en banc granted,*
   9 F.4th 1369 (11th Cir. 2021) .......................................................................................... 13, 14

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) ................................................................................................................6, 7

*Babb v. Wilkie*,
   140 S. Ct. 1168 (2020) ........................................................................................................*passim*

*Bear Creek Bible Church v. EEOC*,
   No. 4:18-CV-00824-O, 2021 WL 5449038 (N.D. Tex. Nov. 22, 2021)
   (O'Connor, J.) ......................................................................................................................*passim*

*Bostock*: *Phillips v. Martin Marietta Corp.*,
   400 U.S. 542 (1971) .............................................................................................................*passim*

*Burch v. Coca-Cola Co.*,
   119 F.3d 305 (5th Cir. 1997) ................................................................................................... 18

*Celotex Corp. v. Catrett*,
   477 U.S. 317, 327 (1986) ............................................................................................................ 6

*Ctr. for Auto Safety v. NHTSA*,
   452 F.3d 798 (D.C. Cir. 2006) .................................................................................................. 23

*Dep't. of Lab. v. Kast Metals Corp.*,
   744 F.2d 1145 (5th Cir. 1984) .................................................................................................. 22

*Dept. of Commerce v. New York*,
   No. 18-966, 2019 WL 1093053 (U.S. Mar. 6, 2019) ("The District Court Erred in
   Enjoining the Secretary from Reinstating the Citizenship Question to the 2020
   Decennial Census") .................................................................................................................. 28

*Doe 2 v. Shanahan*,
   755 F. App'x 19 (D.C. Cir. 2019) (per curiam) ..................................................................... 12

*Doe 2 v. Shanahan*,
   917 F.3d 694 (D.C. Cir. 2019) (Williams, J., concurring in the result) ...........................*passim*

*Durr v. Dep't of Veterans Affs.*,
   843 F. App'x 246 (11th Cir. 2021) (per curiam) ................................................................... 21

*EEOC v. Abercrombie & Fitch Stores, Inc.,*
   575 U.S. 768 (2015) ..................................................................................................... 19

*EEOC v. Arabian Am. Oil Co.,*
   499 U.S. 244 (1991) ..................................................................................................... 19

*EEOC v. Catastrophe Mgmt. Sols.,*
   852 F.3d 1018 (11th Cir. 2016) ................................................................................... 17

*Espinoza v. Farah Mfg. Co.,*
   414 U.S. 86 (1973) ....................................................................................................... 17

*Garcia v. Gloor,*
   618 F.2d 264 (5th Cir. 1980) ................................................................................. 16, 17

*Garcia v. Spun Steak Co.,*
   998 F.2d 1480 (9th Cir. 1993) (O'Scannlain, J.) .................................................... 16, 20

*Gulley-Fernandez v. Wis. Dept. of Corr.,*
   2015 WL 7777997 (E.D. Wis. Dec. 1, 2015) .............................................................. 25

*Harris v. Forklift Sys., Inc.,*
   510 U.S. 17 (1993) (Ginsburg, J., concurring) ............................................................. 8

*Hazen Paper Co., v. Biggins,*
   507 U.S. 614 (1993) ..................................................................................................... 17

*Kastl v. Maricopa Cnty. Cmty. Coll. Dist.,*
   2004 WL 2008954 (D. Ariz. June 3, 2004) ................................................................. 25

*L.A. Dep't of Water & Power v. Manhart,*
   435 U.S. 702 (1978) ....................................................................................................... 9

*Lawrence v. Texas,*
   539 U.S. 558 (2003) ..................................................................................................... 10

*Lusardi v. McHugh,*
   Appeal No. 0120133395, 2015 WL 1607756 (EEOC, Apr. 1, 2015) .................. 11, 21, 22

*Maner v. Dignity Health,*
   9 F. 4th 1114 (9th Cir. 2021) (Bea, J.) ......................................................................... 9

*Mia Macy v. Holder,*
   Appeal No. 0120120821, 2012 WL 1435995 (EEOC Apr. 20, 2012) ...................... 21, 22

*Michaels v. Akal Sec., Inc.,*
   2010 WL 2573988 (D. Colo. June 24, 2010) ............................................................... 25

*Mitchell v. Wall,*
    2015 WL 10936775 (W.D. Wis. Aug. 6, 2015) ...................................................................25

*Nat'l Mining Ass'n v. McCarthy,*
    758 F.3d 243 (D.C. Cir. 2014) (Kavanaugh, J.).................................................................23

*Natl. Council for Adoption v. Blinken,*
    4 F.4th 106 (D.C. Cir. 2021) ...............................................................................................24

*NRDC v. Wheeler,*
    955 F.3d 68 (D.C. Cir. 2020) ...............................................................................................25

*Oncale v. Sundowner Offshore Servs., Inc.,*
    523 U.S. 75 (1998)..........................................................................................................8, 13

*Parker v. Strawser Constr., Inc.,*
    307 F. Supp. 3d 744 (S.D. Ohio 2018).................................................................................25

*Perez v. Mortg. Bankers Ass'n,*
    575 U.S. 92 (2015)................................................................................................................23

*Prof'ls and Patients for Customized Care v. Shalala,*
    56 F.3d 592 (5th Cir. 1995)...........................................................................................23, 26

*Ragas v. Tenn. Gas Pipeline Co.,*
    136 F.3d 455,458 (5th Cir. 1998) ..........................................................................................6

*Raytheon Co. v. Hernandez,*
    540 U.S. 44 (2003)..........................................................................................................14, 18

*Smith v. City of Jackson,*
    544 U.S. 228 (2005)..............................................................................................................21

*Texas Dept. of Cmty. Affairs v. Burdine,*
    450 U.S. 248 (1981)..............................................................................................................17

*Texas v. Biden,*
    20 F.4th 928 (5th Cir. 2021) ................................................................................................23

*In re Union Pac. R.R. Emp. Pracs. Litig.,*
    479 F.3d 936 (8th Cir. 2007)................................................................................................17

*Univ. of Tex. Sw. Med. Ctr. v. Nassar,*
    570 U.S. 338 (2013)..............................................................................................................19

*Walker v. Sears, Roebuck & Co.,*
    853 F.2d 355 (5th Cir. 1988).................................................................................................6

*Willingham v. Macon Tel. Publ'g Co.*,
    507 F.2d 1084 (5th Cir. 1975) (en banc) ..........................................................9, 13

*Zarda v. Altitude Express, Inc.*,
    883 F.3d 100 (2d Cir. 2018) (en banc) ...........................................................8, 9, 13

**Statutes**

5 U.S.C.
    § 551(4) ...........................................................................................................22
    § 553 .................................................................................................................22
    § 553(b)(A) ......................................................................................................23

20 U.S.C. § 1681 .........................................................................................................4

29 U.S.C. § 705(20)(F)(i) ..........................................................................................25

42 U.S.C.
    § 2000-e2(a)(1) ................................................................................................20
    § 2000e–16(a) Title VII ............................................................................*passim*
    § 2000e(j) ...................................................................................................17, 18
    § 12211 .............................................................................................................19
    § 12211(b) ..........................................................................................................5
    § 18116 ...............................................................................................................4

**Other Authorities**

*Against Heterosexuality*, First Things, March 2014, available at
    https:www.firsthings.com/article/2014/03/against-heterosexuality ..............11

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* § 30
    (2012) ..............................................................................................................14

Fed. R. Civ. P. 56(a) ...................................................................................................6

Guidance Regarding the Employment of Transgender Individuals in the Federal
    Workplace at 1, available at http://www.opm.gov/policy-data-
    oversight/diversity-and-inclusion/reference-materials/gender- .....................12

J. D'Emilio & E. Freedman, *Intimate Matters: A History of Sexuality in America* 121 (2d
    ed. 1997) ..........................................................................................................10

J. Katz, *The Invention of Heterosexuality* 10 (1995) ..................................................10

John M. Finnis, *Law, Morality, and "Sexual Orientation,"* 69 Notre Dame L. Rev. 1049,
    1053–54 (1994) ................................................................................................10

Michel Foucault, *The History of Sexuality: Volume I: An Introduction* 43 (1978)
(discussing the historical emergence of "the homosexual" in a "famous article of
1870," and suggesting that "[h]omosexuality appeared as one of the forms of
sexuality when it was transposed from the practice of sodomy onto a kind of
interior androgyny, a hermaphrodism of the soul," and concluding that "[t]he
sodomite had been a temporary aberration; the homosexual was now a species") .......................10

William N. Eskridge, Jr., *A Social Constructionist Critique of Posner's Sex and Reason: Steps
Toward a Gaylegal Agenda*, 102 Yale L.J. 333, 360, 367 (1992)..............................................................10

BACKGROUND

I.      **EEOC's June 15 Guidance.**

Following the Supreme Court's ruling in *Bostock v. Clayton County*,140 S. Ct. 1731 (2020), EEOC, under the authority of Chairman Charlotte Burrows, issued on June 15, 2021, what it termed a "technical assistance document[.]" That document purportedly both "explain[ed] what the *Bostock* decision means for LGBTQ+ workers (and all covered workers) and for employers across the country" and "explain[ed] the [EEOC's] established legal positions on LGBTQ+ related matters, as voted by the Commission [in appeals by federal employees]." App.002–003 (the "June 15 Guidance"). It ties those two sources—*Bostock* and EEOC's previous federal-sector decisions—together from the start: first discussing "the landmark decision" in *Bostock* and immediately pivoting to EEOC's pre-*Bostock* federal-sector administrative decisions, not noting that the latter construed a different provision of Title VII. App.003. Emphasizing the point further, the June 15 Guidance circles back to *Bostock*, discussing how EEOC "applied the *Bostock* decision in the federal sector" in the line of its pre-*Bostock* decisions. App.003.

The June 15 Guidance states that it applies to "[a]pplicants for employment, employees, employers covered by Title VII[, and] related representatives and practitioners," App.003, and that "employers covered by Title VII" include "state … government employers with 15 or more employees." App.005. The June 15 Guidance also has a boilerplate disclaimer that

> [t]his information is not new policy. This publication in itself does not have the force and effect of law and is not meant to bind the public in any way. It is intended only to provide clarity to the public regarding existing requirements under the law.

App.004; *see also* App.003 (additional similar disclaimer).

In question-and-answer format, the June 15 Guidance purports to describe three key substantive requirements *Bostock* imposed on employers:

9.      **May a covered employer require a transgender employee to dress in accordance with the employee's sex assigned at birth?**

1

No. Prohibiting a transgender person from dressing or presenting consistent with that person's gender identity would constitute sex discrimination.

App.007 (the "Dress Code Accommodation") (citations omitted).

**10.    Does an employer have the right to have separate, sex-segregated bathrooms, locker rooms, or showers for men and women?**

Yes. Courts have long recognized that employers may have separate bathrooms, locker rooms, and showers for men and women, or may choose to have unisex or single-use bathrooms, locker rooms, and showers. The Commission has taken the position that employers may not deny an employee equal access to a bathroom, locker room, or shower that corresponds to the employee's gender identity. In other words, if an employer has separate bathrooms, locker rooms, or showers for men and women, all men (including transgender men) should be allowed to use the men's facilities and all women (including transgender women) should be allowed to use the women's facilities.

