UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

THE STATE OF TEXAS,

        Plaintiff,

v.

EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION, *et al.*,

        Defendants.

Case No. 2:21-cv-00194

District Judge Matthew J. Kacsmaryk

**DEFENDANTS' OPPOSITION TO PLAINTIFF'S CROSS-MOTION FOR
SUMMARY JUDGMENT, AND REPLY IN SUPPORT OF DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................1

ARGUMENT .......................................................................................................................1

I.      Texas Lacks Standing and the Suit is Unripe .........................................................1

II.     The EEOC Document is Consistent With Law .......................................................3

        A.      Texas is Wrong that Title VII Covers Only "the Status of Feeling" Transgender .......3

        B.      The EEOC Document Does Not Conflate Gender Identity and Gender Dysphoria ..............................................................................................10

        C.      The EEOC Document Does Not Create an Accomodations Mandate ....................12

III.    The HHS Guidance is Lawful ...............................................................................14

IV.     The Agency Documents are Reasonable ...............................................................17

        A.      The EEOC Document Was Not the Product of Arbitrary and Capricious Decisionmaking .............................................................................18

        B.      The HHS Guidance Was Not the Product of Arbitrary and Capricious Decisionmaking .............................................................................21

V.      The Agency Documents are Not Substantive Rules ..............................................22

VI.     Texas's Remaining APA Claims Against EEOC Fail ............................................27

VII.    The EEOC Document Does Not Violate the First Amendment. ............................30

VIII.   Defendants Did Not Violate FOIA ........................................................................33

IX.     Texas's Requested Relief is Improper ...................................................................34

CONCLUSION ..................................................................................................................36

# TABLE OF AUTHORITES

## CASES

*Adams Cnty. Water Ass'n v. City of Natchez,*
   No. 5:10CV199-DCB-RHW, 2013 WL 3762658 n.3 (S.D. Miss. July 16, 2013) ..............................35

*Alfred L. Snapp & Son, Inc. v. P.R. ex rel. Barez,*
   458 U.S. 592 (1982) .................................................................................................................................31

*Arias v. Wells Fargo Bank, N.A.,*
   No. 3:18-CV-00418-L, 2019 WL 2770160 (N.D. Tex. July 2, 2019) ........................................33

*Arizona v. Biden,*
   --- F.4th ----, 2022 WL 2437870 (6th Cir. July 5, 2022) ...............................................................35

*Babb v. Wilkie,*
   140 S. Ct. 1168 (2020) ...........................................................................................................................19

*Bear Creek Bible Church v. EEOC,*
   571 F. Supp. 3d 571 (N.D. Tex. 2021), *appeal filed,*
   *Briarwood Mgmt. v. EEOC*, No. 22-10145 (5th Cir. Feb. 14, 2022)...............................11, 20

*Bostock v. Clayton County,*
   140 S. Ct. 1731 (2020) .......................................................................................................*passim*

*Brock v. Cathedral Bluffs Shale Oil Co.,*
   796 F.2d 533 (D.C. Cir. 1986).............................................................................................................26

*Brown Express, Inc. v. United States,*
   607 F.2d 695 (5th Cir. 1979) ................................................................................................................25

*Cal. Cmtys. Against Toxics v. EPA,*
   934 F.3d 627 (D.C. Cir. 2019), *en banc rehearing denied*, 947 F.3d 822 (D.C. Cir. 2020).......................24

*CBS, Inc. v. Democratic Nat'l Comm.,*
   412 U.S. 94 (1973) .................................................................................................................................31

*Chrysler Corp. v. Brown,*
   441 U.S. 281 (1979) ....................................................................................................................23, 24, 25

*City of Alpine v. Abbot,*
   730 F. Supp. 2d 630 (W.D. Tex. 2010)...............................................................................................31

*D&M Specialists, Inc. v. Apache Creek Props., LLC,*
   No. SA-12-CA-588-FB, 2014 WL 12493290 (W.D. Tex. Aug. 21, 2014)...........................15

*De Franceschi v. BAC Home Loans Servicing, L.P.,*
   477 F. App'x 200 (5th Cir. 2012)...........................................................................................................2

*Deffenbaugh-Williams v. Wal-Mart Stores, Inc.,*
  156 F.3d 581 (5th Cir. 1998) .........................................................................................5

*Dep't of Homeland Security v. New York,*
  140 S. Ct. 599 (2020) ...................................................................................................35

*Doe v. Arizona,*
  No. CV-15-02399-PHX-DGC, 2016 WL 1089743 (D. Ariz. Mar. 21, 2016).....................19

*EEOC v. Arabian Am. Oil Co.,*
  499 U.S. 244 (1991) .....................................................................................................24

*EEOC v. Catastrophe Mgmt.,*
  *Sols.,* 852 F.3d 1018 (11th Cir. 2016).............................................................................10

*EEOC v. R.G. & G.R. Harris Funeral Homes, Inc.,*
  884 F.3d 560 (6th Cir. 2018) .....................................................................................5, 7

*Equal Employment Opportunity Commission v. Boh Brothers Construction Co.,*
  731 F.3d 444 (5th Cir. 2013) ......................................................................................6, 7

*Fields v. Dep't of Pub. Safety,*
  No. 11-101, 2014 WL 5801460......................................................................................33

*Fowlkes v. Ironworkers Loc. 40,*
  790 F.3d 378 (2d Cir. 2015).........................................................................................19

*Garcia v. Gloor,*
  618 F.2d 264 (5th Cir. 1980) .........................................................................................9

*Garcia v. Spun Steak Co.,*
  998 F.2d 1480 (9th Cir. 1993) .......................................................................................9

*Gill v. Whitford,*
  138 S. Ct. 1916 (2018)..................................................................................................35

*Indep. Equip. Dealers Ass'n v. EPA,*
  372 F.3d 420 (D.C. Cir. 2004)......................................................................................23

*Joganik v. E. Texas Med. Ctr.,*
  No. 6:19-CV-517-JCB-KNM, 2021 WL 6694455 (E.D. Tex. Dec. 14, 2021),
  *report & recommendation adopted,* 2022 WL 243886 (E.D. Tex. Jan. 25, 2022) ......................16

*Lopez v. River Oaks Imaging & Diagnostic Grp., Inc.,*
  542 F. Supp. 2d 653 (S.D. Tex. 2008)............................................................................6

*Lusardi v. Department of the Army,*
  EEOC Appeal No. 012013395, 2015 WL 1607756 (Apr. 1, 2015)....................................19

*Macy v. Department of Justice,*
  EEOC Appeal No. 0120120821, 2012 WL 1435995 (Apr. 20, 2012) ................................. 18

*Madsen v. Women's Health Ctr., Inc.,*
  512 U.S. 753 (1994) ....................................................................................................... 35

*Mass. Mfg. Extension P'ship v. Locke,*
  723 F. Supp. 2d 27 (D.D.C. 2010) ................................................................................... 34

*Massachusetts v. Mellon,*
  262 U.S. 447 (1923) ....................................................................................................... 32

*Md. Cas. Co. v. Pac. Coal & Oil Co.,*
  312 U.S. 270 (1941) ....................................................................................................... 31

*MedImmune, Inc. v. Genentech, Inc.,*
  549 U.S. 118 (2007) ................................................................................................... 31, 32

*Medina Cnty. Env't Action Ass'n v. Surface Transp. Bd.,*
  602 F.3d 687 (5th Cir. 2010) ........................................................................................... 17

*Meese v. Keene,*
  481 U.S. 465 (1987) ................................................................................................... 30, 31

*Meriwether v. Hartop,*
  992 F.3d 492 (6th Cir. 2021) ........................................................................................... 32

*Monsanto Co. v. Geertson Seed Farms,*
  561 U.S. 139 (2010) ....................................................................................................... 35

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
  463 U.S. 29 (1983) ......................................................................................................... 17

*Nat'l Mining Ass'n v. McCarthy,*
  758 F.3d 243 (D.C. Cir. 2014) ......................................................................................... 23

*Pacheco v. Fredom Buick GMC Truck, Inc.,*
  No. 7:10-CV-116-RAJ, 2011 WL 5410751 (W.D. Tex. Oct. 17, 2011) ............................. 18

*Pros. & Patients for Customized Care v. Shalala,*
  56 F.3d 592 (5th Cir. 1995) ..................................................................................... 23, 26, 27

*Perez v. Morg. Bankers Ass'n,*
  575 U.S. 92 (2016) ................................................................................................. 23, 24, 25

*Price Waterhouse v. Hopkins,*
  490 U.S. 228 (1989) ................................................................................................. 6, 7, 21

*Printz v. United States,*
   521 U.S. 898 (1997) ...................................................................................................35

*Reno v. ACLU,*
   521 U.S. 844 (1997) ...................................................................................................17

*Roberson v. United States,*
   Nos. 4:18-CV-997-A, 4:17-CR-112-A, 2019 WL 1115858 (N.D. Tex. Mar. 11, 2019) ....................14

*Roberts v. Clark Cnty. Sch. Dist.,*
   215 F. Supp. 3d 1001 (D. Nev. 2016) ...................................................................................19

*Ryder Truck Lines, Inc. v. United States,*
   716 F.2d 1369 (11th Cir. 1983) ...................................................................................23

*Sarco v. 5 Star Fin., LLC,*
   No. 5:19cv86, 2020 WL 5507534 (W.D. Va. Sept. 11, 2020) ..........................................................7

*Shalala v. Guernsey Mem. Hosp.,*
   514 U.S. 87 (1995) ...................................................................................................23

*Shell Offshore Inc. v. Babbitt,*
   238 F.3d 622 (5th Cir. 2001) ...................................................................................25

*Sierra Club v. U.S. Dep't of Interior,*
   990 F.3d 909 (5th Cir. 2021) ...................................................................................17

*Smith v. City of Salem,*
   378 F.3d 566 (6th Cir. 2004) ...................................................................................7

*Tearney v. Nat'l Transp. Safety Bd.,*
   868 F.2d 1451 (5th Cir. 1989) ...................................................................................34

*Texas v. EEOC,*
   933 F.3d 433 (5th Cir. 2019) ...................................................................................24, 35

*United States v. Muhammad,*
   14 F.4th 352 (5th Cir. 2021) ...................................................................................15

*Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.,*
   858 F.3d 1034 (7th Cir. 2017) ...................................................................................8