App.007–008 (the "Bathroom Accommodation") (citations omitted).

**11.    Could use of pronouns or names that are inconsistent with an individual's gender identity be considered harassment?**

Yes, in certain circumstances. Unlawful harassment includes unwelcome conduct that is based on gender identity. To be unlawful, the conduct must be severe or pervasive when considered together with all other unwelcome conduct based on the individual's sex including gender identity, thereby creating a work environment that a reasonable person would consider intimidating, hostile, or offensive. In its decision in Lusardi v. Dep't of the Army, the Commission explained that although accidental misuse of a transgender employee's preferred name and pronouns does not violate Title VII, intentionally and repeatedly using the wrong name and pronouns to refer to a transgender employee could contribute to an unlawful hostile work environment.

App.008 (the "Pronoun Accommodation") (citations omitted). And the June 15 Guidance tells its audience of employers and employees that all of these are "existing requirements under the law"—twice. App.003; App.004.

After setting forth the Dress Code Accommodation, the Bathroom Accommodation, and the Pronoun Accommodation, the June 15 Guidance invites "applicants and employees of … state … government employers" whose "Title VII rights have been violated" to "contact the EEOC for help" including filing a charge of discrimination that the agency will investigate. App.008. It also points those

2

looking to "fil[e] a charge of discrimination against … a state … government employer [to] go to the EEOC Online Public Portal." App.008.

## II.    HHS's March 2 Guidance.

Not to be outdone by EEOC, HHS has also been active in using *Bostock* to increase its reach.

In February 2022, Governor Greg Abbott wrote to Jaime Masters, Commissioner of the Texas Department of Family and Protective Services, attaching an opinion from Attorney General Ken Paxton. In that letter, Governor Abbott directed DFPS "to conduct a prompt and thorough investigation of any reported instances" of "so-called 'sex change' procedures" conducted on minors that Texas law recognizes as child abuse. Supp.App.013. He issued that direction because "DFPS and all other state agencies must follow the law as explained in" the attached Attorney General Opinion. *Id.* That opinion had concluded that "it is already against the law to subject Texas children to a wide variety of elective procedures for gender transitioning, including reassignment surgeries that can cause sterilization, mastectomies, removals of otherwise healthy body parts, and administration of puberty-blocking drugs or supraphysiologic doses of testosterone or estrogen." *See* Supp.App.015–027.

On March 2, 2022, HHS's Office of Civil Rights ("OCR") issued what it termed "additional information on federal civil rights protections . . . that apply to gender affirming care." Supp.App.001–004 (the "March 2 Guidance"). It was neither published in the Federal Register nor promulgated subject to notice-and-comment procedures. An accompanying press release from HHS Secretary Xavier Becerra stated that OCR had issued the guidance in direct response to "a gubernatorial order in Texas" and that it was "intended to remind Texas and others of the federal protections that exist" under HHS's erroneous interpretation of the law. Supp.App.006–008. In bolded, inflated-size type, the March 2 Guidance invited "[p]arents and caregivers who believe their child has been denied health care, including gender affirming care, on the basis of that child's gender identity" and "[h]ealth care

providers who believe that they are or have been unlawfully restricted from providing health care to a patient on the basis of that patient's gender identity" to "file a complaint with OCR." Supp.App.002.

Section 1557 of the Affordable Care Act makes it illegal for an entity receiving funds for a program under that law to discriminate against a person's participation in or receipt of benefits under such a program based on, among other things, the person's sex. *See* 42 U.S.C. § 18116 (incorporating 20 U.S.C. § 1681 (Title IX)). The March 2 Guidance purported to "remind" the public that that "federally-funded [sic] covered entities restricting an individual's ability to receive medically necessary care, including gender-affirming care, from their [sic] health care provider solely on the basis of their sex assigned at birth or gender identity likely violates Section 1557." Supp.App.003. Section 1557, however, does no such thing, mentioning the concept of gender identity not at all. Instead, the March 2 Guidance adopted a new interpretation of Section 1557, relying on an erroneous interpretation of *Bostock*—which proceeds directly on the assumption that "'sex' . . . refer[s] only to biological distinctions between male and female"—to do so. 140 S. Ct. at 1739. The March 2 Guidance purports to empower HHS to withhold federal funding from entities, such as the State of Texas, that do not adhere to that misinterpretation. Specifically, it states—incorrectly—that doctors and other staff members at facilities that receive federal funds who comply with obligations to report suspected child abuse to State authorities may have violated federal law. Supp.App.003.

The March 2 Guidance further states that "Section 504 [of the Rehabilitation Act] protects qualified individuals with disabilities from discrimination in programs and activities receiving federal financial assistance" and that "[g]ender dysphoria may, in some cases, qualify as a disability under" that law. Supp.App.003. It concludes on that basis that "[r]estrictions that prevent otherwise qualified individuals from receiving medically necessary care on the basis of their gender dysphoria . . . may, therefore, also violate Section 504[.]" *Id.* Congress, however, has explicitly exempted gender dysphoria

4

from the definition of "disability" under Section 504 and the Americans with Disabilities Act except when that condition itself results from a physical impairment. See 42 U.S.C. § 12211(b).

## STANDARD OF REVIEW

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if its existence or non-existence "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986). "[T]he substantive law will identify which facts are material." *Id.* at 248. A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The movant must inform the court of the basis of the motion and show from the record that no genuine issue of material fact exists. *Celotex Corp. v. Catrett,* 477 U.S. 317,327 (1986). "The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his or her claim." *Ragas v. Tenn. Gas Pipeline Co.,* 136 F.3d 455,458 (5th Cir. 1998).

When reviewing summary-judgment evidence, the court must resolve all reasonable doubts and draw all reasonable inferences in the light most favorable to the non-movant. *Walker v. Sears, Roebuck & Co.,* 853 F.2d 355, 358 (5th Cir. 1988). If enough evidence supports a disputed allegation that "reasonable minds could differ as to the import of the evidence," the court must deny the motion. *Anderson*, 477 U.S. at 250.

## ARGUMENT

### I.    Plaintiffs have standing and the challenged actions constitute final agency action.

The Court has already found that Plaintiff has standing to challenge both Guidances, and that both guidance documents constitute final agency action. ECF 53 at 17–24; *id.* at 4–13. When the plaintiff is "an object of the [agency's] action," "there is ordinarily little question that the action … has

caused him injury, and that a judgment preventing … the action will redress it." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561–62 (1992).

Because both Guidances apply to Texas on their face, this test is satisfied as a matter of law. The June 15 Guidance explicitly applies to State employers, App.005, and the workplace policies of the Texas Department of Agriculture contradict the Dress Code Accommodation, the Bathroom Accommodation, and the Pronoun Accommodation. *See* Declaration of Sid Miller, 2Supp.App.002–004. And Texas will likely suffer harm from the March 2 Guidance. As Texas previously described, the pressure from that guidance "to change state law" is a harm sufficient to confer standing "because states have a sovereign interest in the power to create and enforce a legal code." *Texas v. EEOC*, 933 F.3d 433, 446–47 (5th Cir. 2019) (citation omitted).

Texas is threatened with financial harm, too. A program or entity that HHS believes has violated the March 2 Guidance may lose its federal funding, be barred from doing business with the federal government, or risk false-claims liability. *See* 45 C.F.R. § 92.5(a) (citing authorities). For entities that receive large amounts of federal grants or matching funds, this threat is essentially *in terrorem*: "program or activity" includes not just what a normal person might deem a "program or activity," but entire departments, agencies, and districts of State and local governments; entire colleges, universities, and "public system[s] of higher education;" and entire local educational agencies and "other school system[s.]" 20 U.S.C. § 1687. That is, the Texas Health and Human Services Commission could lose billions of dollars of Medicaid funding per quarter[1] should HHS conclude that some participants in HHSC's Alliance for Adolescent Recovery and Treatment program[2] were discriminated against

---

[1] The federal government's share of Texas's Medicaid program, administered by HHS, for the first quarter of FY2021 was nearly $31 billion. *See* U.S. Treas. Dept., Bur. of Fiscal Serv., FAIN 2105TX5MAP, *available at* https://www.usaspending.gov/award/ASST_NON_2105TX5MAP_7530.

[2] Recipient of $105,238 from HHS in Q1FY2021. *Id.* at H79TI080195, *available at* https://www.usaspending.gov/award/ASST_NON_H79TI080195_7522.

because they were not allowed to use the single-sex bathroom of their choice. Texas is not required to wait for an attack that Secretary Becerra has already threatened. *See* Supp.App.006; *see also Susan B. Anthony List v. Dreihaus*, 573 U.S. 149, 158 (2014) (when a plaintiff is subject to a threat of enforcement, "an actual . . . enforcement action is not a prerequisite to challenging the law").

## II.    The June 15 Guidance is not in accordance with law because it is inconsistent with Title VII and *Bostock*.

*Bostock* stands for a far more limited interpretation of Title VII that that articulated in the June 15 Guidance. First, "it did not establish a new or otherwise separate protected class, but instead clarified the scope of sex classification." *Stollings v. Texas Tech Univ.*, No. 5:20-cv-250-H, 2021 WL 3748964, at *10 (N.D. Tex. Aug. 25, 2021) (Hendrix, J.) (citing *Bostock*, 140 S. Ct. at 1739); *Bear Creek Bible Church v. EEOC*, No. 4:18-CV-00824-O, 2021 WL 5449038, at *35 (N.D. Tex. Nov. 22, 2021) (O'Connor, J.) ("Transgender individuals are not a protected class, and the 'discrimination' must still link to a biological sex.") (citing *Bostock*, 140 S. Ct. at 1740).

Second, *Bostock* did not adopt a different and broader definition of "sex." Rather, the Court "proceed[ed] on the assumption that 'sex' … refer[s] only to biological distinctions between male and female," and did not include "norms concerning gender identity." *Bostock*, 140 S. Ct. at 1739.

Third, *Bostock* disclaimed that it was deciding whether "sex-segregated bathrooms, locker rooms, and dress codes" would violate Title VII. *Id.* Nor did it address the issue of pronouns.

Fourth, *Bostock* did not prohibit all sex-based distinctions in employment. *Bostock* repeatedly cited the Court's earlier decision in *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75 (1998), as authority. *Oncale* explained that Title VII "does not reach genuine but innocuous differences in the ways men and women routinely interact with members of the same sex and of the opposite sex," and "requires neither asexuality nor androgyny in the workplace." *Id.* at 81.