## STATUTES

5 U.S.C. § 551 ...................................................................................................22

5 U.S.C. § 552 ...................................................................................................33

5 U.S.C. § 553 ...................................................................................................23

5 U.S.C. § 704 ..................................................................................................................24

5 U.S.C. § 706 ..................................................................................................................17

42 U.S.C. § 2000e-2 ..........................................................................................................4

42 U.S.C. § 2000e-4 ...................................................................................................passim

42 U.S.C. § 2000e-5 ........................................................................................................24

42 U.S.C. § 2000e-6 ........................................................................................................24

42 U.S.C. § 12211 ............................................................................................................22

**REGULATIONS**

29 C.F.R. § 1695.2 ..........................................................................................................30

**STATUTES**

EEOC, Fact Sheet: Notable EEOC Litigation Regarding Title VII & Discrimination Based on Sexual Orientation and Gender Identity, https://www.eeoc.gov/fact-sheet-notable-eeoc-litigation-regarding-title-vii-discrimination-based-sexual-orientation-and ........................................................................................20

EEOC Resource Documents, https://www.eeoc.gov/resource-document/eeoc-resource-documents ...........................................29

"Preventing Employment Discrimination Against Lesbian, Gay, Bisexual or Transgender Workers." https://www.eeoc.gov/laws/guidance/preventing-employment-discrimination-against-lesbian-gay-bisexual-or-transgender ........................................................................................20

## INTRODUCTION

In *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020), the Supreme Court held that firing an employee because they are transgender constitutes prohibited discrimination on the basis of sex. In its Cross-Motion and Opposition, Texas strives to avoid the reasoning of the Court and argue that the EEOC's 2021 Document ("EEOC Document") goes beyond that decision. But the case's logic clearly supports the EEOC's longstanding interpretation, as does the language in Title VII and numerous other lower court decisions. HHS's 2022 Guidance document, explaining that gender identity discrimination is also barred under Section 1557 of the Affordable Care Act, likewise is plainly consistent with the reasoning in *Bostock* and other cases.

Indeed, Texas's arguments effectively ignore *Bostock*'s holding and reasoning. Texas asserts that federal law protects against discrimination only as to the "status" of being transgender, and is silent when any conduct or action relating to gender identity is at issue. Texas then attempts to draw some meaningful distinction between the supposedly protected "internal sense" of a transgender employee and their unprotected conduct. But *Bostock* makes clear that employers cannot make employment decisions on the basis of gender identity. The holding and rationale of *Bostock* are binding law, and their proper application in interpretive, nonbinding documents does not give rise to a valid claim. To the extent that Texas challenges portions of the documents that concern issues not addressed by *Bostock*, those interpretations are consistent with *Bostock* and not contrary to law.

Texas's remaining arguments are undeveloped and meritless. This Court should accordingly enter judgment for Defendants.

## ARGUMENT

### I.    Texas Lacks Standing and the Suit is Unripe

Defendants previously explained why Texas lacks standing and why this lawsuit is unripe. However, this Court disagreed and held that the case could proceed to the merits. Order at 17-28,

ECF No. 53.  Defendants will not repeat their prior arguments as to standing and ripeness, but will incorporate them by reference here.  *See* Defs.' MTD at 8-17, ECF No. 12; Defs.' Reply in Supp. of MTD at 2-12, ECF No. 29; Defs.' MTD First Am. Compl. at 6-15, ECF No. 37; Defs.' Reply in Supp. of MTD First Am. Compl. at 1-4, ECF No. 48.  Defendants would also be amenable to providing additional briefing on these points, to the extent it would be helpful to the Court.

Defendants note, however, that Texas has improperly added allegations regarding standing at the summary judgment stage.  In its Cross-Motion, Texas for the first time alleges specifically that the Texas Health and Human Services Commission could lose money if HHS concluded that participants in the "Alliance for Adolescent Recovery and Treatment program" were "discriminated against because they were not allowed to use the single-sex bathroom of their choice."  Pl.'s Cross-Mot. for Summ. J., at 6-7, ECF No. 62 ("Pl.'s Cross-MSJ").  Yet the HHS Guidance generally explains that Section 1557 prohibits the denial of medically necessary treatment on the basis of gender identity.  App. to Defs.' Mem. in Supp. of Defs. Mot. for Summ. J. ("Defs.' App'x") at App_0012, ECF No. 57-2.  It does not speak to the use of "single sex bathrooms," and so it is unclear how or why the Guidance could be used to make any determination with regard to bathroom use.  Further, neither this treatment program nor its relationship to any potential loss of funding is mentioned in the First Amended Complaint, and Texas may not import new allegations of financial injury at the Summary Judgment stage.  *See De Franceschi v. BAC Home Loans Servicing, L.P.*, 477 F. App'x 200, 204 (5th Cir. 2012) (affirming district court's refusal to consider "new factual allegations and theories of liability not present in the pleadings" raised for the first time in summary judgment briefing).  This Court should accordingly disregard Texas's new assertions of injury.

II.    **The EEOC Document Is Consistent With Law**

   A.    **Texas Is Wrong that Title VII Covers Only "the Status of Feeling"
          Transgender**

On the merits, the bulk of Texas's argument reduces to the notion that Title VII narrowly

protects only certain "statuses," such as a person's race, national origin, and sex, and does not

prohibit discrimination if an employee is terminated on account of "conduct" related to a given

status.  For example, Texas asserts that "*Bostock* forbids employers from discriminating against an

employee based on that individual's internal sense of being male or female.  *Bostock* does not allow

any expansion of this concept to conduct that may be 'associated with' transgender status—or any

expansion as to sexual orientation beyond the internal orientation of one's sexual attraction."  Pl.'s

Cross-MSJ at 18; *see also id.* at 10 ("The June 15 Guidance is part of a long political strategy of

conflating 'orientation' or 'identity' with any conduct that may be associated with it.") (citation

omitted).

Texas's theory is meritless for at least two reasons.  First, *Bostock* itself refutes Texas's

argument because it asked only whether an employee's sex was a "but-for" cause of an adverse

employment action; it did not ask whether the allegedly discriminatory actions flowed from the

employee's status or conduct.  Second, the idea that Title VII sharply delineates between protected

status and unprotected conduct finds no support in the caselaw or the statutory text and is

unworkable on its own terms.

The first and foremost problem with Texas's conduct-status distinction is that it was rejected

by the Supreme Court in *Bostock*.  As this Court explained, "the Supreme Court used a 'but-for'

causation analysis to decide *Bostock* and hold Title VII prohibits employment discrimination because

of one's gender identity."  Order at 9.  That is, "[a]n employer violates Title VII when it intentionally

fires an individual employee based in part on sex.  It doesn't matter if other factors besides the

plaintiff's sex contributed to the decision," if "the employer intentionally penalizes a person

identified as male at birth for traits or actions that it tolerates in an employee identified as female at birth." *Bostock*, 140 S. Ct. at 1741; 42 U.S.C. § 2000e-2. The analysis prescribed by the Supreme Court does not require courts to distinguish between status and conduct – in using the terms "traits or actions" it clearly encompasses both. And it provides the appropriate question: if the employee's sex was different, with the same traits or actions, would the result have been different?

To take just one illustration, the *Bostock* Court explained that if an employer fires "any woman he discovers to be a Yankees fan," the termination is unlawful "if the employer would have tolerated the same allegiance in a male employee." *Bostock*, 140 S. Ct. at 1742. In such a scenario, courts do not evaluate the extent to which an employee's baseball fandom is linked to her sex. "Title VII doesn't care. If an employer would not have discharged an employee but for that individual's sex, the statute's causation standard is met, and liability may attach." *Id. Bostock* also explained why it is immaterial whether an employer justifies a firing on the basis of transgender status or related conduct. "[N]othing in Title VII turns on the employer's labels or any further intentions (or motivations) for its conduct beyond sex discrimination." *Id.* at 1746-47. *Bostock* could hardly have been clearer: "[a]n employer who fires an individual for being . . . transgender fires that person for *traits or actions* it would not have questioned in members of a different sex." *Id.* at 1737 (emphasis added).

In sum, "an employer who intentionally treats a person worse because of sex—*such as by firing the person for actions or attributes it would tolerate in an individual of another sex*—discriminates against that person in violation of Title VII." *Bostock*, 140 S. Ct. at 1740 (emphasis added). In other words, where certain conduct is tolerated only in members of one sex, termination on the basis of that conduct *is itself* termination on the basis of sex. Texas's claimed distinction between status and conduct thus collapses when viewed in light of the straightforward but-for causation analysis applied in *Bostock*. Even though Defendants raised this argument in their opening motion, *see* Defs.' Mem.

in Supp. of Defs. Mot. for Summ. J. at 10, ECF No. 58 ("Defs.' MSJ"), Texas has no response—

indeed, Texas fails to even once mention the but-for standard discussed in *Bostock*, let alone

demonstrate that this standard was improperly applied in the EEOC Document.

Texas also has no response to the point that *Bostock* clearly addressed specific conduct of the

plaintiffs. *See* Defs.' MSJ at 9-10; *see also* 140 S. Ct. at 1738 (explaining that Mr. Bostock was fired for

"conduct 'unbecoming' a county employee" when he joined a gay softball league); *EEOC v. R.G. &*

*G.R. Harris Funeral Homes, Inc.*, 884 F.3d 560, 569 (6th Cir. 2018) (explaining that Ms. Stephens was

fired after informing her employer she "wanted to dress as a woman") (citation omitted). Thus,

Texas errs in claiming that "no discrimination based on conduct was at issue" in *Bostock*. Pl.'s Cross-

MSJ at 9. And Texas cannot explain how the Supreme Court could have held these firings unlawful,

under Texas's theory, if they were prompted by supposedly unprotected action or conduct.

Texas appears to concede that Title VII does cover adverse employment decisions motivated

in part by an employee's conduct, but suggests that such conduct must be "inextricably related" to a

protected status. Pl.'s Cross-MSJ at 21. But in their Motion, Defendants explained that the Fifth

Circuit and other courts routinely find discrimination where race or sex is a but-for cause of the

adverse action at issue, without inquiring how "related" a given action is to a protected status, Defs.'