The *Bostock* Court further explained that the central concern of Title VII was not every aspect of interaction in the workplace but "whether members of one sex are exposed to disadvantageous

terms or conditions of employment to which members of the other sex are not exposed." *Id.* at 80 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 25 (1993) (Ginsburg, J., concurring)). The Second Circuit—in one of the cases consolidated with and affirmed in *Bostock*—also favorably cites *Oncale* as "arguably" supporting the view that "sex-specific bathroom and grooming policies [do not] impose disadvantageous terms or conditions" because not all distinctions of "'sexual content or connotations' rise to the level of discrimination." *Zarda v. Altitude Express, Inc.*, 883 F.3d 100, 119 & n.16 (2d Cir. 2018) (en banc) (quoting *Oncale*, 523 U.S. at 79–80)). Relatedly, *Bostock* also cautioned that "Title VII does not concern itself with everything that happens 'because of' sex." 140 S. Ct. at 1740. Rather, only discrimination that is "inextricably" related to sex is forbidden by Title VII; distinctions "related to sex in some vague sense" or having only "some disparate impact on one sex or the other" are not reached by the statute. *Id.* at 1741–42.

Fifth, *Bostock* did not overturn any Supreme Court precedents, instead resting on precedents dating to the 1970s. It also did not disturb lower-court precedent that has long applied those same precedents. "[T]the Court relied in *Bostock* on the same well established Title VII principles that animated the outcome in those prior decisions [of lower courts that applied the same key precedents, so those courts] effectively anticipated *Bostock*'s rationale." *Maner v. Dignity Health*, 9 F.4th 1114, 1124 (9th Cir. 2021) (Bea, J.) (explaining *Bostock* did not overturn decades of lower-court precedents rejecting "paramour preference" theory of liability).

This is consistent with *Willingham v. Macon Tel. Publ'g Co.*, 507 F.2d 1084 (5th Cir. 1975) (en banc), where the full Fifth Circuit upheld sex-specific grooming codes under Title VII. *Willingham* applied *Phillips v. Martin Marietta Corp.*, 400 U.S. 542 (1971), one of the key cases the Supreme Court relied on in *Bostock*. The Second Circuit in *Zarda*—which relied on the same key precedents that the Supreme Court would later adopt in *Bostock* (*Martin Marietta* and *L.A. Dep't of Water & Power v. Manhart*, 435 U.S. 702 (1978))—favorably cited *Willingham* as consistent with its analysis, 883 F.3d at 118–19.

In short, *Bostock* did not nullify the Supreme Court's longstanding acceptance of differences between the sexes. It did not question any longstanding precedent beyond the narrow question before it: whether "[a]n employer who fires an individual *merely for being* gay or transgender defies the law." *Bostock*, 140 S. Ct. at 1754 (emphasis added).

Finally, *Bostock* never defined the terms "sexual orientation," "transgender status," or "gender identity." Indeed, the issues in *Bostock* were exclusively related to discrimination based on status; no discrimination based on conduct was at issue: "Each of the three cases before us started the same way: An employer fired a long-time employee shortly after the employee revealed that he or she is homosexual or transgender—and allegedly for no reason other than the employee's homosexuality or transgender status." *Id.* at 1737; *see also id.* at 1753 ("The only question before us is whether an employer who fires someone *simply for being* homosexual or transgender" violates Title VII) (emphasis added).

What Defendants refer to as Plaintiff's "exceedingly narrow interpretation of *Bostock*," ECF 58-1 at 9, is consistent with how the terms "sexual orientation" and "gender identity" are defined by proponents of those concepts. The Nation's largest "LGBTQ+" advocacy organization defines "sexual orientation" based not on conduct but on "emotional, romantic, or sexual attraction to other people." Human Rights Campaign, *Sexual Orientation and Gender Identity Definitions*, available at https://www.hrc.org/resources/sexual-orientation-and-gender-identity-terminology-and-definitions. This is consistent with *Bostock*'s status-based interpretation and with the reality that not all persons with "an emotional, romantic, or sexual attraction" to people of the same sex act on those urges.[3]

The Human Rights Campaign also defines "gender identity" as "[o]ne's innermost concept of self as male, female, a blend of both or neither—how individuals perceive themselves and what they call themselves." *Id.* It contrasts this with "[g]ender expression" which is the "[e]xternal appearance

---

[3]   *See, e.g., A Gay Catholic Voice Against Same-Sex-Marriage*, The New York Times, June 4, 2010, available at https://www.nytimes.com/2010/06/05/us/05beliefs.html.

of one's gender identity, usually expressed through behavior, clothing, haircut or voice, and which may or may not conform to socially defined behaviors and characteristics typically associated with being either masculine or feminine." *Id.*

The same organization notes the highly contingent nature of "transitioning," noting that "*some* transgender and non-binary people" undergo such a "unique and personal process that can include changing clothes, names, pronouns and behaviors to fit their gender identity" and can include medical interventions such as hormones, voice training, hair removal, and surgical amputations. Human Rights Campaign, *Transgender and Non-Binary People FAQ*, available at https://www.hrc.org/resources/ transgender-and-non-binary-faq (emphasis added). However, it asserts that "[a] person's gender identity is valid whether or not they choose to take some, all or none of these steps to transition." *Id.* There is no objective way of determining another's gender identity—it relies exclusively on the subjective, internal sense of that person: "You may know if someone is transgender or non-binary if they are open about their identity or otherwise choose to tell you. There is no one way to determine if someone is transgender or non-binary unless they share their personal gender identity." *Id.*

### A.     The June 15 Guidance conflates gender identity with gender dysphoria.

The June 15 Guidance is part of a long political strategy of conflating "orientation" or "identity" with any conduct that may be associated with it. *See* John M. Finnis, *Law, Morality, and "Sexual Orientation,"* 69 Notre Dame L. Rev. 1049, 1053–54 (1994); William N. Eskridge, Jr., *A Social Constructionist Critique of Posner's Sex and Reason: Steps Toward a Gaylegal Agenda*, 102 Yale L.J. 333, 360, 367 (1992). There is widespread acceptance that people should not be discriminated against because of their deep-seated subjective identities shaped by the cultural forces of their times. This strategy seeks to leverage that consensus to reach conduct that may be associated with those identities or the sub-cultures that have sprung up around them.

This conflation arose once "the concept of the homosexual as a distinct category of person emerged in the late 19th century." *Lawrence v. Texas*, 539 U.S. 558, 568 (2003) (cleaned up).[4] What had once been an evaluation of a person's conduct became a classification of a person's inner identity. This classification scheme was originally set up by the emerging medical establishment to condemn "homosexual" acts and to contrast them with supposedly justified non-procreative "heterosexual" acts. After the breakdown of "heterosexual" morality throughout the 20th century undermined the justifications for criticizing "homosexual" conduct, however, the concept was taken up by its original targets to remove the stigma from their behavior.[5]

The same sleight-of-hand is seen in treatment of the later concept of "gender identity," including in the June 15 Guidance. This concept took off after World War II, building on the subjective identity basis in sexual orientation. *See Bostock*, 140 S. Ct. at 1772–73 (Alito, J. dissenting). "Transgender individuals have a gender identity—an internalized, felt sense of who they are as male or female— that does not align with their sex assigned at birth." *Doe 2 v. Shanahan*, 917 F.3d 694, 708 (D.C. Cir. 2019) (Williams, J., concurring in the result) (cleaned up).

But the June 15 Guidance does not address discrimination against employees based on their "internalized, felt sense of who they are as male or female"—it instead seeks to require exceptions for transgender employees from concededly lawful sex-based rules for dress codes, bathroom usage, and pronoun usage. But such special treatment violates *Bostock's* admonition that "[a]n individual's

---

[4]   See J. Katz, The Invention of Heterosexuality 10 (1995); J. D'Emilio & E. Freedman, Intimate Matters: A History of Sexuality in America 121 (2d ed. 1997); Michel Foucault, The History of Sexuality: Volume I: An Introduction 43 (1978) (discussing the historical emergence of "the homosexual" in a "famous article of 1870," and suggesting that "[h]omosexuality appeared as one of the forms of sexuality when it was transposed from the practice of sodomy onto a kind of interior androgyny, a hermaphrodism of the soul," and concluding that "[t]he sodomite had been a temporary aberration; the homosexual was now a species").

[5]   *See* Michael Hannon, *Against Heterosexuality*, First Things, March 2014, available at https://www.firstthings.com/article/2014/03/against-heterosexuality.

homosexuality or transgender status is not relevant to employment decisions." *Bostock*, 140 S. Ct. at 1741.

Judge O'Connor's analysis of *Bostock* (and its several hypotheticals) in *Bear Creek Bible Church*, 2021 WL 5449038, is the one that makes the most sense of the opinion. *Bear Creek Bible Church* points to "[t]wo diverging tests [that] have emerged in Title VII sex discrimination litigation: favoritism and blindness." *Id.* at *29 (citing *Wittmer v. Phillips 66 Co.*, 915 F.3d 328, 333–34 (5th Cir. 2019) (Ho, J., concurring)). "Under the [favoritism test], 'Title VII prohibits employers from favoring men over women, or vice versa. By contrast, under [the blindness test], Title VII does more than prohibit favoritism toward men or women—it requires employers to be entirely blind to a person's sex.'" *Id.* (quoting *Wittmer*, 915 F.3d at 333–34). Thoroughly examining the language of *Bostock* and its hypotheticals, *Bear Creek Bible Church* concludes that "*Bostock* did not explicitly endorse one or the other," *id.*, but the best understanding is that "the proper test must be favoritism, plus blindness to sex if the secondary trait is homosexuality or transgenderism." *Id.* at 31. This is consistent with *Bostock*'s repeated reliance on *Oncale*, which explained that Title VII "does not reach genuine but innocuous differences in the ways men and women routinely interact with members of the same sex and of the opposite sex," and "requires neither asexuality nor androgyny in the workplace." *Oncale*, 523 U.S. at 81.

This approach also avoids other aspects of Title VII from being undermined by the subjectivity of gender identity. Since context determines meaning, it makes sense to consider the entire context of the language under construction. With statutory construction, that means looking not only to the provision in question, but also to "the language and design of the statute as a whole." *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988). Courts construe statutes so one provision does not contradict another. The "task is to fit, if possible, all parts into an harmonious whole." *Roberts v. Sea-Land Servs., Inc.*, 566 U.S. 93, 100 (2012) (quoting *FTC v. Mandel Bros., Inc.*, 359 U.S. 385, 389 (1959)); *see also FDA*

*v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) ("A court must therefore interpret the statute 'as a symmetrical and coherent regulatory scheme,' and 'fit, if possible, all parts into an harmonious whole.'" (citations omitted)).

By requiring total disregard of the concept of gender identity in employment decisions, the blindness approach prevents several provisions of Title VII from becoming incoherent. For example, under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), "a plaintiff must demonstrate that she: (1) belonged to a protected group; (2) was qualified for her position; (3) suffered an adverse employment action; and (4) *was replaced by someone outside of the protected class* or, in the case of disparate treatment, that similarly situated employees were treated more favorably." *Nasti v. CIBA Specialty Chems. Corp.*, 492 F.3d 589, 593 (5th Cir. 2007) (emphasis added)(citing *Okoye v. Univ. of Tex. Houston Health Sci. Ctr.*, 245 F.3d 507, 512–13 (5th Cir. 2001)). If the replacement employee were able to be classified as a member of the same sex of the plaintiff based solely on an unchallengeable assertion, Congress's intention to protect employees against sex discrimination would be undermined. *See* Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 451 (5th ed. 2013) (defining "transgender" to include "individuals who transiently" identify one way).