MSJ at 11, and Texas fails to square its conduct-status distinction with that case law. For instance, in

*Deffenbaugh-Williams v. Wal-Mart Stores, Inc.*, 156 F.3d 581, 588 (5th Cir. 1998), the Fifth Circuit held

that Title VII prohibits "employment discrimination premised on an interracial relationship."

Texas's response—that this decision "involved straightforward discrimination based on the

protected trait – race – itself," Pl.'s Cross-MSJ at 20—confirms the correctness of the Government's

position in this case. The employer in *Deffenbaugh-Williams* did not take action against the plaintiff

solely because of her "protected trait" (race), but because the plaintiff, "a white person, had a

relationship with a black person." *Deffenbaugh-Williams*, 156 F.3d at 589. This is undoubtedly

"conduct" which is not engaged in by all white individuals, and so under Texas's theory it would not be "inextricably intertwined" with plaintiff's race. But *Deffenbaugh-Williams*'s "straightforward" finding of "discrimination," Pl.'s Cross-MSJ at 20, harmonizes perfectly with *Bostock* because the plaintiff's race was a but-for cause of her termination; she, as a white person, was treated differently than if she had been black.

Title VII's prohibition on sex stereotyping further underscores how prohibited discrimination occurs where an employer punishes an employee for engaging in conduct which is not typically associated with a given sex. As just one example, in *Equal Employment Opportunity Commission v. Boh Brothers Construction Co.*, 731 F.3d 444, 454 (5th Cir. 2013) (en banc), the Fifth Circuit explained that "a plaintiff can satisfy Title VII's because-of-sex requirement with evidence of a plaintiff's perceived failure to conform to traditional gender stereotypes." In response, Texas merely avers that "failure to conform to sex stereotypes could be 'evidence' of a violation of Title VII, [but] not itself a violation." Pl.'s Cross-MSJ at 20. Texas therefore appears to recognize that employee conduct is generally relevant to a Title VII case. Indeed, *Bostock*, *Boh Brothers*, and many other cases confirm that certain employee actions or behavior, especially those which are at odds with stereotypical expectations for a given sex, can and often do form the basis of a cognizable Title VII claim.

Texas cannot dispute that discrimination on the basis of sex occurs when an employee is fired for conduct which does not conform to traditional gender stereotypes. *See, e.g.*, *Price Waterhouse v. Hopkins*, 490 U.S. 228, 251 (1989) ("[W]e are beyond the day when an employer could evaluate employees by assuming or insisting that they matched the stereotype associated with their group . . . ."); *Lopez v. River Oaks Imaging & Diagnostic Grp., Inc.*, 542 F. Supp. 2d 653, 659 (S.D. Tex. 2008) (holding that transgender person pled a viable Title VII claim for gender stereotyping, because "Title VII is violated when an employer discriminates against any employee, [transgender] or not,

6

because he or she has failed to act or appear sufficiently masculine or feminine enough for an employer."); *Smith v. City of Salem,* 378 F.3d 566, 572, 575 (6th Cir. 2004) ("Sex stereotyping based on a person's gender non-conforming behavior is impermissible discrimination, irrespective of the cause of that behavior[.]").  In *Boh Brothers,* the Fifth Circuit held that the EEOC could properly rely on evidence that the plaintiff was viewed as "insufficiently masculine" to prove a Title VII claim. 731 F.3d at 456; *see also id.* at 459 (affirming claim because jury could find that adverse action was taken because plaintiff "fell outside of [a] manly-man stereotype").  This well-established case law further refutes Texas's theory that "Title VII protects only against discrimination based on immutable characteristics, not conduct associated with protected classes."  Pl.'s Cross-MSJ at 19.

Texas errs further in contending that *Bostock* "rejected" such sex stereotyping case law.  *Id.* at 31.  To the contrary, *Bostock* explicitly reaffirmed that Title VII prohibits discrimination on the basis of gender stereotypes.  *See* 140 S. Ct. at 1742-43 (rejecting claim that gender stereotyping would be appropriate if applied to both men and women, since "an employer who fires both Hannah and Bob for failing to fulfill traditional sex stereotypes doubles rather than eliminates Title VII liability"); *see also id.* at 1741 (favorably citing to *Price Waterhouse,* 490 U.S. at 239).[1]  As the Court in *Bostock* explained, where an employer fires a woman "because she is insufficiently feminine" and fires a man for "being insufficiently masculine," then "in *both* cases the employer fires an individual in part because of sex."  *Id.* at 1741.  This result again follows necessarily from *Bostock*'s application of the but-for analysis.  *See also Sarco v. 5 Star Fin., LLC*, No. 5:19cv86, 2020 WL 5507534, at *7 (W.D. Va.

---

[1] Further, in *EEOC v. R.G. &. G.R. Harris Funeral Homes, Inc.*, 884 F.3d 560, 576–77 (6th Cir. 2018), which was affirmed in *Bostock*, the court held that just as Title VII prohibits discrimination of a transgender employee on the basis of gender stereotyping, it also bars adverse actions taken due their transgender status.  As the court explained, "an employer cannot discriminate on the basis of transgender status without imposing its stereotypical notions of how sexual organs and gender identity ought to align.  There is no way to disaggregate discrimination on the basis of transgender status from discrimination on the basis of gender non-conformity."  *Id.*

Sept. 11, 2020) (holding that gender nonconforming plaintiff pled a plausible Title VII "sex discrimination claim [] that he was penalized for failing to meet gender stereotypes"); *Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1049 (7th Cir. 2017) (collecting cases).

In fact, Defendants cited numerous cases "before and after *Bostock*" which found discrimination against transgender individuals for the "intentional use of the wrong pronouns," and restrictions on the wearing of clothes and usage of restrooms corresponding with their gender identity. Defs.' Cross-MSJ at 11-12 (collecting cases). Texas fails to identify any error in these decisions, let alone explain how they are contrary to the text of Title VII.

Not only is Texas's argument refuted by *Bostock* and other cases, the State's view of Title VII would narrow the protections afforded by that law until they vanished entirely. In Texas's view, the law protects a transgender employee from termination only due to their "status of feeling" transgender—an employer is presumably barred only from firing the employee on account of the employee's internally-understood identity, but not any outward manifestation of that identity. Pl.'s Cross-MSJ at 22. That is, Texas asserts that an employer could lawfully fire the employee as soon as that employee acts in a way that demonstrates their gender identity. *See id.* at 18 (asserting that Title VII prohibits discrimination only "against an employee based on that individual's internal sense of being male or female," not for conduct "*correlated*" with transgender status").

Under that view, Title VII would only protect closeted individuals from clairvoyant employers. The notion that Title VII protects gay and transgender people only so long as they maintain a vow of silence as to their identity is absurd on its face, and would reduce *Bostock*, and Title VII's sex discrimination prohibition, to a nullity.

Perhaps recognizing the disconnect between its position and the Supreme Court's decision, Texas concedes that certain "behavior" *can* trigger Title VII protections, but only if it is

"inextricably" related to transgender status. *Id.* at 18, 21. Though Texas cites to *Bostock* for this purported rule, the Supreme Court established no such requirement. *Bostock* established that, in the context of employment actions that had been taken based on the conduct of transgender employees, transgender status *was inextricably related to sex*, not that Title VII's protections only extended to conduct inextricably related to transgender status. 140 S. Ct. at 1741-42. Defendants previously explained that Texas's "inextricably related" test was invented out of whole cloth, Defs.' MSJ at 29-30, and tellingly, Texas does not provide any additional support for its position.

Texas also fails to explain how its "inextricably related" analysis could be applied, such as how the "relatedness" of behavior to status could be measured, and what behavior could meet the standard. *Accord* Pl.'s Cross-MSJ at 22 (asserting that "even 100% correlation" between conduct and transgender status "is not enough" to support a Title VII claim). Indeed, Texas itself articulates precisely why this test is unworkable. Specifically, Texas avers that the EEOC Document requires courts to engage in "unbounded theorizing" and "speculat[e] about what practices are 'associated with' different sexual orientations or gender identities," presumably in an attempt to determine whether certain conduct is sufficiently related to protected statuses. *Id.* at 25. But such "unbounded" analysis is not a consequence of the EEOC Document. It is instead Texas that repeatedly insists courts must somehow determine the relatedness of conduct to a given status.

Further, the case law cited by Texas does not establish that certain types of conduct may never be reached by Title VII. Rather, the particular allegations at issue in Texas's cited decisions simply did not give rise to an inference of prohibited discrimination, though the courts were often careful to note that similar conduct *could* establish a Title VII violation under different facts. *See, e.g.,* *Garcia v. Gloor*, 618 F.2d 264, 268 (5th Cir. 1980) (cautioning that "[l]anguage may be used as a covert basis for national origin discrimination, but the English-only rule was not applied to Garcia by Gloor either to this end or with this result"); *Garcia v. Spun Steak Co.*, 998 F.2d 1480, 1488 (9th Cir. 1993)

(holding that an English-only policy could violate Title VII, but "[r]emand [was] necessary to determine whether [an employee] has suffered adverse effects from the policy").[2]  Even Texas's cited decisions repeatedly recognize that employee conduct *can* trigger prohibited discrimination, under specific circumstances, further confirming that Texas's claimed distinction between protected status and unprotected conduct lacks merit.

At bottom, Texas's foundational argument is that antidiscrimination law protects only status and not conduct, a false dichotomy which is rejected in the case law.  In *Bostock*, the Court made plain that in identifying prohibited discrimination a court need not "theoriz[e]" about how intertwined certain behavior is with a given status, courts must instead conduct a far simpler inquiry: whether the adverse action was taken because of sex.  Texas scarcely mentions this governing analysis, and fails to explain why the EEOC and HHS Guidance documents' are unlawful, pursuant to the "but-for" standard.  Accordingly, Texas's arguments are meritless.  *See* Pl.'s Cross-MSJ at 10-15, 18-22.