Also, the allowance in Title VII for positions where sex is a bona fide employment qualification, 42 U.S.C. § 2000e-2(e)(1), including "for "accommodating patients' privacy interests" in the healthcare setting, *Chaney v. Plainfield Healthcare Ctr.*, 612 F.3d 908, 913 (7th Cir. 2010), would not serve its purpose if a man could claim qualification for such a position by his subjective identification as a woman.

The June 15 Guidance also cites EEOC's past decisions as consistent with its new interpretation. For example, it cites *Lusardi v. McHugh*, Appeal No. 0120133395, 2015 WL 1607756 (EEOC, Apr. 1, 2015), in support of its interpretation that Title VII requires that transgender

employees be referred to by the pronouns of the opposite sex. App.008. That decision, in turn, cites as an authority an Office of Personnel Management guidance document, *Lusardi*, 2015 WL 1607756, at *8 n.3, which defines "[g]ender identity" as "the individual's internal sense of being male or female or an identity other than the traditional definitions of male or female," and distinguishes this from "gender expression," which is "[t]he way an individual expresses his or her gender identity."[6]

*Bostock* makes no mention of "gender expression." What the June 15 Guidance really seems to be addressing is discrimination based on that concept or gender dysphoria and any treatment for it. These subjects are commonly confused, but courts have sometimes been careful recognizing these distinctions. For example, in *Shanahan*, the D.C. Circuit considered a challenge to the Department of Defense's policy requiring members of the military to serve consistent with their biological sex. *Shanahan*, 755 F. App'x 19 (D.C. Cir. 2019) (per curiam). This policy was challenged as a "transgender ban," but the Court found that it instead discriminated based on gender dysphoria rather than gender identity. *Id.* at 24; *see also Shanahan*, 917 F.3d at 696 (Wilkins, J., concurring); *id.* at 721–23 (Williams, J., concurring in the result). Transgender members were permitted to serve so long as they did not attempt any "transitioning" to the opposite sex, including dressing and complying with physical fitness standards of the opposite sex.

Gender dysphoria is "a mental health condition from which only a subset of transgender people suffer. It is a serious mental health condition that is recognized by the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders." *Shanahan*, 917 F.3d at 708 (Williams, J., concurring in the result) (cleaned up). A recommended treatment "includes, as

---

[6] See Guidance Regarding the Employment of Transgender Individuals in the Federal Workplace at 1, available at http://www.opm.gov/policy-data-oversight/diversity-and-inclusion/reference-materials/gender-identity-guidance/.

appropriate, gender transition, which includes social transition, hormone therapy, and surgical interventions to bring the body into alignment with one's gender identity." *Id.* (cleaned up).

Social transition, which is "the sole choice of many, consists simply of living one's life fully in accordance with one's gender identity, which typically includes publicly identifying oneself as that gender through all of the ways that people signal their gender to others such as through their name, pronoun usage, dress, manner and appearance, and social interactions." *Id.* at 708–09 (cleaned up). By contrast, few transgender people take the extreme step of surgical body modification. Only 2% of biologically male transgender persons undergo "sex reassignment surgery"; this number is only 10% for biologically female transgender persons. *Id.* at 708.

In sum, being "transgender" is defined "in terms of how one *identifies*, not how one *lives*." *Id.* at 722 (emphasis in original; cleaned up). This distinction has a meaningful practical application: "[O]nly 55% of transgender individuals report living in their preferred gender," and "of the remainder only half—27% of the total—even wished to transition at some point in the future." *Id.*

### B. The June 15 Guidance applies *Bostock's* prohibition of gender-identity discrimination to workplace policies disregarding that concept.

The policies targeted by the June 15 Guidance do not discriminate based on gender identity. While *Bostock* held that "discrimination based on homosexuality or transgender status necessarily entails discrimination based on sex," 140 S. Ct. at 1747, the June 15 Guidance instead addresses "the converse question: whether discrimination on the basis of sex necessarily entails discrimination based on transgender status." *Adams v. Sch. Bd. of St. Johns Cty.*, 3 F.4th 1299, 1332 (11th Cir. 2021) (Pryor, C.J., dissenting), *vacated, reh'g en banc granted,* 9 F.4th 1369 (11th Cir. 2021).

The June 15 Guidance never addresses the question of whether the policies "impose disadvantageous terms or conditions" based on sex. The Second Circuit ruling affirmed in *Bostock* left this question open but indicated the serious possibility that such policies were not covered by Title VII even if discrimination based on sexual orientation and gender identity were forbidden. *Zarda*, 883

F.3d at 118-19 (favorably citing on this ground *Oncale,* 523 U.S. 75, and *Willingham,* 507 F.2d 1084). This distinction is alluded to in *Bostock* itself. *See Bostock,* 140 S. Ct. at 1753 (after noting that its reasoning does not settle the issue of "bathrooms, locker rooms, or anything else of the kind," referring to Title VII's limitation to "distinctions or differences in treatment that injure protected individuals"; while "firing employees surely counts, other policies and practices might or might not qualify as unlawful discrimination") (cleaned up). But if such policies *are* covered by Title VII, then the June 15 Guidance violates the prohibition on treating employees differently based on gender identity.

Consider standard bathroom norms, such as those in the Texas Department of Agriculture's workplace policies. 2Supp.App.003. All biological males, regardless of their gender identity, may use the men's bathroom; all biological females, regardless of their gender identity, may use the women's bathroom. "Separating bathrooms based on sex dates back as far as written history will take us," long before the concept of gender identity even existed. *Adams,* 3 F.4th at 1328 (Pryor, C.J., dissenting) (cleaned up). These policies do not even consider "gender identity," and therefore cannot be described as discriminating based on that category. *Cf. Raytheon Co. v. Hernandez,* 540 U.S. 44, 54 n.7 (2003) ("[I]f no part of the hiring decision turned on [the applicant's] status as disabled, he cannot, *ipso facto,* have been subject to disparate treatment"). "Separating bathrooms by sex treats people differently on the basis of sex . . . [but] the mere act of determining an individual's sex, using the same rubric for both sexes, does not treat anyone differently on the basis of sex." *Adams,* 3 F.4th at 1325–26 (Pryor, C.J., dissenting).

The June 15 Guidance purports to allow sex-specific bathrooms (explicitly)[7] and sex-specific dress codes and pronoun usage policies (implicitly) as a general matter. But it then "tr[ies] to work

---

[7]   Indeed, EEOC's existing regulations approve of States requiring employers to have separate restrooms based on sex. See 29 C.F.R. § 1604.2(b)(5) ("Some States require that separate restrooms be provided for

around [those concessions] with a linguistic device." *Shanahan*, 917 F.3d at 723 (Williams, J., concurring in the result) (noting plaintiffs' concession that military may have sex-specific standards but maintaining that "sex" should be determined by subjective gender identity). It is no consolation to tell employers they can still have sex-specific bathrooms (or dress codes or pronoun usage) so long as they allow exceptions for employees who subjectively identify as the opposite sex.

If employers may have separate bathrooms for men and women, as the June 15 Guidance concedes, then they may also require their employees to comply with that policy. *Cf.* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* § 30, at 192–93 (2012) ("[W]henever a power is given by a statute, everything necessary to making it effectual or requisite to attaining the end is implied.") (citation omitted). The same is true for sex-specific dress codes or allowing the use of gendered pronouns as part of standard English in the workplace; such policies do not classify based on the gender identity of employees but disregard that concept altogether, exactly as *Bostock* requires. Indeed, to allow employers to have sex-specific workplace policies, but then require them to allow exemptions only for transgender employees violates *Bostock.*

For example, under the June 15 Guidance, an employer may prevent a male employee from using the women's restroom as a general policy. But EEOC claims that if that male employee has a transgender gender identity, the employer must allow *him* to use the women's restroom, based on his gender identity. This requires employers to discriminate based on gender identity, violating *Bostock's* admonition that "an individual's homosexuality or transgender status is *not relevant* to employment decisions." 140 S. Ct. at 1741 (emphasis added); *see also Bear Creek Bible Church,* 2021 WL 5449038, at *31, 35 (upholding sex-specific dress codes and bathroom policies because they do not treat one

---

employees of each sex. An employer will be deemed to have engaged in an unlawful employment practice if it refuses to hire or otherwise adversely affects the employment opportunities of applicants or employees in order to avoid the provision of such restrooms for persons of that sex.").

biological sex worse than the other, even if they have different particular standards for each sex, because they do not classify based on gender identity).

> ### C.    The June 15 Guidance wrongly protects practices correlated with protected traits.

Again, the June 15 Guidance improperly conflates "gender identity"—the internal sense of gender of an employee, at issue in *Bostock*—with the mental illness of gender dysphoria, which is sometimes treated by having the person perform certain practices, to "socially transition" by living as the opposite sex. Discrimination based on gender dysphoria or its treatment—which would include conduct such as opposite-sex dress, bathroom usage, or pronoun usage—is not the same as discrimination based on transgender *status*. *Shanahan*, 917 F.3d at 699–700.

By finding Title VII to prohibit discrimination based on gender identity because it is sex discrimination, *Bostock* forbids employers from discriminating against an employee based on that individual's internal sense of being male or female. *Bostock* does not allow any expansion of this concept to conduct that may be "associated with" transgender status—or any expansion as to sexual orientation beyond the internal orientation of one's sexual attraction. Any such conduct would only be "related [to transgender status] in 'some vague sense,'" or merely have "some disparate impact" on transgender employees. *Bostock*, 140 S. Ct. at 1742. Given that many transgender persons make no attempt to socially transition, such behavior is not "inextricably" related to transgender status, and thus not sufficiently related to sex to be reached by Title VII. *Id.*

*Bostock's* treatment of sex discrimination is consistent with longstanding judicial precedent relating to other protected categories in Title VII and other anti-discrimination laws. As a result, even if "social transitioning" is *correlated* with transgender status, it is not protected.

For example, Title VII permits employers to limit the languages spoken in the workplace, even though an employee's native language is closely bound up with his national origin and he may have a strong cultural connection with his native language. The Fifth Circuit has rejected attempts to find

discrimination based on language merely because it is correlated with national origin. *See, e.g., Garcia v. Gloor,* 618 F.2d 264, 268 (5th Cir. 1980). This was the case even though there was expert testimony that "the Spanish language is the most important aspect of ethnic identification for Mexican–Americans, and it is to them what skin color is to others." *Id.* at 267; *see also Garcia v. Spun Steak Co.,* 998 F.2d 1480, 1489–90 (9th Cir. 1993) (O'Scannlain, J.) (rejecting EEOC guideline and holding that a rule mandating that only English be spoken in the workplace was not national origin discrimination); *see also id.* at 1487 (while "an individual's primary language can be an important link to his ethnic culture and identity, Title VII does not protect the ability of workers to express their cultural heritage at the workplace") (cleaned up).