## B. The EEOC Document Does Not Conflate Gender Identity and Gender Dysphoria

Texas does not identify the text of the EEOC Document that it believes conflates "gender identity" and "gender dysphoria."  Instead of referencing the EEOC Document at issue, Texas invokes inapt district court opinions, Pl.'s Cross-MSJ at 12, thirty-year-old law review articles, *id.* at 10, and the 20th-century French philosopher Michel Foucault, *id.* at 11 n.4, to create a narrative that the EEOC Document fits within an allegedly nefarious "long political strategy" of conflating

---

[2] While courts have upheld policies that operate to prohibit certain hairstyles culturally associated with race, *EEOC v. Catastrophe Mgmt. Sols.*, 852 F.3d 1018, 1032 (11th Cir. 2016), adverse employment action taken due to hair styles can plainly demonstrate racial discrimination, depending on the facts of the case.  For instance, an African-American employee would likely have strong evidence of discrimination if his employer terminated him for wearing dreadlocks, while permitting a Caucasian employee to wear his hair in the same manner.

transgender behavior with gender identity, *id.* at 10. But tellingly, Texas cannot point to any link between the EEOC Document and any of the other sources Texas takes issue with. This Court should accordingly reject Texas's arguments.

The Court should also reject Texas's proposal to utilize a so-called "favoritism"-plus-"blindness" approach in employment law. *Id.* at 12-13. According to Texas, if a discrimination claim involves an individual's sexual orientation or gender identity, a court must apply a test of "favoritism, plus blindness to sex." *Id.* at 12 (citing *Bear Creek Bible Church v. EEOC,* 571 F. Supp. 3d 571 (N.D. Tex. 2021)*, appeal filed, Briarwood Mgmt. v. EEOC*, No. 22-10145 (5th Cir. Feb. 14, 2022). But Texas does not explain how it believes the "favoritism, plus blindness" approach would apply in this context, nor does Texas attempt to establish that the EEOC Document fails this "test." *Id.* In any event, this Court should reject Texas's proposed standard, which is unexplained and untethered from the text of Title VII fails to address the standard set out in *Bostock.* Instead, the Court should hold that the EEOC Document reflects a permissible reading of Title VII, particularly given *Bostock*'s clear holding that a proper standard for assessing whether a plaintiff has made out a discrimination claim based on sex under Title VII is the "but for" test. *Bostock*, 140 S.Ct. at 1742 ("If an employer would not have discharged an employee *but for* that individual's sex, the statute's causation standard is met, and liability may attach.") (emphasis added).[3] The EEOC Document is entirely consistent with the standard articulated and applied by the Supreme Court in *Bostock.*

Texas also faults the EEOC for not explaining how certain employer actions against transgender employees would "impose disadvantageous terms or conditions based on sex." Pl.'s Cross-MSJ at 15. But information about how a specific policy affects a specific employee is, of course, the type of information that would be developed once an employee files a charge with the EEOC.

---

[3] *Bostock* also explained that under Title VII, litigants could apply the "more forgiving" standard to show that a "protected trait like sex" was only a "motivating factor" in a challenged employment action. 140 S. Ct. at 1739.

Such information is lacking in this case precisely because Texas has brought an abstract, pre-enforcement challenge. Moreover, courts have repeatedly held that harassing use of pronouns, and restrictions on dress and restroom access can cause significant harm to transgender individuals, and such adverse action in those instances can certainly constitute a Title VII violation. *See* Defs.' MSJ at 11-12 (collecting cases).

Thus, the specific EEOC statements challenged by Texas are consistent with Title VII, numerous decisions of lower courts interpreting sex discrimination, and comport with the reasoning of *Bostock.* And while the EEOC Document provides a general interpretation of Title VII, it also acknowledges that the analysis must be done on a case-by-case basis, and that employers may have defenses to charges of discrimination depending on the "facts of a particular case," including potential "religious defenses." Defs.' App'x at App_0004. Accordingly, the EEOC Document does not preclude an employer from raising defenses to a particular charge, including religious defenses to discrimination claims under Title VII and other applicable laws, *see* Pl.'s Cross-MSJ at 13; such arguments thus may be addressed in the concrete context of an actual discrimination claim. At bottom, Texas fails to demonstrate that the interpretation of Title VII set forth in the EEOC document is contrary to law.

### C. The EEOC Document Does Not Create an Accommodations Mandate

Texas next argues that the EEOC Document should be enjoined because it imposes improper "accommodation requirements." *Id.* at 22-26. However, this argument also fails because the EEOC Document only restates existing obligations under Title VII and does not mandate anything, including accommodation.

Texas effectively characterizes any prohibition on discriminatory treatment of different groups as a requirement to "accommodate" the discriminated group. However, a statutory requirement that a group not be discriminated against is not a requirement that that group receive some sort of

preferential accommodation. As previously explained, the EEOC Document simply summarizes the EEOC's existing interpretation of Title VII and cites a number of previous actions, pre-dating *Bostock*, as prohibiting sex discrimination against individuals on the basis of their gender identities in some circumstances.

Moreover, nothing in the EEOC Document *mandates* that an employer take any action, let alone provide an accommodation. Texas particularly focuses on the brief portion of the EEOC Document that addresses "use of pronouns or names." Defs.' App'x at App_0007. According to Texas, this portion of the EEOC Document somehow requires a violation of "the standard use of the English language," Pl.'s Cross-MSJ at 25, and therefore mandates an accommodation. Not so. Nothing in the EEOC Document mandates the use of specific pronouns or names. The section of the EEOC Document in question notes only that "in certain circumstances" the "severe or pervasive" use of names or pronouns inconsistent with an employee's gender identity could, "when considered together with all other unwelcome conduct based on the individual's sex including gender identity," rise to the level of unlawful harassment under Title VII. Defs.' App'x at App_0007. Far from a mandate, this is simply a recognition that harassment on the basis of sex can constitute unlawful discrimination in violation of Title VII, and that severe or pervasive misuse of pronouns or names may be one factor to consider as part of that inquiry. Texas is similarly wrong to suggest that a transgender person's use of a restroom corresponding with their gender identity somehow constitutes "discriminat[ion]" by an employer on the basis of gender identity. Pl.'s Cross-MSJ at 17. As *Bostock* held, an employer discriminates by treating an employee "*worse* because of sex – such as by firing the person for actions or attributes it would tolerate in an individual of another sex." 140 S.Ct. at 1740 (emphasis added). Moreover, nothing in the EEOC Document prohibits sex-specific restrooms or dress-code policies as it simply reiterates the EEOC's interpretation of Title VII as prohibiting discrimination on the basis of an individual's gender identity.

13

The EEOC Document also does not bind agency officials in addressing claims of discrimination, which further confirms that it imposes no accommodations mandate on employers. To the contrary, the document preserves discretion for agency decisionmakers to consider all facts and circumstances surrounding a complaint before making any recommendation or determination. *See, e.g.*, Defs.' App'x at App_0001-App_0007 (noting that deliberate and repeated misuse of pronouns "*could* contribute to an unlawful hostile work environment" "*in certain circumstances*" "when considered together with all *other unwelcome conduct* based on the individual's sex.") (emphasis added). Far from requiring accommodations by employers or particular actions by the EEOC, the EEOC Document does exactly the opposite, thereby safeguarding the agency's ability to determine whether it believes a Title VII violation has occurred based upon all the facts and circumstances of a particular case.

## III.    The HHS Guidance is Lawful

Texas's challenges to the HHS Guidance are undeveloped and unconvincing. *See* Pl.'s Cross-MSJ at 26-28. In its lead points, Texas notes certain differences between the language of the antidiscrimination provisions of Title IX and Title VII, such as the fact that Title IX proscribes "discrimination on the basis of sex," while Title VII does the same "because of" sex. *Id.* at 26. Texas highlights a provision in Title IX which permits educational institutions to maintain "separate living facilities" for different sexes, and Texas notes that Title IX was enacted under Congress's spending clause power. *Id.* But Texas makes no argument as to why these supposed distinctions are meaningful, much less why they compel the result Texas seeks to achieve here.

This Court is not "required to guess or to develop arguments on a litigant's behalf." *Roberson v. United States*, Nos. 4:18-CV-997-A, 4:17-CR-112-A, 2019 WL 1115858, at *3 (N.D. Tex. Mar. 11, 2019). Unlike Texas, Defendants addressed in detail the relevant language of Titles VII and IX and explained why the prohibitions on sex discrimination therein are materially identical. Defs.' MSJ at 24-28. Texas has no substantive response to Defendants' argument that "the two statutes [Title IX

14

and Title VII] impose the same standards for determining what is sex discrimination." *Id.* at 28; *see id.* 24-28. In declining to rebut this point, Texas has conceded that the standards applicable to sex discrimination in Title VII, including the analysis in *Bostock*, apply equally in the Title IX context. *See, e.g.*, *D&M Specialties, Inc. v. Apache Creek Props., L.C.*, No. SA-12-CA-588-FB, 2014 WL 12493290, at *3 (W.D. Tex. Aug. 21, 2014) ("Where a party fails to respond to arguments in the opposing party's motion for summary judgment, the points are conceded."). And any other substantive points Texas could have made on this ground are waived. *Accord United States v. Muhammad*, 14 F.4th 352, 363 n.3 (5th Cir. 2021) ("Litigants may not raise arguments for the first time in a reply brief.").

Texas then argues that, even if sex discrimination under Title IX is evaluated pursuant to the same standard set forth in Title VII, the HHS Guidance is unlawful. But Texas's abbreviated contentions on this ground are meritless.

First, Texas argues that the HHS Guidance is unlawful because it "targets state child-abuse laws" on the basis that those "laws refuse to . . . make accommodations – based on gender identity." Pl.'s Cross-MSJ at 27. But Texas identifies no statement in the HHS Guidance which "targets" specific state laws due to a refusal to provide "accommodations" on the basis of gender identity, and indeed no such language exists.

Texas appears to base its challenge on the following sentence of the Guidance: "Federally-funded covered entities restricting an individual's ability to receive medically necessary care, including gender-affirming care, from their health care provider solely on the basis of their sex assigned at birth or gender identity likely violates Section 1557." First Am. Compl. ¶ 45 (citation omitted). The only apparent challenge to this language is buried in the Background of Texas's Cross-Motion. There, Texas argues that Section 1557 does not bar discrimination on the basis of gender identity because such a prohibition is not specifically "mention[ed]" in Title IX. Pl.'s Cross-MSJ at 4. But this precise argument was rejected in *Bostock*. Although the Court "agree[d] that

15

homosexuality and transgender status are distinct concepts from sex," the protected characteristic

listed in both Title VII and Title IX, the Court nevertheless explained that "discrimination based on

homosexuality or transgender status necessarily entails discrimination based on sex; the first cannot

happen without the second." 140 S. Ct. at 1746-47. Accordingly, the HHS Guidance simply mirrors

*Bostock* in explaining that the discrimination solely on the basis of gender identity may run afoul of

Title IX, and thus Section 1557.