The central distinction is that Title VII protects only against discrimination based on immutable characteristics, not conduct associated with protected classes. As explained by the Fifth Circuit:

> Save for religion, the discriminations on which [Title VII] focuses its laser of prohibition are those that are either beyond the victim's power to alter, or that impose a burden on an employee on one of the prohibited bases. No one can change his place of birth (national origin), the place of birth of his forebears (national origin), his race or fundamental sexual characteristics.

*Gloor,* 618 F.2d at 269 (cleaned up). For all categories in Title VII (other than religion), courts have repeatedly rejected attempts to conflate volitional behavior or attributes that are associated with protected classes. *See Espinoza v. Farah Mfg. Co.,* 414 U.S. 86, 88, 95 (1973) (rejecting conflation of citizenship or alienage status with Title VII category of national origin); *EEOC v. Catastrophe Mgmt. Sols.,* 852 F.3d 1018, 1032 (11th Cir. 2016) (noting "every court to have considered the issue has rejected the argument that Title VII protects hairstyles culturally associated with race") (collecting cases); *In re Union Pac. R.R. Emp. Pracs. Litig.,* 479 F.3d 936, 942–45 (8th Cir. 2007) (rejecting conflation of contraception use with Title VII category of sex); *cf. Hazen Paper Co., v. Biggins,* 507 U.S. 614, 608–14 (1993) (rejecting conflation of age discrimination under ADEA with seniority or pension status).

Defendants take issue with this longstanding norm of antidiscrimination law, citing cases they maintain contradict this principle. *See* ECF 58-1 a 9–12. But these cases do not interpret federal anti-discrimination statutes. Instead, they are constitutional cases involving the First Amendment, *Christian Legal Soc'y v. Martinez*, 561 U.S. 661 (2010), or claims of substantive due process, *Lawrence*, 539 U.S. 558.[8] Of course, the Supreme Court recently rejected an argument that the Equal Protection Clause protected conduct closely correlated with the female sex:

> we briefly address one additional constitutional provision that some of respondents' *amici* have now offered as yet another potential home for the abortion right: the Fourteenth Amendment's Equal Protection Clause. Neither *Roe* nor *Casey* saw fit to invoke this theory, and it is squarely foreclosed by our precedents, which establish that a State's regulation of abortion is not a sex-based classification and is thus not subject to the "heightened scrutiny" that applies to such classifications. The regulation of a medical procedure that only one sex can undergo does not trigger heightened constitutional scrutiny unless the regulation is a "mere pretex[t] designed to effect an invidious discrimination against members of one sex or the other." And as the Court has stated, the "goal of preventing abortion" does not constitute "invidiously discriminatory animus" against women. Accordingly, laws regulating or prohibiting abortion are not subject to heightened scrutiny. Rather, they are governed by the same standard of review as other health and safety measures.

*Dobbs v. Jackson Women's Health Org.*, No. 19-1392, 2022 WL 2276808, at *10 (U.S. June 24, 2022) (citations omitted).

Defendants cite Fifth Circuit cases that do not rebut the norms of anti-discrimination law set forth here. *EEOC v. Boh Brothers* held that failure to conform to sex stereotypes could be "evidence" of a violation of Title VII, not itself a violation, 731 F.3d 444, 454 (5th Cir. 2013) (en banc). *Williams v. Wal-Mart Stores, Inc.*, 156 F.3d 581 (5th Cir. 1998) involved straightforward discrimination based on the protected trait—race—itself. And *EEOC v. Houston Funding II Ltd.*, 717 F.3d 425 (5th Cir. 2013) involved direct discrimination based on a protected trait—lactation. This latter case supports

---

[8] Justice O'Connor concurred in the judgment on the grounds of equal protection. *Lawrence*, 539 U.S. at 579. Even there, however, the opinion was based on purported discrimination based on status: "The State has admitted that because of the sodomy law, *being* homosexual carries the presumption of being a criminal." *Id.* at 584 (emphasis in original).

Plaintiff's argument because it involved the Pregnancy Discrimination Act ("PDA"), that explicitly added to the definition of "because of sex" discrimination to include "because of or on the basis of pregnancy, childbirth, or related medical conditions." 42 U.S.C. § 2000e-(k). The PDA was adopted after the Supreme Court had held that such discrimination was not covered by the general prohibition on discrimination "because of sex" in Title VII. *See Gen. Elec. Co. v. Gilbert*, 429 U.S. 125, 136–38 (1976). Defendants point to no such statute relating to traits or attributes "associated with" transgenderism, so their interpretation is doomed by the "Negative–Implication Canon[:] The expression of one thing implies the exclusion of others (*expressio unius est exclusio alterius*)"). Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 107 (2012).

Defendants make the same argument to defend the March 2 Guidance. ECF 58-1 at 28–32. They contend that because "gender dysphoria" is "a condition predominantly experienced by transgender people," *id.* at 30, any argument that it is not inextricably linked to transgenderism fails. But the vast majority of children who identify as transgender grow out of it. *See* Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 455 (5th ed. 2013) (finding between 97.8% and 70% of boys and between 88% and 50% of girls suffering from gender dysphoria will have it resolved by adulthood). This means that most of the children protected from mutilation by Texas's child abuse laws are not transgender in any essential way. And both those who identify as transgender and those who do not undergo experimental "gender-affirming" procedures. "Non-transgender individuals who develop gender dysphoria do so as a consequence of grievous injuries or diseases … [such as] horrific testicular wounds or mastectomies because of cancer," *Shanahan*, 917 F.3d at 734 (Williams, J., concurring in the result), and "an exceedingly small percentage [of those who identify as transgender] undergo sex-reassignment surgery," *id.* at 735. These facts demonstrate that such behavior is not "inextricably" related to transgender status, and thus not sufficiently related to sex to be reached by Title VII. *Bostock*, 140 S. Ct. at 1742.

21

Even if there were a high correlation between "gender-affirming care" and transgender status, Dobbs makes clear that even 100% correlation is not enough. 2022 WL 2276808, at *10; *see also Geduldig v. Aiello*, 417 U.S. 484, 496–97 (1974) ("The program divides potential recipients into two groups, pregnant women and nonpregnant persons. While the first group is exclusively female, the second includes members of both sexes."); *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 271–72 (1979) (explaining that "many [laws] affect certain groups unevenly, even though the law itself treats them no differently from all other members of the class described by the law").

Simply put, gender identity is not more protected than race or national origin, and EEOC was wrong to do so in the June 15 Guidance. Practices or conduct associated with transgender status—as opposed to the status of feeling one is "really" the opposite sex—are not protected at all.

### D.    The June 15 Guidance wrongly attempts to impose accommodation requirements.

While *Bostock* prohibits an employer from discriminating against employees based on sexual orientation or gender identity, the employer is not required to treat homosexual or transgender employees more favorably than other employees. *See Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 259 (1981) (employers not required to give preferential treatment to minorities or women). By requiring employers to make exceptions to concededly lawful policies for practices "associated with" a particular gender identity, the June 15 Guidance turns Title VII's prohibition on sex discrimination into an accommodation mandate. There is no textual warrant for requiring accommodations for any aspect of sex discrimination—unlike, for example, religious accommodation. *See* 42 U.S.C. § 2000e(j).

The June 15 Guidance does not address discrimination based on sexual orientation or gender identity as aspects of sex discrimination, as did *Bostock*. Instead, to reiterate, it attempts to require employers to accommodate practices that are purportedly "associated with" transgender status.

Again, the policies targeted by the June 15 Guidance do not discriminate based on the gender identity of employees, because it is well established that "apply[ing] a neutral, generally applicable" policy "can, in no way, be said to have been motivated by" a protected classification and constitute illegal disparate treatment. *Raytheon*, 540 U.S. at 55.

"It is plain enough what 'accommodation' means. The employer must be willing to consider making changes in its ordinary work rules, facilities, terms, and conditions." *Burch v. Coca-Cola Co.*, 119 F.3d 305, 313–15 (5th Cir. 1997) (examining Americans with Disabilities Act) (citation omitted). That is exactly what the June 15 Guidance is attempting to do: to require the alteration of the "ordinary work rules, facilities, terms, and conditions" that apply to all other employees. *Cf. Shanahan*, 917 F.3d at 708 (Williams, J., concurring in the result) (describing the requirement that all servicemembers serve in their biological sex as "declining to make … accommodations for gender transition," rather than "a transgender ban"); *Bear Creek Bible Church,* 2021 WL 5449038, at *35 ("Plaintiffs seek a declaration that they may prohibit employees from using a restroom designated for the opposite biological sex. Defendants maintain that if an individual identifies as the opposite sex, the employer must accommodate.") (cleaned up). But "[f]ailure to provide a reasonable accommodation is a type of unlawful discrimination … not generally applicable to all the protected status groups under Title VII, and has been reserved to issues of discrimination on the basis of religion and disability." 1 Barbara T. Lindemann & Paul Grossman, *Employment Discrimination Law* 265 (4th ed. 2007).

Compare the June 15 Guidance's accommodation mandates with Title VII's well-known accommodation requirement for religion. Title VII defines "religion" broadly to include "all aspects of religious *observance and practice*, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate an employee's or prospective employee's religious observance or practice." 42 U.S.C. § 2000e(j) (emphasis added). And Title VII's accommodation requirement, unlike

the norm of neutrality for most anti-discrimination provisions, requires preferential treatment for employees based on religious practices:

> Title VII does not demand mere neutrality with regard to religious practices—that they be treated no worse than other practices. Rather, it gives them favored treatment, affirmatively obligating employers not "to fail or refuse to hire or discharge any individual … because of such individual's" "religious observance and practice." An employer is surely entitled to have, for example, a no-headwear policy as an ordinary matter. But when an applicant requires an accommodation as an "aspec[t] of religious … practice," it is no response that the subsequent "fail[ure] … to hire" was due to an otherwise-neutral policy. Title VII requires otherwise-neutral policies to give way to the need for an accommodation.

*EEOC v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 775 (2015).

*Bostock*, on the other hand, forbids "favored treatment" based on the "belief[s]" of sexual orientation and gender identity, and thus precludes any requirement of accommodation. In this regard, Title VII's treatment of religion is dispositive of EEOC's attempt to impose an accommodation requirement for gender identity (more precisely, for gender expression or gender dysphoria). None of the other Title VII protected characteristics require accommodation of employees' voluntary "observance[s] or practice[s]," including dress, bathroom usage, or customized language demands. The religious accommodation requirement "reinforce[es] the conclusion that Congress acted deliberately when it omitted" any accommodation requirement from the sex discrimination provision in the same section of the statute. *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 354 (2013); *see also EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 256 (1991). Indeed, Congress has explicitly precluded gender dysphoria or transgender status (or homosexuality) as a basis for an accommodation under the Americans with Disabilities Act. *See* 42 U.S.C. § 12211. Through the June 15 Guidance, EEOC seeks to overcome Congress's deliberate choice to not require accommodations based on these concepts.