      Texas next asserts that "*Bostock's* interpretation of Title VII would not apply to the practice

of medicine." Pl.'s Cross-MSJ at 27. This is so, Texas argues, because while transgender status is

not relevant to employment decisions, "it would be medical malpractice not to consider [such] traits

in the healthcare setting." *Id.* But the HHS Guidance does not address whether and in what

circumstances gender identity should be considered by medical professionals; instead, it simply

states, that it may be a violation under Section 1557 for doctors to deny medically necessary care

solely on the basis of gender identity. And contrary to Texas's claim, under Section 1557, the

prohibition on sex discrimination in Title IX applies to federally-funded healthcare facilities. *See*

*Joganik v. E. Texas Med. Ctr.*, No. 6:19-CV-517-JCB-KNM, 2021 WL 6694455, at *6 (E.D. Tex. Dec.

14, 2021) ("Section 1557 incorporates long-standing anti-discrimination laws and applies them to

healthcare."), *report and recommendation adopted*, 2022 WL 243886 (E.D. Tex. Jan. 25, 2022). As set

forth above, discrimination on the basis of gender identity is prohibited under Title IX or Section

1557, just as it is barred under Title VII. Texas also ignores the robust case law, cited by

Defendants, holding that Section 1557 prohibits discrimination on the basis of gender identity in

healthcare settings. *See* Defs.' MSJ at 27-28 & n.3 (collecting cases holding that discrimination on

the basis of gender identity is prohibited by Title IX and Section 1557). Section 1557 forecloses any

argument that gender identity discrimination is permitted in healthcare, and the HHS Guidance

simply affirms that fact.

Texas finally argues in passing that the state's interest in protecting minors "differentiates the healthcare setting from that of employment." Pl.'s Cross-MSJ at 28. But Texas once again fails to develop a substantive argument on this point, declining to explain why any state interest in the "well-being of minors" undermines the legal interpretation set forth in the HHS Guidance. *Id.* (quoting *Reno v. ACLU*, 521 U.S. 844, 869 (1997)). Again, the Guidance makes the fundamental point that federal statutes prohibit doctors from denying medically necessary care to their patients solely on the basis of gender identity. Texas does not explain why such discrimination should be permitted when specifically directed against minors. And it is axiomatic that a state's vague and generalized interest in "regulat[ing] the practice of medicine" cannot overcome federal antidiscrimination law. Pl.'s Cross-MSJ at 28.

At bottom, Texas fails to identify any actual text of the HHS Guidance that is objectionable. Texas's undeveloped arguments against the HHS Guidance accordingly fail, and the Guidance is plainly consistent with law.

## IV.     The Agency Documents are Reasonable

Texas next argues that it is entitled to summary judgment because both documents at issue – the EEOC Document and the HHS Guidance – were the products of arbitrary and capricious decisionmaking in violation of 5 U.S.C. § 706(2). *Id.* at 28-32. However, Texas's arguments fail because both of these documents express reasonable – indeed, correct – explanations of the law.

Under the APA, the arbitrary and capricious standard is "narrow and highly deferential," *Sierra Club v. U.S. Dep't of Interior*, 990 F.3d 909, 913 (5th Cir. 2021) (quoting *Medina Cnty. Env't Action Ass'n v. Surface Transp. Bd.*, 602 F.3d 687, 699 (5th Cir. 2010)), and in applying the standard the court "is not to substitute its judgment for that of the agency," *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

**A. The EEOC Document Was Not the Product of Arbitrary and Capricious Decisionmaking**

Texas first argues that the EEOC Document is arbitrary and capricious because certain authorities cited allegedly interpreted a provision of Title VII that applies exclusively to federal employers. Texas accordingly asserts that the EEOC Document announced "for the first time" the EEOC's view that Title VII barred discrimination by non-federal employers against individuals on the basis of their transgender status. Pl.'s Cross-MSJ at 39. Defendants recognize that this issue was raised before the Court in the briefing on Defendants' motions to dismiss, and this Court held in Texas's favor, Order at 6. However, at that time the Parties had not raised the fact that 42 U.S.C. § 2000e-(k) defines "sex" the same for the federal and private sector provisions of Title VII, as well as the Fifth Circuit precedent in which it has held that its decision in federal sector cases are precedential in private sector cases. *See* Defs.' MSJ at 15-16. Furthermore, as Defendants explain below, the EEOC interpreted Title VII as prohibiting such discrimination by private and state employers long before the issuance of the EEOC Document.

For instance, in 2011 the EEOC filed an *amicus* brief[4] in *Pacheco v. Freedom Buick GMC Truck, Inc.*, No. 7:10-CV-116-RAJ, 2011 WL 5410751 (W.D. Tex. Oct. 17, 2011), a case involving a private employer. The case involved a private employer and the EEOC stated unequivocally in its brief that "[i]t is the position of the EEOC that disparate treatment of an employee because he or she is transgender is discrimination 'because of . . . sex' under Title VII." *Id.* This position was broadly reaffirmed in *Macy v. Department of Justice*, in which the EEOC reiterated its "conclu[sion] that intentional discrimination against a transgender individual because that person is transgender is, by definition, discrimination 'based on . . . sex,' and such discrimination therefore violates Title VII." EEOC Appeal No. 0120120821, 2012 WL 1435995 at *11 (Apr. 20, 2012). Nowhere in *Macy* or

---

[4] Authorization to file an *amicus* brief on behalf of EEOC requires a Commission vote.

elsewhere did the EEOC suggest that its position was limited cases involving federal employers subject to 42 U.S.C. § 2000e-(16)(a).  The EEOC did not limit its position only to the supposedly "stricter standard" that applies to Federal employers, Pl.'s Cross-MSJ at 29 (quoting *Babb v. Wilkie*, 140 S. Ct. 1168, 1173-74 (2020)), because it was defining "sex discrimination," which is the same for both federal and private employees.[5]  The EEOC's position was correctly recognized by a number of federal courts, considering actions against state or private employers, as the agency's general interpretation of Title VII's antidiscrimination provisions.  *See, e.g., Fowlkes v. Ironworkers Loc. 40*, 790 F.3d 378, 386 (2d Cir. 2015) (explaining that in *Macy* the EEOC "altered its position" and "concluded that discrimination against transgender individuals based on their transgender status does constitute sex-based discrimination in violation of Title VII"); *Roberts v. Clark Cnty. Sch. Dist.*, 215 F. Supp. 3d 1001, 1014 (D. Nev. 2016) (similar); *Doe v. Arizona*, No. CV-15-02399-PHX-DGC, 2016 WL 1089743, at *2 (D. Ariz. Mar. 21, 2016) (similar).  Justice Alito's *Bostock* dissent likewise recognized that the EEOC's longstanding position was not limited to the federal employment context, writing that "[t]he EEOC first held that 'discrimination against a transgender individual because that person is transgender' *violates Title VII* in 2012 . . . though it earlier advanced *that position* in an *amicus* brief in Federal District Court in 2011."  140 S. Ct. at 1757 n.7 (Alito, J., dissenting) (citation omitted) (emphasis added).

EEOC's decisions and actions since 2012 are fully consistent with its conclusion that discrimination on the basis of an employee's gender identity violates Title VII, regardless of the employer.  In *Lusardi v. Department of the Army*, for example, the EEOC concluded that Title VII is violated where an employer denies an employee equal access to a restroom corresponding to the employee's gender identity.  EEOC Appeal No. 012013395, 2015 WL 1607756 at *10, 13 (Apr. 1,

---

[5] Texas does not address that the definition of "sex" is identical for both the federal sector and private sector portions of the statute.  42 U.S.C. § 2000e-(k).  *Babb*, which Texas does cite, was concerned with the amount of proof necessary to find a violation, not the definition of sex.  Here, however, the test for determining whether discrimination on the basis of sex has been clearly articulated by the *Bostock* court, and *Babb* has no relevance.

2015). The following year, in 2016, the EEOC published a technical assistance document entitled "Preventing Employment Discrimination Against Lesbian, Gay, Bisexual or Transgender Workers." https://www.eeoc.gov/laws/guidance/preventing-employment-discrimination-against-lesbian-gay-bisexual-or-transgender (last accessed July 27, 2022). In this document, under "Who is Protected," the EEOC noted that Title VII "applies to all *private sector and state/local government employers* with at least 15 employees," and further reiterated the EEOC's position that discrimination on the basis of gender identify violates Title VII. *Id.* (emphasis added). The EEOC could hardly have been clearer that its interpretation of gender identity discrimination under Title VII applied to private and state employers.[6] The EEOC's public position was further recognized by the district court in *Bear Creek Bible Church*, a case involving a private employer, which cited *Lusardi* and the 2016 document as the basis for the EEOC's "requirement" "that employers allow employees into restrooms that correspond to the employees' gender identity[.]" *Bear Creek Bible Church*, 571 F. Supp. 3d at 589.

In short, the EEOC has publicly and consistently found Title VII to bar gender identity discrimination by state and private employers, going back more than 10 years. Thus, the EEOC Document was not the first announcement of the agency's position on this issue, it is merely the most recent.

Texas next argues that the EEOC Decision was arbitrary and capricious because it does not acknowledge that "*Bostock*'s finding of sex discrimination depended on the fact that a biological male

---

[6] The EEOC also brought a number of lawsuits against private sector employers for discrimination during this time period. *See* EEOC, Fact Sheet: Notable EEOC Litigation Regarding Title VII & Discrimination Based on Sexual Orientation and Gender Identity, https://www.eeoc.gov/fact-sheet-notable-eeoc-litigation-regarding-title-vii-discrimination-based-sexual-orientation-and- (last accessed July 27, 2022). While Texas has previously asserted that these consent decrees do not constitute "authoritative decisionmaking," Pl.'s Mem. in Opp'n to Defs.' MTD for Lack of Jurisdiction, at 21, ECF No. 18, this misses the point. The EEOC's decision to bring suit in the first place, as well as the resulting consent decrees, reflects its consistent position that Title VII prohibits discrimination against individuals on the basis of their transgender status by state and private-sector employers.

who identifies as a female is in fact a male." Pl.'s Cross-MSJ at 30. But *Bostock* did no such thing. Tellingly, Texas can cite to no actual language from anywhere in the *Bostock* opinion citing this proposition, because no such language exists. And regardless, Texas fails to demonstrate that *Bostock* is substantively inconsistent with any of the statements in the EEOC Document.