Consider pronouns. Standard English usage is that individual pronouns are based on sex, not gender identity—a usage that existed long before the latter concept existed. EEOC does not assert

that standard English is forbidden in workplaces in general, but the June 15 Guidance requires that an exception be made when referring to transgender employees. But

> [Title VII] does not reach genuine but innocuous differences in the ways men and women routinely interact with members of the same sex and of the opposite sex. The prohibition of harassment on the basis of sex requires neither asexuality nor androgyny in the workplace; it forbids only behavior so objectively offensive as to alter the "conditions" of the victim's employment.
>
> "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview." *Harris,* 510 U.S., at 21, 114 S.Ct., at 370, citing *Meritor,* 477 U.S., at 67, 106 S.Ct., at 2405–2406. We have always regarded that requirement as crucial, and as sufficient to ensure that courts and juries do not mistake ordinary socializing in the workplace—such as male-on-male horseplay or intersexual flirtation—for discriminatory "conditions of employment."

*Oncale*, 523 U.S. at 81. It is difficult to think of anything more of a "genuine but innocuous difference[] in the ways men and women routinely interact with members of the same sex and of the opposite sex" than the standard use of the English language.

The June 15 Guidance would also produce a host of practical difficulties. Under its approach, employers, judges, and juries would be required to engage in unbounded theorizing about what "real" homosexual or transgender individuals do, speculating about what practices are "associated with" different sexual orientations or gender identities; whether a given employee is of this or that sexual orientation or gender identity; and whether the employee is, by some behavior or practice, engaging in a cultural display associated with that identity, as to which he—but not his co-workers of a different identity— is uniquely entitled. The result would be the very sort of stereotyping and discrimination that the Supreme Court in *Bostock* said Title VII forbids.

Unlike with religion, Title VII does not protect "observance[s] or practice[s]" related to sexual orientation or gender identity nor require employers to accommodate such volitional practices— transgender *status* or homosexual *status* alone are protected. "It is axiomatic that an employee must often sacrifice individual self-expression during working hours. Just as a private employer is not

25

required to allow other types of self-expression, there is nothing in Title VII which requires an employer to allow employees to express their cultural identity." *Spun Steak Co.*, 998 F.2d at 1487.

### III.  The March 2 Guidance is not in accordance with law because it is not consistent with Section 1557 and *Bostock.*

The textual differences between Title IX—which Section 1557 incorporates for its provisions on sex discrimination—have already been noted by the Court. *See* ECF 53 at 8–9 (noting that Title IX proscribes "discrimination on the basis of sex," while Title VII does the same "because of" sex); *see also Meriwether v. Hartop*, 992 F.3d 492, 510 n.4 (6th Cir. 2021) ("Title VII differs from Title IX in important respects: For example, under Title IX, universities must consider sex in allocating athletic scholarships, 34 C.F.R. § 106.37(c), and may take it into account in "maintaining separate living facilities for the different sexes." 20 U.S.C. § 1686. Thus, it does not follow that principles announced in the Title VII context automatically apply in the Title IX context.").

Title IX mandates that no person "shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). But an important qualification tempers this mandate: "nothing contained herein shall be construed to prohibit any educational institution receiving funds under this Act, from maintaining separate living facilities for the different sexes." *Id.* § 1686. The implementing regulations clarify that institutions "may provide separate toilet, locker room, and shower facilities on the basis of sex, but such facilities provided for students of one sex shall be comparable to such facilities provided for students of the other sex." 34 C.F.R. § 106.33. Title IX's emphasis on the acceptability of biological distinctions combines with the source of its authority—the Spending Clause—to distinguish it from Title VII.

Because Congress enacted Title IX under its Spending Clause power, U.S. Const. art. I, § 8, cl. 1, a violation by States must be unambiguous to trigger liability. Although the Spending Clause allows Congress to "attach conditions on the receipt of federal funds," *South Dakota v. Dole*, 483 U.S. 203, 206

(1987), "[t]he legitimacy of Congress' power to legislate under the spending power … rests on whether the State voluntarily and knowingly accepts the terms of the 'contract.'" *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). In other words, "if Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously." *Id*. This requirement applies when courts interpret Title IX. *See Davis ex rel. D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 649–50, (1999).

However, even if *Bostock* applies, the March 2 Guidance exceeds the bounds of that decision for the same reasons as the June 15 Guidance exceeds the bounds of that decision. The March 2 Guidance targets state child-abuse laws not on the basis that they discriminate against anyone based on their "internalized, felt sense of who they are as male or female," *Shanahan*, 917 F.3d at 708 (Williams, J., concurring in the result), but because the targeted laws refuse to make exceptions from their generally applicable language—that is, make accommodations—based on gender identity. The child-abuse laws the March 2 Guidance purports to target do not discriminate based on the concept of gender identity; they disregard that concept altogether, as *Bostock* requires. *See Bostock*, 140 S. Ct. at 1741 ("[homosexuality or transgender status is not relevant to" decisions governed by a prohibition on sex discrimination). For example, Texas's child abuse laws forbid sterilization, genital mutilation, and unnecessary medical interventions for minors regardless of the minor's subjective gender identity. Supp.App.013–027.

Regardless, *Bostock*'s interpretation of Title VII would not apply to the practice of medicine. For while "[a]n individual's homosexuality or transgender status is not relevant to employment decisions," *Bostock*, 140 S. Ct. at 1741; *see also* id. ("An individual employee's sex is 'not relevant to the selection, evaluation, or compensation of employees), it would be medical malpractice not to consider those traits in the healthcare setting. For example, "a hospital that declines to remove the perfectly healthy uterus of a woman who identifies as a man is not engaging in 'gender identity' discrimination at all [because] [t]he gender identity of the patient plays no role in the decision-making process …

doctors do not remove healthy uteruses from *any* patients, regardless of how they identify themselves." Ryan T. Anderson, *A Brave New World of Transgender Policy*, 41 Harv. J.L. & Pub. Pol'y 309, 349–51 (2018).

The issue of the protection of minors also differentiates the healthcare setting from that of employment. States have a "compelling interest in protecting the physical and psychological well-being of minors," *Reno v. ACLU*, 521 U.S. 844, 869 (1997) (citation omitted); *see also Lawrence*, 539 U.S. at 578 ("The present case does not involve minors."), and "sex reassignment surgery is fiercely debated within the medical community." *Gibson v. Collier*, 920 F.3d 212, 224 (5th Cir. 2019). Where, as here, "there is medical and scientific uncertainty," States have "wide discretion" to regulate the practice of medicine. *Gonzales v. Carhart*, 550 U.S. 124, 157 (2007).

## IV.    The Guidances are the products of arbitrary and capricious decisionmaking.

The Courts are compelled to "hold unlawful and set aside agency action[s]" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2). While a reviewing court must not "substitute" its "own policy for that of the agency" and must apply this standard deferentially, the agency action must still "be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021). This court "must set aside any action premised on reasoning that fails to account for relevant factors or evinces a clear error of judgment." *Univ. of Tex. M.D. Anderson Cancer Ctr. v. HHS*, 985 F.3d 472, 475 (5th Cir. 2021) (quotation omitted). Arbitrary and capricious review "is not toothless." *Sw. Elec. Power Co. v. EPA*, 920 F.3d 999, 1013 (5th Cir. 2019). "In fact … it [now] has serious bite." *Wages & White Lion Invs., LLC v. FDA*, 16 F.4th 1130, 1136 (5th Cir. 2021). "[A]n agency's action must be upheld, if at all, on the basis articulated by the agency itself," not reasons developed post hoc. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983).

### A.      The June 15 Guidance is arbitrary and capricious.

In addition, these "established legal positions" that the June 15 Guidance cites as authority for its specific requirements are clearly inapplicable. App.003; App.007–008. Those authorities did not interpret the portion of Title VII that applies to private and State employers. Instead, they involved the distinct portion that applies to federal employers. It was irrational for EEOC to rely on pre-*Bostock* authorities that interpret the wrong provision—it is even more brazen to declare those authorities as "established law" to employers, including States, to which they do not apply.

For private-sector and State employers, Title VII makes it unlawful "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, *because of* such individual's race, color, religion, sex or national origin." 42 U.S.C. § 2000-e2(a)(1) (emphasis added). The language covering federal employers is broader. There, the statute states that "[a]ll personnel actions affecting employees or applicants for employment … shall be made *free from any discrimination based on* race, color, religion, sex, or national origin." *Id.* at § 2000e-16(a) (emphasis added).

These textual differences "hold the Federal Government to a stricter standard than private employers or state or local governments." *Babb v. Wilkie*, 140 S. Ct. 1168, 1173–74 (2020) (relating to ADEA standard with identical wording to Title VII); *id.* at 1181 ("Because § 633a(a)'s language also appears in the federal-sector provision of Title VII, 42 U.S.C. § 2000e–16(a), the Court's rule presumably applies to claims alleging discrimination based on sex, race, religion, color, and national origin as well.") (Thomas, J., dissenting); *see also Smith v. City of Jackson*, 544 U.S. 228 (2005) (provisions of the ADEA should be read *in pari materia* with parallel provisions in Title VII); *Durr v. Dep't of Veterans Affs.*, 843 F. App'x 246, 247 (11th Cir. 2021) (per curiam) (recognizing applicability of *Babb* to Title VII and lower causation threshold in federal employment context).

The lack of reasoned decisionmaking in the Rule is also evident in its attempt "to explain what the *Bostock* decision means" by citing decisions that are themselves inconsistent with *Bostock*.

First, despite its purported intention to "provide clarity to the public," App.004, the June 15 Guidance never mentions to its target audience—the private-sector and State employers and their employees—that EEOC's prior decisions were decided under the distinct textual provision applicable only to federal employment. It also has a curt reference to *Bostock* having "reserved some issues for future cases," App.004, without mentioning that those issues are the very ones addressed in the June 15 Guidance.

Second, *Bostock's* finding of sex discrimination depended on the fact that a biological male who identifies as a female is in fact a male (and thus was treated differently than biological females). *See Bostock*, 140 S. Ct. at 1741 ("take an employer who fires a transgender person who was identified as a male at birth but who now identifies as a female. If the employer retains an otherwise identical employee who was identified female at birth, the employer intentionally penalizes a person identified as male at birth for traits or actions that it tolerates in an employee identified as female as birth.").

But the June 15 Guidance's cited authorities state the opposite. *See Lusardi*, 2015 WL 1607756, *8) ("there is no cause to question that Complainant–who was assigned the sex of male at birth but identifies as female—*is* female." (emphasis in original); *Mia Macy v. Holder*, Appeal No. 0120120821, 2012 WL 1435995, *5 (EEOC Apr. 20, 2012) (asserting that Title VII does not prohibit sex discrimination only on the basis of biological sex). These (pre-*Bostock*) authorities cannot rationally be cited as authority as to what *Bostock* means or to what Title VII requires of private-sector and State employers addressed. Those authorities also rely heavily on the "sex-stereotyping" theory of *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989) and lower court cases applying that precedent. *See Mia Macy*, 2012 WL 1435995, *6–10; *Lusardi*, 2015 WL 1607756, *6–7 & n.6. *Price Waterhouse* "figure[d] prominently in the decisions of the lower courts [in the consolidated cases in *Bostock*] and in briefs

submitted by or in support of the employees [in the Supreme Court]." *Bostock*, 140 S. Ct. at 1763 (Alito, J., dissenting). But the *Bostock* majority "apparently f[ound] these arguments unpersuasive" as it ignored them. *Id.* It is not reasoned decisionmaking—in purporting to "explain" what *Bostock* said— to rely on pre-*Bostock* authorities that themselves depend on a rationale rejected in *Bostock* itself.