Texas next argues that the EEOC Decision was arbitrary and capricious because prior EEOC decisions could not serve as "authority as to what *Bostock* means or to what Title VII requires of private-sector and State employers[.]" Pl.'s Cross-MSJ at 30. But the purpose of the EEOC Document was not only to explain *Bostock*, but also to explain "*the EEOC's established legal positions on sexual-orientation and gender-identity-related workplace discrimination issues*." Defs.' App'x at App_0001 (emphasis added). Pre-*Bostock* EEOC decisions are plainly relevant to that purpose.

Finally, Texas errs in claiming that some of the cited materials improperly relied on a "sex-stereotyping" theory that *Bostock* allegedly "rejected." Pl.'s Cross-MSJ at 30-31. But as explained above, the *Bostock* opinion itself affirmed that Title VII prohibits gender stereotyping. *See Bostock*, 140 S.Ct. at 1741 (explaining that employers may not "fire[] a woman . . . because she is insufficiently feminine" or "fire[] a man . . . for being insufficiently masculine"); *see also Price Waterhouse v. Hopkins*, 490 U.S. 228, 251 (1989) ("[W]e are beyond the day when an employer could evaluate employees by assuming or insisting that they matched the stereotype associated with their group . . . ."). In sum, Texas's arguments come nowhere near demonstrating that the EEOC Guidance is arbitrary or capricious.

## B. The HHS Guidance Was Not the Product of Arbitrary and Capricious Decisionmaking

Texas also challenges the HHS Guidance as arbitrary and capricious. As explained in previous briefing, however, the HHS Guidance is reasonable with respect to both Section 1557 of the ACA and Section 504 of the Rehabilitation Act. Defs.' MSJ at 28-33. In its cross-motion and response, Texas raises only a single, brief argument as to why the HHS Guidance is arbitrary and capricious,

solely as to Section 504.[7]  Pl.'s Cross-MSJ at 31.  However, the statement in the HHS Guidance that Texas characterizes as arbitrary is a plainly correct statement of law with which Texas itself agrees.

Texas argues that the HHS Guidance is arbitrary and capricious because it states that "[g]ender dysphoria may, *in some cases*, qualify as a disability under [Section 504 of the Rehabilitation Act and Title II of the ADA]."  Defs.' App'x at App_0012 (emphasis added).  The text of the Rehabilitation Act excludes as disabilities only "gender identity disorders not resulting from physical impairments." 42 U.S.C. § 12211(b)(1).  As Defendants previously explained, there is no dispute that the Rehabilitation Act does cover gender dysphoria that results from physical impairments.  Defs.' MSJ at 32-33.  Indeed, Texas admits that its own laws "recognize this exception." Pl.'s Cross-MSJ at 31-32; First Am. Compl. ¶ 54.  Accordingly, the parties agree that the Rehabilitation Act does recognize gender dysphoria as a disability "in some cases," as the HHS Guidance states.  Texas cites nothing in the HHS Guidance that extends beyond Texas's own reading of the Rehabilitation Act, *see* Pl.'s Cross-MSJ at 31-32, and the Court should therefore reject Texas's argument.

### V.  The Agency Documents are Not Substantive Rules

Texas further argues that it is entitled to summary judgment because both agency documents are "substantive" rules that required notice and comment rulemaking.  However, neither of the non-binding interpretive documents challenged by Texas in this action qualifies as a "substantive" rule,[8] and therefore notice and comment rulemaking was not required for either the EEOC Document or the HHS Guidance.

---

[7] Texas has accordingly waived any argument that the HHS Guidance is arbitrary and capricious with respect to Section 1557.

[8]  Texas asserts that Defendants have conceded that the documents at issue are "rules" within the definition of that term in 5 U.S.C. § 551(4).  Pl.'s Cross-MSJ at 32.  Defendants do not concede that these non-binding interpretive documents are "rules," for the reasons spelled out in more detail in Defendants' motions to dismiss, ECF Nos. 12 and 37.  However, even if these documents are "rules," they are at most interpretive rules for which notice and comment rulemaking was not required.

The APA exempts "interpretive rules, general statements of policy, or rules of agency organization, procedure or practice" from notice and comment procedures otherwise required. 5 U.S.C. § 553(b)(A). The distinction between "interpretive" rules and "substantive" or "legislative" rules is that interpretive rules are "issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers," *Shalala v. Guernsey Mem. Hosp.*, 514 U.S. 87, 99 (1995) (citation omitted), while substantive rules have "the force and effect of law," *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2016) (quoting *Chrysler Corp. v. Brown*, 441 U.S. 281, 302-03 (1979)). Under the law of the Fifth Circuit, the primary question in distinguishing between the two is whether the agency action creates a "binding effect on agency discretion or severely restricts it." *Pros. & Patients for Customized Care v. Shalala*, 56 F.3d 592, 595 (5th Cir. 1995). In conducting this analysis, courts give "deference" to the agency's characterization of whether the interpretation is binding. *Id.* at 596. Texas cannot dispute that "[a]s long as the agency remains free to consider the individual facts in the various cases that arise, then the agency action in question has not established a binding norm." *Id.* at 596-97 (quoting *Ryder Truck Lines, Inc. v. United States*, 716 F.2d 1369, 1377 (11th Cir. 1983)). As then-Judge Kavanaugh explained, even when "regulated parties may feel pressure to voluntarily conform their behavior because the writing is on the wall about what will be needed" as a result of an agency action, that is still insufficient to render the action a substantive rule where there has been no "order compelling the regulated entity to do anything." *Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 253 (D.C. Cir. 2014) (quoting *Indep. Equip. Dealers Ass'n v. EPA*, 372 F.3d 420, 428 (D.C. Cir. 2004)).

Texas first argues that this Court has in effect already decided whether the agency documents are substantive or interpretive rules. According to Texas, because this Court decided in its order denying Defendants' motion to dismiss that these documents constituted final agency action, Order at 4-13, the Court also necessarily decided that the documents were substantive, not

interpretive, and therefore notice and comment rulemaking was required. Pl.'s Cross-MSJ at 33. However, though the two tests may "have become blurred," whether an agency action is final or amounts to a legislative rule constitute two distinct inquiries. *Cal. Cmtys. Against Toxics v. EPA*, 934 F.3d 627, 634 (D.C. Cir. 2019), *en banc rehearing denied*, 947 F.3d 822 (D.C. Cir. 2020).

Indeed, treating the two inquires as identical would run directly contrary to how the Supreme Court has addressed these issues. In *Perez v. Mortgage Bankers Ass'n*, for instance, the Court affirmed the principle "that interpretive rules do not have the force and effect of law." 575 U.S. at 103 (citing *Chrysler Corp. v. Brown*, 441 U.S. at 302 n.31). Yet the *Perez* Court noted that regulated entities retain the ability to challenge an interpretive rule under the APA, *id.* at 106. Because only a final agency action is reviewable under the APA, *see* 5 U.S.C. § 704, this necessarily means that agency action may both be "final" and constitute "an interpretive rule." *See also Cal. Cmtys. Against Toxics*, 934 F.3d at 635 ("[T]he finality analysis is distinct from the test for whether an agency action is a legislative rule."). This distinction is not merely academic – to hold otherwise would mean that all interpretive rules would inherently be non-final, and thus *never* be subject to challenge under the APA.

Furthermore, while Texas repeatedly characterizes the EEOC Document as binding, it never explains why that is so. *See* Pl.'s Cross-MSJ at 33. As an initial matter, the EEOC's rulemaking and enforcement powers regarding Title VII are limited – "[i]t may issue only 'procedural regulations' implementing Title VII and may not promulgate substantive rules." *Texas v. EEOC*, 933 F.3d 433, 439 (5th Cir. 2019) (citing *EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 257 (1991)). The EEOC also does not have the authority to bring a civil enforcement proceeding against state employers. *Id.* (citing 42 U.S.C. §§ 2000e-5(f)(1), 2000e-6(a)). Accordingly, it is simply not possible under the law for the EEOC Document to have "the force and effect of law" with regard to Texas.

Nor does the document remove discretion from any agency decisionmakers or bind them to take any specific action or actions. To the contrary, the EEOC Document highlights the agency's

24

discretion to act on the facts of particular cases. The document states that it merely "explains the Supreme Court's decision in *Bostock v. Clayton County* and the EEOC's established legal positions on sexual-orientation and gender-identity-related workplace discrimination issues" and states that its contents "do not have the force and effect of law and are not meant to bind the public in any way." Defs.' App'x at App_0001-App_0002. Nothing in the document binds agency personnel to any particular course of action in any case or type of case such that it has "the force and effect of law." *Perez*, 575 U.S. at 96 (quoting *Chrysler Corp.*, 441 U.S. at 302-03). For example, the EEOC Document specifically provides that deliberate and repeated misuse of pronouns "*could* contribute to an unlawful hostile work environment" "in certain circumstances" "when considered together with all other unwelcome conduct based on the individual's sex." Defs.' App'x at App_0007 (emphasis added). The EEOC Document also notes that the EEOC must consider and apply "on a case-by-case basis any religious defenses to discrimination claims" and that "[o]ther defenses might also be available to employers depending on the facts of a particular case." *Id.* at App_0004. Far from binding the agency to any specific course of action and removing discretion from agency decisionmakers, then, the EEOC Document does exactly the opposite, preserving the agency's ability to determine whether it believes a Title VII violation has occurred on a case-by-case basis. These statements are exactly the sort of "statements as to what the administrative officer thinks the statute or regulation means" that courts have held to be interpretive, not substantive, rules. *Shell Offshore Inc. v. Babbitt*, 238 F.3d 622, 628 (5th Cir. 2001) (quoting *Brown Express, Inc. v. United States*, 607 F.2d 695, 700 (5th Cir. 1979)).