## B.    The March 2 Guidance is arbitrary and capricious.

HHS failed to consider "the relevant data" and draw a "rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43, 103 S. Ct. at 2866 (internal quotation marks omitted). Defendants cite no prior HHS interpretation that Section 504 of the Rehabilitation Act protects as a disability "some cases" of gender dysphoria, as the OCR document asserts. Supp.App.003. The Rehabilitation Act expressly excludes "transvestism, transsexualism . . . [and] gender identity disorders not resulting from physical impairments" from its definition of disability. 29 U.S.C. § 705(20)(F)(i). And "[g]ender dysphoria, as a gender identity disorder, is specifically exempted as a disability by the Rehabilitation Act." *Michaels v. Akal Sec., Inc.*, 2010 WL 2573988, at *6 (D. Colo. June 24, 2010). *See also Parker v. Strawser Constr., Inc.*, 307 F. Supp. 3d 744, 753-54 (S.D. Ohio 2018);; *Gulley-Fernandez v. Wis. Dept. of Corr.*, 2015 WL 7777997, at *2 (E.D. Wis. Dec. 1, 2015) ("gender identity disorder is not a 'disability' under the Americans with Disabilities Act or the Rehabilitation Act."); *Mitchell v. Wall*, 2015 WL 10936775, at *1 (W.D. Wis. Aug. 6, 2015) (gender identity disorders expressly excluded from coverage under the ADA); *Kastl v. Maricopa Cnty. Cmty. Coll. Dist.*, 2004 WL 2008954, at *4 & n. 2 (D. Ariz. June 3, 2004) (equating "gender identity disorder" and "gender dysphoria" and holding them to be expressly excluded from definition of "disability").

Defendants attempt to use the exception for gender identity disorders arising from physical impairments to defend the March 2 Guidance, noting that Texas's child abuse laws recognize this

exception. ECF 58-1 at 32–33. But the fact that Texas's child abuse laws do not apply to such rare cases[9] makes the March 2 Guidance's statements clearly about the cases that Texas's laws do cover.

## V.     The June 15 Guidance and the March 2 Guidance are invalid substantive rules.

Both the June 15 Guidance and the March 3 Guidance are procedurally invalid under the APA for failing to undergo notice and comment. *See* 5 U.S.C. § 553. Indeed, the June 15 Guidance could not have been issued even with notice-and-comment rulemaking, because "EEOC has limited rulemaking and enforcement power with respect to Title VII [and] may issue only 'procedural regulations' implementing Title VII and may not promulgate substantive rules." *EEOC*, 933 F.3d at 439 (citing 42 U.S.C. § 2000e-12(a)).

The APA's notice and comment requirements apply to "substantive" or "legislative" rules, but the APA makes exceptions for certain categories of "non-legislative" rules, to which the notice and comment requirements do not apply. *Texas v. United States*, 809 F.3d 134, 170–71 (5th Cir. 2015); *Dep't. of Lab.v. Kast Metals Corp.*, 744 F.2d 1145, 1152 (5th Cir. 1984). "[I]f a rule is 'substantive,' the exemption is inapplicable, and the full panoply of notice-and-comment requirements must be adhered to scrupulously." *Texas*, 809 F.3d at 171. Importantly, "the APA's notice and comment exemptions must be narrowly construed." *Id.* (cleaned up).

Defendants do not dispute that the Guidances are rules under 5 U.S.C. § 551(4), nor do they claim to have complied with the APA's notice-and-comment requirements.

The Fifth Circuit distinguishes general statements of policy from legislative rules using two criteria: "whether the rule (1) imposes any rights and obligations and (2) genuinely leaves the agency and its decision-makers free to exercise discretion." *Texas*, 809 F.3d at 171 (cleaned up). Courts should note that there "is some overlap in the analysis of those prongs" and also be "mindful but suspicious

---

[9]   Consistent with this narrow exception, Texas's child abuse laws recognize "rare circumstances" of medical necessity for "children [who] have a medically verifiable genetic disorder of sex development or do not have the normal sex chromosome structure for male or female." Supp.App.016.

of the agency's own characterization" of its action. *Id.* (citations omitted). But most importantly, the Court should focus "primarily on whether the rule has binding effect on agency discretion or severely restricts it." *Id.* (citation omitted). "An agency pronouncement will be considered binding as a practical matter if it either appears on its face to be binding, or is applied by the agency in a way that indicates it is binding." *Id.* (cleaned up).

"[T]he Fifth Circuit also uses this inquiry to determine whether an agency action is final." *Texas v. United States*, No. 6:21-CV-00016, 2022 WL 2109204, at *40 (S.D. Tex. June 10, 2022) (Tipton, J.). The Fifth Circuit subsequently reinforced this point of Judge Tipton. *Texas v. United States*, No. 22-40367, 2022 WL 2466786, at *12–13 (5th Cir. July 6, 2022) (noting that DHS guidance was a substantive rule "[f]or the same reasons articulated" in the panel's analysis of final agency action).

This Court's analysis of the second prong of the test to determine whether there is final agency action, ECF 63 at 4–13, shows that both the June 15 Guidance and the March 2 Guidance are substantive rules because they both bind the respective agencies and impose new duties and "changed the text of the statutes they profess to interpret." *POET Biorefining, LLC v. EPA*, 970 F.3d 392, 407 (D.C. Cir. 2020); *EEOC*, 827 F.3d at 385–86 ("the [EEOC and HHS] Guidance[s] do[] not simply repeat the relevant provisions of Title IX [and Section 1557 and the Rehabilitation Act]. Instead. The Guidance[s] purport[] to interpret authoritatively [requirements of those statutes]. This court has always considered such a distinction important when deciding whether agency action is 'final' under the APA."). Each Guidance was issued not to "put[] the public on notice of pre-existing legal obligations," but to "speak with the force of law" and create[e] legal effects" for regulated employers and healthcare funding recipients, and are therefore "legislative [or substantive] rule[s]." *NRDC v. Wheeler*, 955 F.3d 68, 83 (D.C. Cir. 2020).

As explained above, neither the relevant statutes nor *Bostock* "compels or logically justifies" the June 15 Guidance or the March 2 Guidance. *Natl. Council for Adoption v. Blinken*, 4 F.4th 106, 113 (D.C. Cir. 2021).

Furthermore, Defendants cite no prior HHS interpretation that Section 504 of the Rehabilitation Act protects as a disability "some cases" of gender dysphoria, as the OCR document asserts. Supp.App.003. The Rehabilitation Act expressly excludes "transvestism, transsexualism . . . [and] gender identity disorders not resulting from physical impairments" from its definition of disability. 29 U.S.C. § 705(20)(F)(i). And "[g]ender dysphoria, as a gender identity disorder, is specifically exempted as a disability by the Rehabilitation Act." *Michaels v. Akal Sec., Inc.*, 2010 WL 2573988, at *6 (D. Colo. June 24, 2010). *See also Parker v. Strawser Constr., Inc.*, 307 F. Supp. 3d 744, 753-54 (S.D. Ohio 2018);; *Gulley-Fernandez v. Wis. Dept. of Corr.*, 2015 WL 7777997, at *2 (E.D. Wis. Dec. 1, 2015) ("gender identity disorder is not a 'disability' under the Americans with Disabilities Act or the Rehabilitation Act."); *Mitchell v. Wall*, 2015 WL 10936775, at *1 (W.D. Wis. Aug. 6, 2015) (gender identity disorders expressly excluded from coverage under the ADA); *Kastl v. Maricopa Cnty. Cmty. Coll. Dist.*, 2004 WL 2008954, at *4 & n. 2 (D. Ariz. June 3, 2004) (equating "gender identity disorder" and "gender dysphoria" and holding them to be expressly excluded from definition of "disability"). The March 2 Guidance is therefore also a legislative rule on this basis.

Because neither Title VII, Section 1557, the Rehabilitation Act, nor *Bostock* "compels or logically justifies" the June 15 Gudiance or the March 2 Guidance, they are legislative rule issued in violation of the APA's notice-and-comment requirements. *See NRDC v. Wheeler*, 955 F.3d 68, 84 (D.C. Cir. 2020) (because EPA "treated [a judicial decision] as having a legal effect—full vacatur—that the decision disclaimed[,] [it was] a legislative rule").

Defendants do not address the binding nature of the March 2 Guidance on the agency—a fatal omission, as binding agency staff, as this Court has explained, affects rights or obligations and indicates a legislative rule. ECF 53 at 9–12.

The Fifth Circuit has held EEOC guidance "broadly condemning" an employment practice "leaves no room for EEOC staff *not* to issue referrals to the Attorney General when an employer" implements that practice. *EEOC*, 933 F.3d at 443. The same reasoning applies here. OCR's document explaining the March 2 Guidance appeared to hedge the certainty of its guidance. *See, e.g.,* Supp.App.003 ("For example, if a parent and their child visit a doctor for a consultation regarding or to receive gender affirming care, and the doctor or other staff at the facility reports the parent to state authorities for seeking such care, that reporting may constitute violation of Section 1557 if the doctor or facility receives federal financial assistance. Restricting a health care provider's ability to provide or prescribe such care may also violate Section 1557."). But the March 2 Guidance was accompanied by the imprimatur of Secretary Becerra himself who hedged not at all. Becerra, indeed, indicated that he had already concluded that Texas's interpretation of its own child-abuse laws was "discriminatory and unconscionable," referring to "a discriminatory gubernatorial order in Texas," explaining that he had "directed [his] team to evaluate the tools at [its] disposal" to interfere with that interpretation, and inviting "[a]ny individual or family in Texas who is being targeted by a child welfare investigation because of this discriminatory gubernatorial order . . . to contact our Office for Civil Rights" to pursue that interference. Supp.App.006.

The Secretary of Health and Human Services himself has announced the Department's conclusion that Texas has violated federal law. What agency staffer has discretion to countermand him? *Cf. Profls. & Patients for Customized Care v. Shalala*, 56 F.3d 592, 599 (5th Cir. 1995) ("We would expect agency employees to consider all sources of pertinent information in performing [their] task[s], whether the information be contained in a substantive rule, an interpretive rule, or a statement of

policy. Indeed, what purpose would an agency's statement of policy serve if agency employees could not refer to it for guidance?"). The March 2 Guidance is therefore binding on the agency "as a practical matter [because] it either appears on its face to be binding, or is applied by the agency in a way that indicates it is binding." *Texas*, 809 F.3d at 171.