The HHS Guidance similarly lacks language binding the agency or agency personnel to any particular course of action. Like the EEOC Document, the HHS Guidance states explicitly that its contents "do not have the force and effect of law and are not meant to bind the public in any way. This document is intended only to provide clarity to the public regarding existing requirements

under the law or the Departments' policies." Defs.' App'x at App_0013. The HHS Guidance

repeatedly uses the word "may" to describe the factors HHS considers in determining whether

certain conduct could be considered to violate Section 1557 or Section 504 of the Rehabilitation Act.

*See, e.g.*, *id.* at App_0012 ("…that reporting *may* constitute violation of Section 1557 if the doctor or

facility receives federal financial assistance") (emphasis added); *id.* ("Restricting a health care

provider's ability to provide or prescribe such care *may* also violate Section 1557.") (emphasis

added); *id.* ("Restrictions that prevent otherwise qualified individuals from receiving medically

necessary care on the basis of their gender dysphoria, gender dysphoria diagnosis, or perception of

gender dysphoria *may*, therefore, also violate Section 504 and Title II of the ADA.") (emphasis

added). *Accord Brock v. Cathedral Bluffs Shale Oil Co.*, 796 F.2d 533, 538 (D.C. Cir. 1986) (Scalia, J.)

(holding no substantive regulation where "[t]he language of the guidelines is replete with indications

that the Secretary retained his discretion").

    Texas does not appear to argue that the language of the HHS Guidance itself is binding

upon the agency such that it has "the force and effect of law." Pl.'s Cross-MSJ at 1 (citation

omitted). Instead, Texas relies almost entirely upon another document, a press release issued by

HHS Secretary Becerra, as the basis for urging this Court to hold that the HHS Guidance is a

substantive rule. *Id.* at 35 (citing Pl.'s Supp. App'x, ECF 64-1 at Supp. App. 006-007). This Court

previously cited *Professionals & Patients for Customized Care v. Shalala*, 56 F.3d 592, 599 (5th Cir. 1995),

for the proposition that HHS employees would be likely bound by the Secretary's statement. *See*

Order at 12 (quoting the statement that "[w]e would expect agency employees to consider all sources

of pertinent information in performing [their] task[s], whether the information be contained in a

substantive rule, an interpretive rule, or a statement of policy.") (quoting *Customized Care*, 56 F.3d at

599). However, by this statement, the court in *Customized Care* explained that even reliance by

agency employees on a policy document *did not* transform that document into a substantive rule. 56

26

F.3d at 599 (holding that reliance on policy document is "not particularly probative [as to] whether the rule is substantive"). The Fifth Circuit also emphasized that even if "informal communications" would indicate the presence of a substantive rule, such materials "are generally entitled to limited weight" and "are not to be considered out of context or in isolation." *Id.*

Nothing in the Becerra press release transforms the HHS Guidance into a binding directive. The press release announces the release of a number of public guidance documents and "calls on all of HHS to explore all options to protect kids, their parents, caretakers and families." Pl.'s Supp. App'x, ECF 64-1 at Supp. App. 006-007. The release ends by noting that anyone who believes they have been discriminated against can file a Complaint with HHS. *Id.* at Supp. App. 007. Nothing in the press release interferes with agency discretion or binds the agency to any specific course of action with regard to any complaint, including those regarding discrimination in the provision of healthcare. Moreover, the press release must be viewed in the context of the actual agency action at issue. *Customized Care,* 56 F.3d at 599. And in the context of the HHS Guidance that even Texas does not argue is binding, it is clear no legislative rule is present.

Accordingly, because neither the EEOC Document nor the HHS Guidance binds the agency or prevents agency officials from considering "individual facts in the various cases that arise," "the agency action in question has not established a binding norm," *id.* at 596-97, and thus neither of the documents challenged by Texas is a substantive rule that would have required notice and comment rulemaking under the APA.

## VI.    Texas's Remaining APA Claims Against EEOC Fail

Texas next asserts that the EEOC was required to formally vote to approve the EEOC Document and only make it available to those who paid for it through the agency's revolving fund. These arguments are also meritless.

Texas misreads the governing statute in arguing that a formal vote is required. Specifically, Texas points to 42 U.S.C. §§ 2000e-4(a), (c), for the proposition that any exercise of the "powers of the Commission" requires a vote of a "quorum" of the Commission. In fact, the cited subsections do not spell out *any* requirements as to what actions of the EEOC require a vote. Subsection (a) establishes, among other things, the position of the EEOC Chair and authorizes her to conduct administrative operations and appoint the numerous personnel who assist the EEOC "in the performance of its functions." Subsection (c) states that "[a] vacancy in the Commission shall not impair the right of the remaining members to exercise all the powers of the Commission and three members thereof shall constitute a quorum." This subsection does not require a formal vote for the exercise of any powers of the EEOC; it merely establishes the process when there are vacancies and specifies that a quorum exists when three members of the Commission are present.

Texas misreads this narrow statement to require a formal vote for any exercise of Commission power, such as the "Powers of [the] Commission" listed in subsection (g), including the "furnish[ing] . . . technical assistance" to persons who "request" such assistance to "further their compliance." 42 U.S.C. § 2000e-4(g)(3). In addition to lacking any textual basis, Texas's reading would produce absurd results. For example, the EEOC powers listed in § 2000e-4(g) include "pay[ing] to witnesses whose depositions are taken or who are summoned before the Commission . . . and mileage fees as are paid to witnesses in the courts of the United States," and "mak[ing] such technical studies as are appropriate . . . and mak[ing] the results of such studies available to the public." 42 U.S.C. §§ 2000e-4(g)(2), (g)(5). Under Texas's reading, because these authorities are defined in the statute as "powers of the commission," any payment of mileage fees to witnesses and decisions to publish technical studies require a formal vote of EEOC Commissioners. The statute does not impose such absurd requirements on the EEOC.

28

Similarly, as previously noted, nothing in 42 U.S.C. §§ 2000e-4(j)-(k) "limits the EEOC to only conducting technical assistance through the Revolving Fund, or to requiring 'fees' as a prerequisite to issuing technical assistance documents such as the EEOC Document." Defs.' MSJ at 18. In response, Texas does not assert that EEOC is incorrectly reading its own statute. Rather, Texas contends that the EEOC Document was characterized as "technical assistance" and asserts that, because "outreach, education, and technical assistance are three different things," EEOC cannot describe the EEOC Document as part of its "educational and outreach activities." Pl.'s Cross-MSJ at 37-38; *see* 42 U.S.C. § 2000e-4(h)(2) (directing the Commission to "carry out educational and outreach activities"). But Texas provides no support for its assertion[9] that the mere description of a document as technical assistance means that it cannot be part and parcel of the EEOC's education and outreach efforts. Nothing in Title VII provides such a limitation. To the contrary, EEOC frequently uses documents described as technical assistance as part of its outreach and educational efforts. *See, e.g.*, EEOC Resource Documents, https://www.eeoc.gov/resource-document/eeoc-resource-documents (last accessed July 27, 2022) (describing EEOC resource documents as those which "assist the public in understanding existing EEOC positions" including "Technical Assistance" documents). Indeed, the EEOC Document itself states that it is "intended only to provide clarity to the public regarding existing requirements under the law or agency policies." Defs.' App'x at App_0002-App_0003.

Texas also misreads the statute in a one-sentence argument that any "educational or promotional activities" may only be undertaken "after EEOC has properly issued technical assistance that someone has requested and paid for." Pl.'s Cross-MSJ at 38. Yet again, Texas fails to provide any substantive argument, declining to explain exactly why EEOC's education and outreach

---

[9] Texas appears to cite to the EEOC Document itself for this proposition, but nothing in that document differentiates among education, outreach, and technical assistance documents.

mission is contingent on someone first requesting, or being charged for, separate technical assistance.[10]  Because the EEOC engaged in education and outreach as authorized by its enabling statute, and because Texas makes no cogent argument of procedural error, Texas's claim fails. Indeed, taken to its logical conclusion, Texas is arguing that the EEOC should only provide information to the public about its established legal positions when asked or when the public pays for it.  Neither of these claims are supported by the statute, and both would be harmful to employers and workers who are trying to understand the EEOC's established positions.

The same is true for Texas's argument that the EEOC was required to vote on the EEOC Document because it constituted a new legal position.  *Id.* at 38-40 (citing 29 C.F.R. § 1695.2(d)).  As set forth above, the EEOC Document reflects longstanding agency positions, applicable to private, state, and federal employers, going back more than a decade.  *See supra* at 19-21.  Texas's argument accordingly boils down to a claim that simply by explaining *Bostock* the EEOC Document was transformed into a new legal position.  Pl.'s Cross-MSJ at 40.  Neither the APA nor common sense supports a contention that the Commission must vote before notifying the public that a recent Supreme Court decision is consistent with the EEOC's longstanding interpretation of the law.

## VII.    The EEOC Document Does Not Violate the First Amendment

Summary judgment is also appropriate on Texas's First Amendment claim.  As a threshold matter, Texas does not state a cognizable theory of relief, as no speech is at issue.  To mount a First Amendment challenge to governmental action, Texas must demonstrate "a claim of *specific* present objective harm or a threat of *specific* future harm."  *Meese v. Keene*, 481 U.S. 465, 472 (1987) (emphasis

---

[10] To the extent Texas contends that all of the EEOC's powers are exclusively listed in 42 U.S.C. § 2000e-4(g), that is incorrect.  Subsection (h) authorizes "educational [and] promotional activities," for example, which are not listed in subsection (g).  *See also* 42 U.S.C. § 2000e-4(j) (providing authority to establish a Technical Assistance Training institute); § 2000e-4(k) (providing authority to establish the Revolving Fund).

added).  A conclusory allegation of possible future First Amendment harm cannot substitute for the

concrete factual context needed to invoke jurisdiction.  *See Meese*, 481 U.S. at 473.

Even if it could identify a concrete risk of an imminent First Amendment violation sufficient

for this Court to exercise its jurisdiction, Texas still could not state a First Amendment claim, as

Texas lacks constitutional speech rights of its own, *see CBS, Inc. v. Democratic Nat'l Comm.*, 412 U.S.