## VI.    The Pronoun Accommodation in the June 15 Guidance violates the First Amendment.

Requiring co-workers and supervisors to use pronouns that validate the concept of gender identity compels them to express an ideological position they do not hold. In *Meriwether v. Hartop*, 992 F.3d 492 (6th Cir. 2021), the Sixth Circuit determined that it was a violation of the Free Speech Clause to require a State employee to use pronouns based on the gender identity of students, and rejected the justification of Title IX. *Id* at 511. This was despite the general applicability of "*Garcetti v. Ceballos*, [where] the Supreme Court held that normally 'when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline.'" 547 U.S. 410, 421, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006)." *Id.* at 504. Defendants cannot use *Garcetti* to justify their restrictions on the speech of public employees of a different sovereign.

Texas is not asserting its right to speak, but challenging EEOC's mandate to expose itself to liability for violating the rights of its employees—if Texas were pressured to discipline their employee in violations of the First Amendment, it would be liable to them. *See, e.g., Truax v. Raich*, 239 U.S. 33, 35 (1915) (the government may not force an employer to terminate an employee on grounds that would be deemed unconstitutional if performed by the government directly, even if the employer always possessed the right to terminate the employee for any reason); *see also Peterson v. City of Greenville*, 373 U.S. 244, 247-48 (1963) (government may not require restauranteur to segregate his place of business even though the restauranteur was, at that time in history, free to segregate his restaurant if he so chose); *cf. Ricci v. DeStefano*, 557 U.S. 557, 594 (2009) (Scalia, J., concurring) ("if the Federal

Government is prohibited from discriminating on the basis of race, … then surely it is also prohibited from enacting laws mandating that third parties—*e.g.,* employers, whether private, State, or municipal—discriminate on the basis of race.").

## VII.   EEOC violated the APA by failing to follow Title VII and its own procedures.

Title VII and EEOC's own rules set forth specific procedures that EEOC must follow to issue technical assistance. The June 15 Guidance wasn't issued in accordance with those requirements, and its issuance therefore violates the APA's requirement that an agency acts only in "observance of procedure required by law." 5 U.S.C. § 706(2)(D).

### A.   EEOC violated Title VII's requirements.

Under Title VII, EEOC's Chairman is responsible for the "administrative operations of the Commission[.]" Exercising "the powers of the Commission," on the other hand, requires a "quorum" of "three members[.]" 42 U.S.C. § 2000e-4(a), (c). Among those powers: "furnish[ing] to persons . . . such technical assistance as they may request to further their compliance with this subchapter… ." *Id.* at § 2000e-4(g)(3). EEOC maintains a "revolving fund" to pay the costs associated with furnishing technical assistance. *Id.* § 2000e-4(k)(1). To "offset [those] costs," EEOC may issue technical assistance only after a payment, "imposed on a uniform basis on persons and entities receiving such … assistance," that replenishes that fund. *Id.* § 2000e-4(k)(2)(A).

The June 15 Guidance, though characterized by Burrows as "technical assistance," Appx.002, complies with none of these requirements. Its issuance was not a matter of administration Burrows could undertake unilaterally, it was not approved by a quorum of the Commission, 2Supp.App.047–056, and it was not paid for by the persons and entities receiving it. Each of these failures violates the procedures imposed by the law; each failure violates the APA and requires vacatur.

The Defendants contest none of this. They instead contend that EEOC can also issue "technical assistance" as part of "educational and outreach activities" that need not be paid for from

the revolving fund. ECF. 58.1 at 17–18 (citing 42 U.S.C. § 2000e-4(h)(1)–(2)). This is wrong for at least two reasons. First, an agency must defend its actions on the same basis that it took them. *See State Farm*, 463 U.S. at 43–44. EEOC itself recognizes that outreach, education, and technical assistance are three different things, *see* Appx.006–007, and having themselves characterized the June 15 Guidance as "technical assistance," Burrows and EEOC may not change their tune now. Second, Title VII's text itself puts the lie to that. The "educational or promotional activities" authorized by subsection (h)(2) may be carried out only in conjunction with EEOC's "exercising its powers under this subchapter"— may be carried out, that is, only after EEOC has properly issued technical assistance that someone has requested and paid for. *Id.* § 2000e-4(h)(2); *id.* § 2000e-4(g)(3), k(2).

And the Defendants' "education and outreach" argument further fails because it presupposes that the June 15 Guidance merely repeated previously adopted EEOC positions—which, as explained above, it did not. For the same reasons, their reliance on 29 C.F.R. § 1695.2(d)—which implicitly allows guidance to be issued without a Commission vote if it does not "set[] forth the Commission's position on a legal principle for the first time"—does not excuse their failures. If the June 15 Guidance is what Burrows and EEOC said it is, technical assistance, it requires a Commission vote. 42 U.S.C. § 2000e-4(g)(3). If it is what Burrows and EEOC now say it is, "education or outreach," it is a statement on a previously unaddressed legal principle, which requires a Commission vote. 29 C.F.R. § 1695.2(d).

**B.     EEOC violated its own agency rules.**

As stated above, EEOC's failure to follow its own rule, which required it to approve the June 15 Guidance by a vote of the Commission, violates the APA and requires vacatur. *See* 5 U.S.C. § 706(2)(D).

When an EEOC guidance document sets forth a legal position for the first time or changes a legal position previously taken, the Commission is required to approve the document by majority vote.

29 C.F.R. § 1695.2(d). The evidence demonstrates that the June 15 Guidance was issued without being approved by the Commission, a fact which the Defendants at any rate do not contest. The only question, then, is whether that guidance set forth a new legal position. It did.

In its June 15 Guidance, EEOC for the first time announced that non-federal employers are obligated to treat biological men as women and treat biological women as men, *see* Appx.007–008 at Questions 9–11, a novel legal position that required such a majority vote. The earlier guidance to which Burrows and EEOC point did not—it applied only to the federal government and federal employees. *See* App.002–011, 013–015. The June 15 Guidance marked the first time EEOC had announced such a position for non-federal employers.

As the Court has already recognized, the distinction between federal and non-federal employers is significant, and renders the June 15 Guidance not "merely [a recital of] 'established legal positions,'" but a directive that "exceeds the scope of Title VII and *Bostock*." ECF 53 at 6. That Title VII defines sex discrimination identically for both federal and private employers is true but as the Court has observed, "irrelevant," *id.*; Title VII's requirements "hold the Federal Government to a stricter standard than private employers or state or local government" because of textual differences in the applicable language. *Babb v. Wilkie*, 140 S. Ct. 1168, 1173–74 (2020). Federal employers must ensure that "all personnel actions . . . be made *free from any discrimination* based on . . . sex," 42 U.S.C. § 2000e-16(a) (emphasis added), but non-federal employers have a narrower obligation: they are prohibited from making certain employment decisions about an individual "*because of* such individual's . . . sex." *Id.* § 2000e-2(a)(1) (emphasis added). That is, an action by a non-federal employer violates Title VII if sex is the but-for[10] cause of the action, but an action by a federal employer violates Title VII if sex "plays any part in the way a decision is made[.]" *Babb*, 140 S. Ct. at 1174.

---

[10]   An employer also violates Title VII if its decision was motivated by sex, even if that was not the sole motivation. 42 U.S.C. § 2000e-2(m).

EEOC's litigation positions against private entities do not alter this result. For one, litigation positions are not announcements that "'leave[] no room for EEOC staff *not* to issue referrals . . . when an employer' implements the condemned practice." ECF 53 at 11 (quoting *Texas v. EEOC*, 933 F.3d at 433). For two, EEOC could not have advanced in previous litigation the argument that *Bostock* "mandate[s] accommodations for transgender employees from lawful, sex-based workplace rules," *see* ECF 53 at 5, for the simple reason that *Bostock* had not yet been decided. Rather than argue from inference, as it had to do before, EEOC now asserts that the Supreme Court has validated its litigation position—and, in doing so, "goes beyond that required in *Bostock*." And three, EEOC points to no guidance approved a vote of the Commission where its interpretation was advanced for the first time—guidance that would, at any rate, be incorrect because it attempts to force Texas "to change its employment practices to reflect Defendants' interpretation of Title VII that extends beyond what is required by *Bostock*." ECF 53 at 25.

The June 15 Guidance was not issued in compliance with Title VII or EEOC's own rules. It was thus adopted "without observance of procedure required by law" and therefore violates the APA. 5 U.S.C. § 706(2)(D). The Court should vacate it.

## VIII.  EEOC and HHS violated the APA by failing to publish substantive rules of general applicability as required by FOIA.

Both sets of guidance were adopted "without observance of procedure required by law" in another way: neither was published in the Federal Register. As "substantive rules of general applicability" and "statements of general policy or interpretations of general applicability," the Freedom of Information Act requires that the June 15 Guidance and the March 2 Guidance be published in the Federal Register. 5 U.S.C. § 552(a)(1)(D). They have not been. Their promulgation therefore violates the APA, and they should be vacated.

As already established, both guidance documents impose rights and obligations and bind agency actors and are therefore substantive rules. *See Texas*, 809 F.3d at 151–155. One reason the APA

was adopted was "to avoid the inherently arbitrary nature of unpublished ad hoc determinations." *Morton v. Ruiz*, 415 U.S. 199, 232 (1974). To further advance that interest, FOIA requires that "substantive rules of general applicability adopted as authorized by law" be published in the Federal Register. 5 U.S.C. § 552(a)(1)(D). But it goes further, eve making "statements of general policy or interpretations of general applicability formulated and adopted by the agency"—which the Defendants concede the guidance documents are, ECF 58.1 at 15–17, 19—subject to the publication requirement. *Id.*

There is no dispute that neither EEOC nor HHS published its respective guidance document in the Federal Register. By violating FOIA's publication requirement, the agencies have violated the APA's ban on agency action taken "without observance of procedure required by law." 5 U.S.C. § 706(2)(D). The March 2 Guidance and June 15 Guidance should therefore be vacated.

## CONCLUSION

Plaintiff respectfully requests that the Court deny Defendants' Motion for Summary Judgment and grant Plaintiff's Cross-Motion for Summary Judgment.

DATED: July 8, 2022

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

PATRICK K. SWEETEN
Deputy Attorney General
for Special Litigation

Respectfully submitted,

WILLIAM T. THOMPSON
Deputy Chief, Special Litigation Unit
Texas Bar No. 24088531

*/s/ Ryan D. Walters*
RYAN D. WALTERS
*Attorney-in-Charge*
Special Counsel
Texas Bar No. 24105085

LEIF A. OLSON
Special Counsel
Texas Bar No. 24032801

OFFICE OF THE ATTORNEY GENERAL
SPECIAL LITIGATION UNIT
P.O. Box 12548 (MC-009)
Austin, Texas 78711-2548
Tel.: (512) 463-2100
Fax: (512) 457-4410
will.thompson@oag.texas.gov
ryan.walters@oag.texas.gov
leif.olson@oag.texas.gov

*Counsel for Plaintiff State of Texas*

## CERTIFICATE OF SERVICE

I certify that a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) on July 8, 2022, which automatically serves all counsel of record who are registered to receive notices in this case.

*/s/ Ryan D. Walters*
RYAN D. WALTERS