94, 139 n.7 (1973), and may not assert those of its citizens or employees, *see Alfred L. Snapp & Son,

Inc. v. P.R. ex rel. Barez*, 458 U.S. 592, 610 n.16 (1982).  Accordingly, rather than seeking to vindicate

anyone's First Amendment rights, *see* Pl.'s Cross-MSJ at 36 ("Texas is not asserting its right to

speak[.]"), Texas seeks a declaratory judgment to avoid "expos[ing] itself to liability" from theoretical

First Amendment lawsuits by unknown state employees whom Texas might someday discipline

voluntarily.  *See id.*  Texas fails to state a claim under this theory as well.  Even putting aside the lack

of any allegation that Texas will imminently discipline any of its employees such that it would have

standing to bring this claim—or that those employees will sue Texas for any reason, let alone on a

First Amendment theory—this theory would not support a declaratory judgment against the Federal

Government.  Declaratory judgment is available only for present controversies "between parties

having adverse legal interests."  *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007) (citation

omitted).  To obtain a declaration of Texas's legal rights as against its employees, Texas would be

required to seek a declaratory judgment against its employees, not the United States.  *See Md. Cas. Co.

v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941) ("[I]n the declaratory judgment suit, the positions of

the parties in the conventional suit are reversed . . . .").  Texas supplies no authority for its

extraordinary counter-position: that a State employer can sue the Federal Government in

anticipation of future First Amendment claims—or any claims—by its employees.  *Cf. City of Alpine

v. Abbot*, 730 F. Supp. 2d 630, 634 (W.D. Tex. 2010) ("[T]he freedom of speech is an individual right

rather than a structural right defining the relative powers of the states and the federal government." (citation omitted)).

Moreover, all of Texas's cited cases involve lawsuits by parties actually injured, or under threat of injury, by the laws or acts at issue; they do not involve prospective lawsuits by employers who caused, or would cause, those injuries. *See* Pl.'s Cross-MSJ at 36-37. So, although the Federal Government may not coerce employers to take unconstitutional action, *id.* at 36, Texas fails to demonstrate how it, as the allegedly *injuring* party—and a hypothetical one at that—has standing to sue the United States for declaratory relief against Texas state employees. *See MedImmune*, 549 U.S. at 127; *see also Massachusetts v. Mellon*, 262 U.S. 447, 485–86 (1923) (holding no power for States to enforce their citizens' rights against the Federal Government).

In addition to these jurisdictional defects, Texas's constitutional challenge to the EEOC Document is meritless. Texas relies on *Meriwether v. Hartop*, 992 F.3d 492 (6th Cir. 2021), for the proposition that employees cannot be "requir[ed]" to "use pronouns that validate the concept of gender identity." Pl.'s Cross-MSJ at 36. But the EEOC Document does not impose such a requirement; it simply states that, "in certain circumstances," considered with all other evidence, the misuse of pronouns or names "*could* be considered harassment"—for instance, when it involves "intentionally and repeatedly using the wrong name and pronouns to refer to a transgender employee[.]" *See* Defs.' App'x at App_0007 (emphasis added). Accordingly, the EEOC Document can hardly be understood to "[r]equir[e]" or "compel[]" anyone to express *anything*, let alone "an ideological position they do not hold."[11] *See* Pl.'s Cross-MSJ at 36.

---

[11] The *Meriwether* case is distinguishable in other ways, too. Unlike Texas, the *Meriwether* plaintiff sued to vindicate his own religious freedom—and did so in response to actual, specific effects on his own expression. *See* 992 F.3d at 500.

For the foregoing reasons, the Court should grant summary judgment for Defendants on Texas' First Amendment claim.[12]

## VIII.   Defendants Did Not Violate FOIA

Texas finally contends that Defendants violated the Freedom of Information Act (FOIA) because that law requires publication in the Federal Register for all "substantive rules of general applicability" and "statements of general policy or interpretations of general applicability." *Id.* at 40 (quoting 5 U.S.C. § 552(a)(1)(D)).  Publication was not required here because the EEOC and HHS Guidance documents are not substantive rules, as explained above. *See supra* at 22-27.

Texas cannot now claim that publication was required for the separate reason that the Guidance documents are "statements of general policy or interpretations of general applicability," 5 U.S.C. § 552(a)(1)(D), as the First Amended Complaint includes no such claim.  In alleging that publication was required under the FOIA, the First Amended Complaint avers only that "[t]he June 15 Guidance and March 2 Guidance are *substantive rules* of general applicability."  First. Am. Compl. ¶ 104 (emphasis added).  The First Amended Complaint thus raises no claim that the documents should have been published as "statements of general policy or interpretations of general applicability," Pl.'s Cross-MSJ at 40 (quoting 5 U.S.C. § 552(a)(1)(D)), and "[a] party may not amend [its] complaint by raising new arguments in [its] brief in opposition to a motion for summary judgment." *Fields v. Dep't of Pub. Safety*, No. 11-101, 2014 WL 5801460, at *5 n. 2 (M.D. La. Nov. 7, 2014) (citation omitted).

---

[12] Texas does not mention its other constitutional claim, under the Eleventh Amendment (Count VII), or rebut Defendants' argument as to this claim. *See* Defs.' MSJ at 23-24.  Accordingly, Texas has abandoned its Eleventh Amendment claim and judgment should be granted to Defendants on this ground. *See Arias v. Wells Fargo Bank, N.A.*, No. 3:18-CV-00418-L, 2019 WL 2770160, at *2 (N.D. Tex. July 2, 2019) ("When a plaintiff fails to defend a claim in response to a motion to dismiss or summary judgment motion, the claim is deemed abandoned.").

In addition, even if this claim had been properly raised, the result would be the same. 5 U.S.C. § 552(a) states that a person may not . . . be adversely affected by[] a matter required to be published in the Federal Register and not so published," "*[e]xcept to the extent that [the] person has actual and timely notice of the terms thereof.*" (emphasis added). Put another way, under the FOIA if a person has notice of an agency action they cannot complain of the agency's failure to publish in the Federal Register.[13]  *See, e.g., Tearney v. Nat'l Transp. Safety Bd.*, 868 F.2d 1451, 1454 (5th Cir. 1989) ("Under this section, persons with actual notice of a rule, even though unpublished, are held accountable."); *Mass. Mfg. Extension P'ship v. Locke*, 723 F. Supp. 2d 27, 41 (D.D.C. 2010) ("[A] a litigant must demonstrate that it has been 'adversely affected' by an unpublished policy that should have been published, and that the litigant did not have actual notice of the content of that policy.").  Here, to the extent Texas contends that it has been adversely affected by the EEOC Document and HHS Guidance, Texas does not claim it lacked timely notice of these statements.  To the contrary, Texas filed suit over the EEOC Document just three months after it was published on the EEOC website, and Texas filed the Amended Complaint less than two weeks after the HHS Guidance was published.  Thus, because Texas has not made and could not make any argument as to lack of notice, its claim under FOIA necessarily fails.

## IX.    Texas's Requested Relief is Improper

Not only are Texas's legal claims meritless, the relief requested is inappropriate as well. Texas requests not only vacatur of the EEOC Document and HHS Guidance, but also an injunction barring the agencies from implementing the "statutory interpretation" contained in those documents.  *See* Pl.'s Proposed Order at 1, ECF No. 61-1.  However, Texas makes no argument as

---

[13] Nor does a failure to publish support an injunction of agency action.  Courts are instead limited to requiring publication of the records at issue.  *See* 5 U.S.C. § 552(a)(4)(B) (stating that courts have "jurisdiction to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant").

to why the Court can and should enjoin federal agencies from adopting a particular view of the law, separate and apart from the challenged agency documents. This is particularly true here, where the injunction requested would essentially stop the federal civil rights agency charged with enforcing Title VII from enforcing a Supreme Court case interpreting Title VII. Indeed, as Defendants previously explained, Texas may not properly seek to "enjoin the [d]efendants from maintaining what amounts to a legal position. . . which may or may not be implicated in the future." *See Adams Cnty. Water Ass'n v. City of Natchez*, No. 5:10CV199-DCB-RHW, 2013 WL 3762658 at *2 n.3 (S.D. Miss. July 16, 2013); *see also* Defs.' MTD First Am. Compl. at 7-10. The cases Texas has previously cited, which merely enjoined agencies from taking some specific action, are in accord. *See* Defs.' Reply at 2. The relief Texas seeks here, in contrast, is plainly improper, in that it identifies no specific action to enjoin, but rather seeks to prevent agencies from either adopting a legal interpretation or applying that interpretation to any future action.

Further, any injunction in this matter should be limited to the parties before the Court. "The Court's constitutionally prescribed role is to vindicate the individual rights of the people appearing before it." *Gill v. Whitford*, 138 S. Ct. 1916, 1933 (2018). Thus, the "plaintiff's remedy must be tailored to redress the plaintiff's particular injury." *Id.* at 1934; *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 162-64 (2010); *Printz v. United States*, 521 U.S. 898, 935 (1997). Injunctions must be no broader than "necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (citation omitted); *accord Arizona v. Biden*, --- F.4th ----, 2022 WL 2437870, at *16 (6th Cir. July 5, 2022) (Sutton, J., concurring) ("[N]ationwide injunctions have not been good for the rule of law."); *cf. Dep't of Homeland Security v. New York*, 140 S. Ct. 599, 600 (2020) (Gorsuch and Thomas, JJ., concurring) ("[W]hen a court . . . order[s] the government to take (or not take) some action with respect to those who are strangers to the suit, it is hard to see how the court could still be acting in the judicial role of resolving cases and controversies."). For these reasons,

35

any relief provided in this matter should be restricted to the parties and at most mirror the relief that Texas obtained in *Texas v. EEOC*, 933 F.3d 433 (5th Cir. 2019) – namely, an injunction that Defendants may not treat the challenged documents as binding, and not relieving Texas from complying with its legal obligations under federal statutes and Supreme Court precedent.

## CONCLUSION

For the foregoing reasons, this Court should grant Defendants' Motion for Summary Judgment, deny Texas's Cross-Motion, and enter judgment for Defendants.

DATED: July 29, 2022

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

JENNIFER D. RICKETTS
Director, Federal Programs Branch

CARLOTTA WELLS
Assistant Director, Federal Programs Branch

/s/ *Martin M. Tomlinson*
MARTIN M. TOMLINSON
MICHAEL DREZNER
CHRISTOPHER R. HEALY
Trial Attorneys
Civil Division, Federal Programs Branch
U.S. Department of Justice
1100 L Street, NW
Washington, DC 20005
Phone:    (202) 353-4556
Email:    martin.m.tomlinson@usdoj.gov

*Counsel for Defendants*